Oren B. Haker, OSB No. 130162
Kristin E. Russell, OSB No. 200074
Daniel R. Kubitz, OSB No. 181381
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone: 503.224.3380
Facsimile: 503.220.2480

*Attorneys for the Debtor and Debtor-in-Possession*

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>BLUE STAR DOUGHNUTS LLC,<br>DBA BLUE STAR DONUTS,<br><br>          Debtor. | Case No. 20-32485-pcm11<br><br>Chapter 11<br><br>DECLARATION OF KATHERINE J. HOUSE IN SUPPORT OF FIRST DAY PAPERS |

I, Katherine J. House, aka Katherine J. Poppe, hereby declares under penalty of perjury:

1.    I formed Blue Star Doughnuts LLC ("**Company**") in 2012 with Micah L. Camden and two local restaurant investors, all of whom have remained members of the Company through the chapter 11 filing date ("**Petition Date**").

2.    Since the Company's inception, I have served as the chief executive officer of the Company, and am generally familiar with the Company's day-to-day operations, its business and financial affairs, and its books and records. I have personal knowledge of the facts stated in this Declaration. I am authorized to submit this Declaration on behalf of the Company, and if called upon to testify, I could and would testify competently to the facts set forth herein.

Page 1  -  DECLARATION OF KATHERINE J. HOUSE IN SUPPORT OF FIRST DAY PAPERS

3. Prior to March 17, 2020, on which date Governor Brown's Executive Order 20-07 ("**EO-07**")—which prohibited, among other things, all restaurants and cafes in Oregon from offering in premises consumption of food and beverages—became effective ("**Covid-19 Shutdown**"), the Company operated eight retail locations in the Portland metropolitan area and employed nearly 100 employees for whom the Company offered quality health care benefits and a 401(k) plan pursuant to which the Company matched employee contributions. EO-07 forced the Company to cease all operations at all its eight retail locations. The effect of the Covid-19 Shutdown was immediate and devastating to the Company's financial condition.

### The Company's Business Model Prior to the Covid-19 Shutdown

4. From the Company's inception in 2012, the Company's mission has been to produce gourmet made-from-scratch doughnuts, using quality ingredients sourced from local farms and producers. Because our doughnuts are prepared with intricate recipes that, by definition, are difficult to reproduce, and required the Company to invest significantly in certain kitchen equipment, I decided that the Company had to adopt a "hub-and-spoke" operating model – pursuant to which all of our doughnuts were prepared in one central production kitchen – in order to deliver the freshest doughnuts to our customers on a daily basis through our retail locations across the Portland metropolitan area.

5. Over the years, the Company had opportunities to expand beyond Oregon and beyond the United States. To test our brand in markets outside of the Portland metropolitan area, the Company entered into two licensing agreements, which enabled the Company to approach expansion in such a way as to avoid leveraging our thriving local business in the Portland metropolitan area. Specifically, the Company entered into a license agreement with an independent operator in Japan on December 28, 2014, which did not survive due to the licensee's

insolvency and was terminated on or around December 4, 2017. The Company also entered into a license agreement with an independent operator in Los Angeles in 2015, Dermer Holdings, LLC ("**Dermer Holdings**"), which licensing relationship remains in effect as of the Petition Date. Dermer Holdings runs three "Blue Star Donut" locations in Los Angeles County, California ("**Blue Star Los Angeles**"). None of the members of the Company have any ownership interest in, nor derive any direct economic benefit from, Blue Star Los Angeles or Dermer Holdings. Blue Star Los Angeles is under separate control and operation by Dermer Holdings, though the Company has provided, and continues to provide, marketing support to Blue Star Los Angeles through its website and other social media platforms.

6. From 2012 through March 17, 2020, our business model provided the Company with a stable and efficient platform to operate multiple retail units, and 100% of the Company's revenues during this period were driven from in-store, in-person, retail sales.

### The Company's Response to the Covid-19 Shutdown

7. The effect of the Covid-19 Shutdown was immediate and catastrophic: all eight retail locations were closed, production was completely halted because we had no outlets to sell our doughnuts, and because the Company's inventory was exhausted on a daily basis, the Company's revenues completely disappeared overnight. Along with other local businesses, the Company faced an entirely uncertain future. Over the next few weeks, I met with my management team to strategize the Company's options. Ultimately, I determined that the Company had a stark choice: either make a sharp pivot of its business model from exclusively retail-driven sales to incorporate wholesale and e-commerce delivery or face a paralyzing future. Paralysis was not a viable option for the Company. And closure would have been catastrophic

not only for the Company's employees and members, but also for the Company's financial and trade creditors.

8. Since the Covid-19 Shutdown, I have focused my efforts on developing a new business model ("**Blue Star 2.0**") that will ensure not only the Company's survival, but also position the Company to thrive in the new reality that many businesses – that rely almost exclusively on in-person, in-store retail sales for revenues – will face going forward. Blue Star 2.0 is a plan that diversifies the Company's revenues by building out a wholesale and e-commerce delivery operation, while at the same time continuing to deliver fresh doughnuts on a daily basis through a potentially scaled-down retail footprint that will depend in part on the pandemic's trajectory over the second half of 2020 and perhaps even into 2021. By diversifying into wholesale and e-commerce, we will be able to protect the Company from the ebbs-and-flows of the Covid-19 pandemic, and well as any future public health crises that force the Company to shut-down its in-store, retail locations.

9. Building out a wholesale and e-commerce delivery operation required – first and foremost – creating a product with a longer shelf-life from time of production to consumption, as well as a product that could be frozen to extend its shelf-life. Already, the Company has made significant progress. In fact, in early April, 2020, within weeks of the Covid-19 Shutdown, the Company beta-launched brand-new wholesale products – doughnut holes and mini vegan cake doughnuts – in select local grocery stores. Customer response to this new product has been very encouraging.

10. However, Will Price, the Company's chief financial officer, and I quickly determined that the Company needed additional equipment and production space for inventory storage and packaging in order to effectively launch the wholesale and e-commerce production

line, which not only required additional capital for inventory storage and packaging, but also demanded increased production capacity due to expected lower earnings per unit on the wholesale line.  I believed that once we successfully launched our wholesale production line to local grocers, we could then further increase production to sell directly to a broader customer base through e-commerce delivery channels, further diversifying the Company's sources of revenue without having to invest significant capital in a "bricks-and-mortar" retail footprint.

11. While my primary focus since March 17th has been to develop Blue Star 2.0, I have invested a significant amount of my time coordinating—almost on a daily basis—with William Price on the Company's precarious financial condition, because without cash flow, my vision for Blue Star 2.0 will remain just that: a vision, and nothing more.

12. What immediately became clear to us was that the Company needed to instantly pivot to selling its new wholesale product line to local grocers in order to generate new revenue as quickly as possible, given we had no idea how long our retail establishments – the only source of revenue to date – would remain closed.  And, in order to generate revenues from our new wholesale products, it was imperative that the Company continued to operate its production kitchen, which was located in leased space on the corner of SW 12th Street and Morrison Street in downtown Portland ("**SW 12th/Morrison Location**").  The SW 12th/Morrison Location was owned by Morrison Development, LLC ("**SW 12th/Morrison Landlord**"), which leased the space to the Company pursuant to a ten-year lease whose term commenced on July 15, 2018 ("**SW 12th/Morrison Lease**").  On behalf of the Company, I had personally negotiated the SW 12th/Morrison Lease with Jordan Menashe, who was the authorized representative of the SW 12th/Morrison Landlord.

13. Prior to the Covid-19 Shutdown, the Company was current on all its lease payments to all of its landlords, including the SW 12th/Morrison Landlord.

14. In late March, 2020, the Company gave all of its landlords notice that it was going to be unable to tender upcoming April 2020 rental payments and seeking accommodations regarding the Company's lease obligations due to the Covid-19 Shutdown.

15. In response to the Company's notice that it could not make April rent payments, seven of the Company's landlords were accommodating. The eighth landlord was SW 12th/Morrison Landlord, who sent the Company an email on March 16, 2020 stating that "April rent will still be due as required by the lease, but no late fees will be assessed."

16. On April 1, 2020, Governor Brown issued Executive Order 20-13 ("**EO-13**"), which prohibited commercial landlords from terminating a lease due to non-payment of rent as a result of the pandemic.

17. Having not materially changed its position regarding accommodations, on April 16, 2020 the SW 12th/Morrison Landlord sent an email and notice of non-payment in which the SW 12th/Morrison Landlord stated that it would "consider amending [the Lease Agreement] to provide some temporary relief to help [the Company] weather the storm." When we tried to discuss the Company's financial condition with the SW 12th/Morrison Landlord and disclosed that in the four weeks since EO-07 was issued, the Company had $0.00 in revenues, we were told that no discussions were possible until the Company provided extensive financial records, including whether the Company had applied for funds through the federal CARES Act Paycheck Protection Program.

18. On May 5, 2020, the SW 12th/Morrison Landlord sent the Company an email asking when it could "expect a good faith payment from [the Company], and then another email

Page 6   -   DECLARATION OF KATHERINE J. HOUSE IN SUPPORT OF FIRST DAY PAPERS

107716290.9 0056668-00010

Case 20-32485-pcm11    Doc 8    Filed 08/26/20

in which the SW 12th/Morrison Landlord stated: "What goes around comes around in life as you know."

19. The Company's deteriorating relationship with the SW 12th/Morrison Landlord exacerbated the existential issues that I was facing in April and May 2020, on behalf of the Company: whether the Company would have sufficient cash reserves to bridge the Company through the Covid-19 Shutdown with a skeletal staff, given the length of the Covid-19 Shutdown was unknowable during that period; whether the Company would have to redesign its retail establishments in response to future public health restrictions imposed on businesses once they were allowed to reopen; how to reconfigure the SW 12th/Morrison Location to enable the Company to install additional equipment necessary for implementing Blue Star 2.0, which was critical for the Company to generate new revenue during the Covid-19 Shutdown to stretch out its liquidity runway, but which required the Company not only to produce a new wholesale product, but also to store it and package it for delivery to select local grocers; and whether the configuration of the production kitchen space at the SW 12th/Morrison Location would enable the Company to execute on real-time guidelines that leading health officials around the United States were relaying to state and local governments relating to employee and workplace safety in response to the Covid-19 pandemic.

20. As the Covid-19 Shutdown continued into May, 2020, I became increasingly alarmed that Company and the SW 12th/Morrison Landlord would not be able to reach an agreement on restructuring the terms of SW 12th/Morrison Lease, nor on any form of interim rent relief for the Company. In fact, on May 6, 2020, I received an email from Jordan Menashe informing that the SW 12th/Morrison Landlord intended to set off the Company's security deposit against unpaid rent and exercise all its remedies under the SW 12th/Morrison Lease,

Page 7 - DECLARATION OF KATHERINE J. HOUSE IN SUPPORT OF FIRST DAY PAPERS

107716290.9 0056668-00010

Case 20-32485-pcm11    Doc 8    Filed 08/26/20

followed by a letter from his outside counsel, Stolle Berne, informing me that the SW 12th/Morrison Landlord had applied our security deposit of $18,056.00 ("**SW 12th/Morrison Security Deposit**") to unpaid rent.

21. During this time period, the Company and the SW 12th/Morrison Landlord were also communicating in connection with 2018 and 2019 reconciliations, and it came to my attention that the Company had been overcharged by the SW 12th/Morrison Landlord for common area maintenance charges in an amount the Company estimates, based on the incomplete information provided by the SW 12th/Morrison Landlord, to be $26,089.47 ("**SW 12th/Morrison CAM Overcharges**"). Considering the SW 12th/Morrison Landlord had already applied the SW 12th/Morrison Security Deposit, and factoring in the SW 12th/Morrison CAM Overcharges, I did not believe the Company owed the SW 12th/Morrison Landlord any payments for rent for the months of April and May, 2020 because the sum of the SW 12th/Morrison CAM Overcharges and the SW 12th/Morrison Security Deposit exceeded the total amount of rent due for April and May, 2020.

22. On or about May 12, 2020, the Company received an email from the SW 12th/Morrison Landlord's controller agreeing to the amount of the SW 12th/Morrison CAM Overcharges and provided the Company with documentation that set forth the overcharges by the SW 12th/Morrison Landlord. However, later that day, the controller retracted her prior statement.

23. Also during the first week of May, 2020, the SW 12th/Morrison Landlord requested that the Company execute an estoppel certificate that required me to certify, on behalf of the Company, that the SW 12th/Morrison Location was open for business (when in fact it wasn't due to EO-07) and that the Company was owed no claim of offset (when in fact it was owed $26,089.07 for common area maintenance overcharges).

Page 8    -   DECLARATION OF KATHERINE J. HOUSE IN SUPPORT OF FIRST DAY
                     PAPERS

107716290.9 0056668-00010

Case 20-32485-pcm11    Doc 8    Filed 08/26/20

24. Throughout the months of April and May, 2020, during the Covid-19 Shutdown, the Company continued to work out of the SW 12th/Morrison Location on a skeletal staff to launch our new wholesale products. Even though we secured three grocer locations for our new products, the wholesale production line was still in beta-stage and was not generating significant revenues. During this period, I became increasingly concerned that Jordan Menashe would indeed follow through on his threat to exercise all remedies under the SW 12th/Morrison Lease, including restricting the Company's access to the SW 12th/Morrison Location, which in turn would force the Company to shut down and prevent the Company from generating new revenue from its beta-stage wholesale production line.

25. By mid-May, I decided that the uncertainty caused by the break-down of the relationship with the SW 12th/Morrison Landlord on the Company's future required decisive action, and I made the business decision to move our production kitchen from the SW 12th/Morrison Location to a temporary location located at 1640 SE 3rd Ave. in Portland ("**Temporary Kitchen Location**") in order to ensure that the dispute with the SW 12th/SW Morrison Landlord did not jeopardize the beta-rollout of our new wholesale product to local grocers or the Company's retail production operation when retail stores were ultimately allowed to reopen. The Temporary Kitchen Location was up and running on or about May 23, 2020.

26. On or about May 26, 2020 and before the Company could move all of its kitchen equipment from the SW 12th/Morrison Location to the Temporary Kitchen Location, the SW 12th/Morrison Landlord changed the locks at the SW 12th/Morrison Location and refused to turn over a kitchen fryer to Company employees that the Company continues to need for its ongoing operations and cannot currently afford to replace. Also, on May 26, 2020, the Company received
Page 9 - DECLARATION OF KATHERINE J. HOUSE IN SUPPORT OF FIRST DAY PAPERS
107716290.9 0056668-00010
Case 20-32485-pcm11    Doc 8    Filed 08/26/20

a written notice of termination letter from the SW 12th/Morrison Landlord that immediately terminated the SW 12th/Morrison Lease.

**Litigation with SW 12th/Morrison Landlord; Other Real Property Leases**

27. On June 5, 2020, the SW 12th/Morrison landlord filed a complaint in in the Multnomah County Circuit Court against the Company, styled *Morrison Development, LLC v. Blue Star Doughnuts, LLC,* case no. 20CV19836, seeking damages no less than $45,814.88 plus the rent and other costs for the balance of the lease term less net proceeds of reletting the premises. ("**Menashe Action**"). There are approximately eight years remaining on the term of the SW 12th/Morrison Lease.

28. On July 14, 2020, the SW 12th/Morrison Landlord filed a Notice of Intent to Apply for Order of Default pursuant to ORCP 69 B(2), and then prematurely filed a Motion for an Order of Default on the grounds that the Company failed to appear by filing a motion or answer and that the time for doing so has expired – even though the time for the Company to respond to the complaint had not yet in fact expired. ORCP 69 B(2) (requiring party who has provided written notice of intent to file appearance to wait minimum of ten days after notice of intent to apply for default is filed).

29. On July 24, 2020, the Company filed its Answer, Affirmative Defenses and Counterclaims ("**Answer**"). Among other things, the Company's Answer cited Oregon Laws 2020, chapter __, section 5 (Special Session) ("HB 4213"), which prohibits a commercial landlord from delivering a notice terminating a rental agreement and from taking any action that would interfere with a tenant's possession based on a tenant's nonpayment during the "emergency period" (i.e., from April 1, 2020 through September 30, 2020). Answer ¶ 3.

30. On July 29, 2020, the Company filed its Opposition to the Motion for Order of Default. Company's Opposition to Motion for Order of Default.

31. On July 29, 2020, the SW 12th/Morrison Landlord served its first request for production of documents on the Company.

32. On July 30, 2020, the SW 12th/Morrison Landlord withdrew its Motion for Default.

33. Notwithstanding the SW 12th/Morrison Landlord's decision to sue the Company on June 5, 2020, the Company continued to seek a consensual resolution to the disputes with the SW 12th/Morrison Landlord from June 5, 2020 through August 26, 2020. Unfortunately, the Company and the SW 12th/Morrison Landlord were unable to resolve the disputes, and the Company now is facing protracted litigation with SW 12th/Morrison Landlord.

34. As chief executive officer of the Company, I have determined that the Company cannot afford protracted litigation with the SW 12th/Morrison Landlord, and further that the Company's ability to implement Blue Star 2.0 will be jeopardized by the Menashe Action.

## The Decision to Seek Chapter 11 Protection

35. Prior to March 17, 2020, I never imagined having to appear in a Bankruptcy Court on behalf of the Company. And yet, as the economic effects of the public health crisis continue to reverberate throughout our economy with no end in sight, and as the Company has been unable to consensually resolve its disputes with the SW 12th/Morrison Landlord, it has become clear to me that the only way the Company can survive and possibly thrive in the post-Covid-19 world is by seeking chapter 11 protection to reorganize its business operations and restructure its existing liabilities.

36. Accordingly, in my capacity as chief executive officer of the Company, I have determined that filing the Company for chapter 11 protection is in the best interests of the Company and its stakeholders, including its employees and its financial and trade creditors. In accordance with the Company's operating agreement, I have been duly authorized to file the Company's petition for chapter 11 protection and to manage the Company's operations as a debtor and debtor-in-possession during its chapter 11 case.

37. To the best of my understanding, the Company, as a debtor and debtor-in-possession, is a "small business debtor" as that term is defined in section 101(51D) of title 11 of the United States Code ("**Bankruptcy Code**"). In connection with filing the voluntary petition, the Company has elected "subchapter V" treatment, and I intend to exercise my authority as chief executive officer of the Company, as a debtor and debtor-in-possession, in accordance with and pursuant to sections 1181 through 1195 of the Bankruptcy Code.

38. I have reviewed each of the motions filed concurrently with the voluntary petition, this declaration, Will Price's declaration and all the related papers ("**First Day Papers**") and the facts set forth in the First Day Papers are true and correct to the best of my knowledge and belief. The relief requested in the First Day Papers is necessary to allow the Company to continue operating as a debtor-in-possession with minimal disruption during the pendency of this Bankruptcy Case and constitutes a critical element in the Company's ability to propose and confirm a chapter 11 plan, and to emerge from chapter 11 protection as a reorganized business.

### The Company's Operations as of the Petition Date

39. As of the Petition Date, the Company has three retail locations that have reopened, and sales have resumed at these locations subject to certain public safety guidelines that we have deployed in order to protect our employees and customers from the pandemic.

40. While the Company continues to produce doughnuts from its Temporary Production Kitchen, upon consulting with my senior management team, I determined that the Company's survival depends on locating and building out a new production kitchen that is designed to achieve two principal goals: first, protect employee health and welfare; and second, increase production capacity to enable the Company to produce, store, and package products for wholesale and e-commerce delivery, while, at the same time, continue to satisfy local customer demand with same-day delivery of fresh doughnuts to our three retail establishments. As of the Petition Date, the Company continues to work on the design of a new production kitchen.

41. As of the Petition Date, I have not determined whether the Company intends to assume or reject the leases at each of the three retail establishments in the Portland metropolitan area. This decision will depend on the Company's performance over the immediate months ahead and on the trajectory and severity of Covid-19 and whether another shutdown of retail business is ordered by the Governor.

42. Since EO-07 went effective, the Company – along with many other businesses in Oregon – has experienced existential challenges but has persevered. Notwithstanding what we have gone through over the past months, I am confident that – if this Court authorizes the Company to continue operating as a debtor and debtor-in-possession for the next three months, the Company will be able to propose a confirmable plan of reorganization that leverages all of the work already invested by the Company in Blue Star 2.0, maximizes the recoveries to all of the Company's stakeholders on account of their claims, preserves the Company's critical commercial relationships, and enables the Company to realize on its mission: to continue delivering the best doughnuts possibly ever made to our loyal customers.

Page 13 - DECLARATION OF KATHERINE J. HOUSE IN SUPPORT OF FIRST DAY PAPERS

Pursuant to section 1746 of title 28 of the United States Code, I declare under penalty of perjury that the foregoing statement are true and correct.

DATED: August 26, 2020.

                                       */s/ Katherine J. House*
                                       Name: Katherine J. House aka Katherine J. Poppe
                                       Title:   Chief Executive Officer
                                                       Blue Star Doughnuts LLC