Oren B. Haker, OSB No. 130162
Kristin E. Russell, OSB No. 200074
Daniel R. Kubitz, OSB No. 181381
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone: 503.224.3380
Facsimile: 503.220.2480

*Proposed Attorneys for Debtor
and Debtor-in-Possession*

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>BLUE STAR DOUGHNUTS LLC,<br>DBA BLUE STAR DONUTS,<br><br>       Debtor. | Case No. 20-32485-pcm11<br><br>Chapter 11<br><br>MEMORANDUM IN SUPPORT OF DEBTOR'S AMENDED MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING CONTINUED USE OF EXISTING BANK ACCOUNTS, (II) SCHEDULING A FINAL HEARING, AND (III) GRANTING RELATED RELIEF [DKT. NO. 24] AND DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING USE OF CASH COLLATERAL, (II) SCHEDULING A FINAL HEARING, AND (III) GRANTING RELATED RELIEF [DKT. NO. 17]<br><br>*EXPEDITED HEARING REQUESTED* |

       Blue Star Doughnuts, LLC, dba Blue Star Donuts ("**Debtor**"), in support of its *Amended Motion for Interim and Final Orders (I) Authorizing Continued Use of Existing Bank Accounts, (II) Scheduling a Final Hearing, and (III) Granting Related Relief*, at dkt. no. 24 ("**Cash**

Page 1 - MEMORANDUM IN SUPPORT OF MOTIONS AT DOCKET NOS. 17 AND 24

**Management Motion**") and its *Motion for Interim and Final Orders (I) Authorizing Use of Cash Collateral, (II) Scheduling a Final Hearing, and (III) Granting Related Relief*, at dkt. no. 17 ("**Cash Collateral Motion**"), and in reply to objections by Zions Bancorporation (dba The Commerce Bank of Oregon) ("**Commerce Bank**") to the relief sought by the Debtor in the Cash Collateral Motion and the full reservation of rights asserted by Commerce Bank to object to the Cash Management Motion ("**Memorandum**"), respectfully states:

## I. Preliminary Statement

1. In an effort to work with Commerce Bank in a collaborative manner after the first-day hearing on August 28th, the Debtor agreed, and the Court so ordered, that the deadline for Commerce Bank to respond to the Cash Collateral Motion is extended to September 14, 2020 at noon (pacific time). However, the additional time has not been constructive. First, it took Commerce Bank 13 days to provide the Debtor with a request for adequate protection, which was finally provided on the evening of Thursday, September 10th. Second, on Friday, September 11th around midday, Commerce Bank demanded an *accounting* of how the Debtor spent the PPP loan proceeds for PPP qualified expenses *during the prepetition period* and gave the Debtor a 5:00 p.m. deadline that same day. Haker Decl., at dkt. no. 75, at ¶ 3. Commerce Bank's use of the intervening period between the preliminary hearing and the final hearing to make an adequate protection request that contravenes the plain meaning of section 363(c) – and would have collateralized the PPP Loan[1] with adequate protection payments had the Debtor agreed to it – is indefensible.

2. The Debtor is a small business debtor whose business model has been decimated by Covid-19. It made the difficult decision to seek the protection of this Court so it could resolve an acrimonious litigation with one of its landlords, and in doing so, recapitalize its balance sheet. The Debtor did not file through any fault of its own, but rather due to an

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Cash Collateral Motion.

economic tsunami that has swept up large and small businesses around the United States and around the world. But make no mistake, the Debtor was a very small business prior to experiencing the effects of Covid-19 and was even smaller when it made the decision to file for chapter 11 protection.

3. Since August 26, 2020 ("**Petition Date**"), the Debtor's principals – Katherine House and William Price – have continued to work around the clock to keep the business going, comply with the disclosure and reporting requirements under the Bankruptcy Code, and prepare for a contested hearing with Commerce Bank, which – notwithstanding the value of the Debtor's brand and the personal guaranty that Katherine House gave Commerce Bank in connection with the Operating Line of Credit – has decided that forced liquidation of the Debtor is preferable to giving the Debtor a short period of time to propose a chapter 11 plan that pays off Commerce Bank in full on a loan that doesn't actually mature until February 2021. Of course, even if Commerce Bank cannot collect on its secured claim from the Debtor, it can sue Ms. House and collect its deficiency.

4. The approach taken by Commerce Bank is short-term and zero sum, and frankly unreasonable under these circumstances: *i.e.*, Covid-19, unprecedented wildfires, and the Debtor, whose business has attracted significant investor interest in the community, but who determined it could not attract capital without first resolving landlord claims. While the Debtor knows its decision to seek this Court's protection was the right decision, the Debtor did not anticipate having to defend itself from a creditor seeking to force its immediate liquidation.

5. If the Debtor is unable to obtain an order from this Court on September 15, 2020 that compels Commerce Bank to be patient for a defined time period, the Debtor may have no choice but to pivot to a debtor in possession loan that will almost certainly change the nature and trajectory of this case. That would be unfortunate – for the Debtor, who filed for subchapter V treatment with the intent to confirm a consensual plan, and frankly for hundreds of other small businesses in Oregon who might be considering subchapter V treatment in chapter 11 as a tool to

restructure contingent and/or unliquidated obligations and recapitalize their respective balance sheets, and in doing so, maximize enterprise value for all stakeholders, including local communities that have been devastated – first by Covid-19, and now by unprecedented wildfires. To those small businesses observing the Debtor's case, an immediate pivot by the Debtor to an asset sale or a DIP loan is not what they thought subchapter V had promised.

6. In support of the Memorandum, the Debtor filed a supplemental declaration from Katherine J. House ("**House Decl**."), at dkt. no. 70, two supplemental declarations from William Price ("**Price Supp. Decl**." and "**Price Second Supp. Decl**."), at dkt. nos. 71, 74, and a declaration from undersigned counsel ("**Haker Decl**."), at dkt. no. 75.

## II. Procedural History

7. On August 26, 2020 ("**Petition Date**"), the Debtor filed a voluntary petition under chapter 11 of title 11 of the United States Code ("**Bankruptcy Code**") as a "small business debtor" pursuant to section 101(51D), and elected treatment under subchapter V of chapter 11 of the Bankruptcy Code.

8. On August 28, 2020, the Court held a first-day hearing on the Debtor's first-day papers, at dkt. nos. 10 (Cash Management Motion), 11 (Gift Card Motion), 12 (Wages Motion) and 17 (Cash Collateral Motion) (collectively, "**First-Day Motions**"). In support of the relief sought in its First-Day Motions, the Debtor filed declarations from Katherine J. House, chief executive officer of the Debtor, at dkt. no. 8 ("**House Declaration**"), and William Price, chief financial officer of the Debtor, at dkt. no. 9 ("**Price Declaration**"). At the conclusion of the first-day hearing, the Court granted the relief sought by the Debtor in the Wages Motion and Gift Card Motion on a final basis and entered orders, at dkt. no. 51 and 29, respectively.

9. The relief sought by the Debtor in the Cash Management Motion and Cash Collateral Motion was granted on an interim basis, at dkt. nos. 33 and 49, respectively, and a final hearing was set for September 15, 2020 at 9:30 a.m. (pacific time).

### III. First Day Hearing

10. At the first-day hearing, Commerce Bank objected to the Debtor's use of its cash collateral and requested adequate protection pursuant to section 363(e) of the Bankruptcy Code. In particular, Commerce Bank demanded (i) a first-position, post-petition lien on all of the Debtor's assets for any diminution in value of its interests; (ii) weekly reporting requirements; and (iii) an evidentiary showing *by the Debtor* that the funds in the Debtor's deposit accounts at Wells Fargo Bank, N.A. ("**Wells Fargo**") are not Commerce Bank's cash collateral as a *condition precedent* to the Court's authorization of the Debtor's use of any of Commerce Bank's cash collateral.

11. Furthermore, Commerce Bank asserted certain material misrepresentations at the first-day hearing, namely:

    a) Commerce Bank asserted that the Debtor moved its operating account from Commerce Bank to Wells Fargo *after* Commerce Bank declined to advance the Debtor additional funds in May 2020, when in fact, the Debtor set up its deposit accounts with Wells Fargo in November 2015. Price Supp. Decl., at ¶¶ 1, 2.

    b) Commerce Bank asserted that that the Debtor changed its business plan prior to the economic shutdown on March 17, 2020. House Supp. Decl., at ¶ 2.

### IV. Debtor Stipulations/Milestones in the Proposed Final Order

12. In an effort to reach a consensual resolution of Commerce Bank's objections and incorporate any comments from the United States Trustee and the subchapter V trustee, the Debtor has drafted a proposed final order granting the Debtor the authority to use cash collateral through December 31, 2020 ("**Proposed Final Order**") and circulated it to the parties late on September 13, 2020. Haker Decl., at ¶ 3.

13. In the Proposed Final Order, the Debtor lays out how it intends to move this case forward. In particular, the Proposed Final Order:

a) Provides that failure by the Debtor to (i) file a plan of reorganization by Monday, November 16, (ii) obtain an order confirming the plan by December 31, and (iii) emerge from bankruptcy protection on January 15 (collectively, the "**Plan Milestones**") is an event of default that entitles Commerce Bank and Wells Fargo to seek an expedited hearing before this Court to terminate the Proposed Final Order;

b) Requires the Debtor to make adequate protection payments to Commerce Bank in the amount of $5,000 per month through December 31, 2020 from the cash deposits in the Debtor's deposit account at Commerce Bank;

c) Grants replacement liens in favor of Commerce Bank and Wells Fargo for the diminution in the value of their interests in property used by the Debtor through December 31, 2020, subject to the Debtor's reservation of rights with respect to Commerce Bank;

c) Requires the Debtor to provide to Commerce Bank, on a weekly basis, balances and summaries of receipts and disbursements for each deposit account at Wells Fargo;

d) Provides that the Debtor stipulates as to the validity and extent of the prepetition liens of Commerce Bank and Wells Fargo, subject only to an express carve-out for $88,938.08 in unencumbered funds constituting the remaining available proceeds on the PPP Loan governed by the PPP.[2]

## V. Commerce Bank Does Not Need Adequate Protection Payments

**A.  The Debtor's assets should be valued as a going concern.**

14. Under section 506, valuations are "determined in light of the purpose of the valuation and of the proposed disposition or use of such property." 11 U.S.C. § 506(a); *see also Associates Commercial Corp. v. Rash*, 520 U.S. 593 (1997).

---

[2] For avoidance of doubt, the $88,938.08 in unencumbered funds were indeed spent by the Debtor in accordance with and pursuant to the Court's *Amended Order (I) Authorizing Interim Use of Cash Collateral, (II) Scheduling a Final Hearing, and (III) Granting Related Relief* at dkt. 49.

15. The Debtor is an operating business with a marketable brand. Liquidation value, in particular "forced liquidation value" has no place in an adequate protection determination, especially considering the Debtor intends to file a confirmable plan that recapitalizes the Debtor within the next 60 days. *See, e.g.*, *In re SK Foods L.P.*, 487 B.R. 257 (E.D. Cal. 2013) (citing *Rash* and affirming bankruptcy court decision to value the assets of a debtor's business as a going concern where such business was being sold as a going concern); *In re Hawaiian Telcom Comms., Inc.*, 430 B.R. 564, 602–03 (Bankr. D. Haw. 2009) ("Where debtors tend to reorganize and continue to operate their business, and prospects for reorganization appear favorable, collateral should be valued using the going concern value[.]"); *see also In re Ralar Dists., Inc.*, 166 B.R. 3, 5 (Bankr. D. Mass. 1994), *aff'd*, 182 B.R. 81 (D. Mass. 1995), *aff'd sub nom.*, *Baybank-Middlesex v. Ralar Dists. Inc.*, 69 F.3d 1200 (1st Cir. 1995) (recognizing that a business's operation as a going concern resulted in an increased valuation of the assets to be sold by the Debtor as compared to their liquidation value); *In re Am. Consol. Transp. Co.*, No. 09-BK-26062, 2009 WL 3571268, at *2 (Bankr. N.D. Ill. Oct. 28, 2009) (using cash collateral to operate as a going concern, rather than winding down, required valuation of assets as going concern).

16. As Congress has explained with respect to section 361:

> The section specifies . . . means of providing adequate protection. They are neither exclusive nor exhaustive. They all rely, however, on the value of the protected entity's interest in the property involved. The section does not specify how value is to be determined, nor does it specify when it is to be determined. These matters are left to case-by-case interpretation and development. ***It is expected that the courts will apply the concept in light of facts of each case and general equitable principles.*** It is not intended that the courts will develop a hard and fast rule that will apply in every case. The time and method of valuation is not specified precisely, in order to avoid that result. . . .
>
> ***Neither is it expected that the courts will construe the term value to mean, in every case, forced sale liquidation value or full going concern value. There is wide latitude between those two extremes.*** In any particular case, especially a reorganization case, the determination of which entity should be entitled to the difference between the going concern value and the liquidation value must be based on equitable considerations based on the facts of the case.

S. Rep. No. 989, 95th Cong., 2nd Sess., 54 (1978); *see also* H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 339 (same) (emphasis added).

B. **Commerce Bank's position that the Debtor must account for every *prepetition* dollar spent of the PPP loan in order to meet its burden on the issue of adequate protection is *contrary to section 363(c) of the Bankruptcy Code*.**

17. At the first-day hearing, Commerce Bank argued that this Court could not authorize the Debtor to use cash collateral in the Debtor's deposit accounts at Wells Fargo unless the Debtor could prove that none of the cash in the Debtor's deposit accounts at Wells Fargo constituted Commerce Bank's cash collateral. And further, that the Debtor should not be able to use Commerce Bank's cash collateral because Commerce Bank did not have sufficient information as to Wells Fargo's rights. The only mention of the PPP Loan at the first-day hearing was that Commerce Bank will treat that as a separate matter, which, over the past two weeks, has turned out not to be the case.

18. As a preliminary matter, the Debtor notes that Commerce Bank knew the Debtor banked at Wells Fargo when it advanced the secured line of credit in February 2019 (see Price Supp. Decl. at ¶¶ 1, 2; House Supp. Decl. at ¶ 1). Furthermore, Commerce Bank could have but never did demand a control agreement over the Debtor's deposit accounts at Wells Fargo. Moreover, on July 1, 2020, Commerce Bank agreed to transfer the PPP loan proceeds into a separate deposit account at Commerce Bank to further aid the Debtor in tracking the PPP loan proceeds. Price Decl., at ¶ 7. From April 2020 through the Petition Date, as the Debtor became obligated on PPP qualified expenses, the Debtor accounted for the PPP loan proceeds by transferring roughly equivalent funds from Commerce Bank to its main operating account at Wells Fargo to pay for those expenses, with one minor exception when the Debtor paid a creditor directly from its Commerce Bank account. Price Supp. Decl., at ¶¶ 7, 8.

19. As explained below, Commerce Bank's argument that – in order to meet its burden on the issues of adequate protection – the Debtor must determine the extent and priority

Case 20-32485-pcm11    Doc 76    Filed 09/14/20

of Commerce Bank's interest in the cash deposits in the Debtor's deposit accounts at Wells Fargo as of the Petition Date is wrong as a matter of law.

20. In fact, Commerce Bank's argument on the Debtor's burden to show adequate protection under section 363(e) is based entirely on a misreading of the Bankruptcy Code, and presumes that the Bankruptcy Court does not have the authority to allow the Debtor to use cash collateral unless the Debtor either obtains the consent of Commerce Bank or unless the Debtor can establish exactly (i) Commerce Bank's interest in cash in the Debtor's possession, custody or control and (ii) Wells Fargo's interest in cash in the Debtor's possession, custody or control. In addition, Commerce Bank also misreads the Bankruptcy Code by arguing that – to the extent the Debtor asserts that a portion of the cash in its possession, custody or control is unencumbered (i.e. the PPP loan proceeds) – it is the Debtor's burden to trace those funds back through the prepetition period to their origin and provide an accounting to Commerce Bank evidencing the how those funds were spent during the prepetition period, , otherwise the Bankruptcy Court has no power to authorize the use of cash collateral.

21. Commerce Bank's argument creates a burden on a chapter 11 debtor that simply does not exist. First, the Bankruptcy Code – in particular, section 363(c)(2) – does not require a chapter 11 debtor in possession to trace its secured creditor's cash collateral as a condition to obtaining an order from this Court authorizing the debtor to use cash collateral. Nor does section 363(c)(2) require the debtor to prove – in order to establish its burden under section 363(p)(1) on the issue of adequate protection under section 363(e) – the validity, extent or priority of each lender's interest in cash in the possession, custody and control of the debtor.

22. That burden is on the creditor asserting an interest – in this case, Commerce Bank. 11 U.S.C. 363(p)(2) ("the entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest"). To the extent Commerce Bank intends to argue at the final hearing that its security interests in the cash deposits in the Wells Fargo deposit accounts extends to every dollar in the Wells Fargo deposit accounts as of the Petition

Date, the burden of proof is on Commerce Bank – and not on the Debtor. 11 U.S.C. 363(p)(2); *Boh Park Highlands NV, LP v. Wilmington Trust, N.A.*, 636 Fed. Appx. 723 (9th Cir. 2016) (in context of sale, objecting creditor has the burden to prove extent of its interest; objecting creditor not entitled to dollar-for-dollar adequate protection of potential diminution in value of its interest); *Chequers Inv. Assocs. v. Hotel Sierra Vista Ltd. P'ship (In re Hotel Sierra Vista Ltd. P'ship)*, 112 F.3d 429 (9th Cir. 1997) (creditor has burden of proving extent and amount of its interest); *In re Las Vegas Monorail Co.*, 429 B.R. 317, 329 (Bankr. D. Nev. 2010) (creditor claiming an interest must establish the existence and extent of its security interest).

23. Moreover, section 363(c)(4)'s requirement that a debtor in possession segregate and account for cash collateral **during the post-petition period** is only triggered if the debtor does not obtain a secured creditor's consent to use cash collateral or an order from the bankruptcy court. *Marathon Petroleum Co., LLC v. Cohen (In re Delco Oil, Inc.)*, 599 F.3d 1255 (11th Cir. 2010); *In re Las Vegas Monorail Co.*, 429 B.R. 317 (Bankr. Nev. 2010). Importantly, section 364(c)(4) is subject to the following exception: "[e]xcept as provided in paragraph (2)." Nothing in section 363(c)(2) or (c)(4) conditions this Court's power to authorize the Debtor to use Commerce Bank's cash collateral on the Debtor's ability to prove "the extent" of Commerce Bank's interest in the Debtor's cash as of the Petition Date at a final hearing on the Cash Collateral Motion. Were such a statutory reading true, the Debtor would have to either obtain the affirmative consent from Wells Fargo (which hasn't even appeared in this case), or alternatively would have to prove the validity, extent, and priority of Wells Fargo's interest in the Debtor's cash at an evidentiary hearing, otherwise this Court would have no power to authorize the Debtor's use of Wells Fargo's cash collateral.

24. Nor is Commerce Bank's argument supported by the plain text of the Bankruptcy Code. In fact, Commerce Bank's argument at the first-day hearing that this Court has no power to allow the Debtor to use Commerce Bank's cash collateral unless Commerce Bank either

consents or unless the Debtor first establishes "the extent" of Commerce Bank's interest in the cash collateral at the Wells Fargo deposit accounts improperly rewrites section 363 as follows:

- First, Commerce Bank's argument writes section 363(p)(2) right out of the Bankruptcy Code (i.e., renders (p)(2) superfluous) because Commerce Bank would never – in the context of a cash collateral hearing – have the burden of establishing the extent of its security interest in cash in the Debtor's possession as of the Petition Date if this Court adopted Commerce Bank's argument; and

- Second, the exception in section 363(c)(4) is not limited to paragraph (2)(A) of section 363(c), but rather is limited to paragraph (2), which – by definition – gives this Court the discretion to authorize a chapter 11 debtor to use cash collateral as the Court determines is in the best interests of the chapter 11 debtor's estate, and does not limit the Court's discretion to only those situations where a chapter 11 debtor can show exactly what each of its secured creditor's interests are in the cash collateral that it is seeking authority to use.

In short, Commerce Bank's argument suggests that Commerce Bank's interests and its judgment trumps the power of this Court and the interests of the Debtor's estate.

25. Had Congress actually intended to require the Debtor to segregate and account for any cash collateral in the Debtor's possession, custody or control as a precondition to empowering this Court to enter an order allowing the Debtor to use Commerce Bank's cash collateral over Commerce Bank's objection, Congress would not have put the burden with respect to the validity, extent and priority of an interest in cash collateral on the creditor asserting an interest – in this case, Commerce Bank. 11 U.S.C. § 363(p)(2). Moreover, Congress would not have excepted from section 363(c)(4) the entirety of paragraph (2) in section 363(c), but rather would have limited the exception in section 363(c)(4) to paragraph (2)(A) in section 363(c). Congress did not do this, because it is axiomatic that the Bankruptcy Court has the power to authorize a chapter 11 debtor to use a secured creditor's cash collateral over the secured creditor's objection – so long as the debtor provides adequate protection.

26. Second, by conflating section 363(p)(1) with 363(p)(2), Commerce Bank argues that a chapter 11 debtor can only meet its burden on the issue of adequate protection under section 363(p)(1) by proving with exactitude how its use of cash for a limited period of time

during the post-petition period could affect one or more of its creditors with interests in the Debtor's cash deposits. That is not the burden of a chapter 11 debtor seeking to use the cash collateral of its secured creditors. And frankly, that burden is an impossible one to establish for small business debtors who (i) have secured creditors with overlapping security interests in its deposit accounts, (ii) are trying to survive in the middle of a pandemic and unprecedented wildfires, and (iii) have had to manage a dizzying and changing regulatory landscape with respect to PPP loans. *See Paycheck Protection Program—Revisions to Loan Forgiveness Interim Final Rule and SBA Loan Review Procedures and Related Borrower and Lender Responsibilities Interim Final Rule*, available at federalregister.gov (explaining that the First Interim Rule on the PPP loan program was issued on April 2 and supplemented with FAQs on April 8, the Final Interim Rule was issued on April 14 and supplemented with FAQs on April 26, the Additional Interim Final Rule was issued on May 22, the Interim Final Rule revising the First Interim Rule on June 11, and further revisions to the same on June 17).

27. If this Court is inclined to require the Debtor to put on evidence that proves the exact interest that Commerce Bank has in the Debtor's deposit accounts at Wells Fargo as a condition to its ability to continue operating using Commerce Bank's cash collateral, the Debtor will be prepared on September 15 to do just that – and in all frankness, the Debtor has spent the entire weekend preparing for such a hearing! However, the Debtor has already declared at the first-day hearing that it has used all but $89,215[3] of the proceeds of the PPP Loan for "authorized uses," and has subsequently declared that it spent the remaining PPP loan proceeds during the first two weeks of the case. The Debtor is prepared to testify to the foregoing.

**C.** **Assuming *arguendo* Commerce Bank is undersecured, minimal periodic payments during the case will provide Commerce Bank with adequate protection.**

28. The Debtor is a "small business debtor," and unlike Commerce Bank, the Debtor does not have the resources to hire an investment banker or financial advisor to provide an expert

---

[3] It turns out the Debtor was off by $276.92, as set forth in Price's second supplemental declaration, and in fact, the Debtor had used all but $88,938.08 as of the Petition Date.

Page 12 - MEMORANDUM IN SUPPORT OF MOTIONS AT DOCKET NOS. 17 AND 24

opinion on the value of its going concern.  All this Debtor has is the opinions of Katherine House and Will Price – but that should be enough, because if it isn't, then the ability of distressed small businesses to access this Court for the relief afforded to them by Congress in the SBRA is merely a mirage.

29. Here, as of the Petition Date, the Debtor had assets comprised of $331,208.82 in deposits at Wells Fargo and $20,393.23 in deposits at Commerce Bank; $31,084.80 in accounts; equipment that the Debtor valued at cost because it does not have an assessment of its fair market value, and Commerce Bank asserted (at the first-day hearing) had a forced liquidation value of $150,000; inventory that Commerce Bank asserted (at the first-day hearing) had a value of approximately $30,000; and general intangibles including the Debtor's brand, which Commerce Bank asserted could not be valued without more information.

30. Of the foregoing assets, the Debtor submits that Commerce Bank has a valid, first-priority lien in the Debtor's accounts, equipment, general intangibles, inventory and cash deposits at Commerce Bank.  The Debtor submits that Commerce Bank has a valid, second-priority lien on the $331,208.82 in cash deposits in the Wells Fargo deposit accounts (behind Wells Fargo who is owed $99,772.96 on the Petition Date), less $88,938.08 in unencumbered PPP loan proceeds on the Petition Date, or $142,497.78.  In other words, Commerce Bank's interest in the Debtor's cash deposits is $162,891.01 as of the Petition Date, but $20,393.23 of that amount is being held in the Debtor's account at Commerce Bank such that it only has any risk with respect to the $142,497.78 that is in the Wells Fargo deposit accounts.

31. In other words, Commerce Bank is trying to shut the Debtor down and force it to lay off all its employees because ***it is concerned about what will happen to $142,497.78 in the next 60 days***.  Or, perhaps, Commerce Bank is not all that concerned – because according to its counsel at the first-day hearing, the Debtor's equipment has a forced liquidation value of $150,000, the accounts have a value of $36,000 and the inventory has a value of $30,000, which, with the addition of $142,497.78, pays it enough to maybe satisfy the principal amount of the

loan off in full. And of course, Commerce Bank can sue Katherine House at any point in time to collect.

33. Irrespective of Commerce Bank's motivations, this Court should rule that Commerce Bank is not entitled to more than $5,000 per month in adequate protection payments and should enter a final order authorizing the Debtor to use cash collateral through December 31, 2020. In support, the Debtor submits that Mr. Price has – to the best of his ability during an unprecedented time – prepared conservative projections over the next ten weeks through November 16, 2020. Based on Mr. Price's projections, the Debtor expects to have $228,610.59 in cash deposits in the Wells Fargo deposit accounts on November 16, 2020. Of the $228,610.59, Wells Fargo's first-priority security interest will secure its claim of, with default interest, $106,046.85, leaving Commerce Bank's interest in the cash deposits at Wells Fargo in the amount of $122,563.74.

33. In short, based on Mr. Price's projections, at most, the Debtor should be entitled to $19,934.04 in adequate protection payments between now and December 31, 2020. As set forth in the Debtor's Proposed Final Order, the Debtor is agreeable to $5,000 in adequate protection payments per month, but only if those payments come from the Commerce Bank deposit account, because, while Wells Fargo has not appeared in this case nor informally demanded adequate protection, the Debtor does not want to create a dynamic where Wells Fargo and Commerce Bank begin competing for priority over cash deposits in the Wells Fargo deposit accounts – at least not until December 31, 2020.

**E.  Commerce is adequately protected because it is oversecured with an equity cushion.**

34. Even though the Debtor is willing to make adequate protection payments, Commerce Bank has a significant equity cushion that constitutes adequate protection for section 363(e) purposes. *See In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984) ("A 20% cushion has been held to be an adequate protection for a secured creditor."); *see also In re Boulders on the River, Inc.*, 164 B.R. 99, 104 (B.A.P. 9th Cir. 1994) (10% equity cushion is sufficient); *In re*

Page 14  -   MEMORANDUM IN SUPPORT OF MOTIONS AT DOCKET NOS. 17 AND 24

107980715.5 0056668-00010

Case 20-32485-pcm11    Doc 76    Filed 09/14/20

*McGowan*, 6 B.R. 241, 243 (Bank. E.D. Pa. 1980) (same); *In re James Wilson Assocs.*, 965 F.2d 160, 171 (7th Cir. 1992) (secured creditor has no right to fence off the entire collateral in which it has an interest).

35. Here, the Debtor submits that Commerce Bank's equity cushion is at least 50% and likely greater. As of the Petition Date, Commerce Bank's interest in the cash deposits ($162,891.01), plus accounts ($31,084.80), plus equipment ($150,000),[4] plus inventory ($30,000)[5] equal $373,975.81. In light of Mr. Price's projections, Commerce Bank will remain oversecured on or about November 16, 2020, even if this Court adopts forced liquidation values for the equipment. And this does not even take into account Commerce Bank's security interest in the Debtor's general intangibles. In particular, the Debtor's "brand," – which is where the trademark meets the customer base – is impressive and has a fair market value of approximately $540,000. Accordingly, the Debtor will argue at an evidentiary hearing that Commerce Bank's interests in the Debtor's assets have a value of $913,975.81.

36. As of the Petition Date, the Debtor owed Commerce Bank approximately $310,000 on the secured loan. If this Court finds that Commerce Bank's interest in the Debtor's assets is indeed $913,975.81, then Commerce Bank's equity cushion is 194%. Even if this Court discounts Mr. Price's testimony as to the Debtor's brand by 50% and finds that the brand has a value of $270,000, Commerce Bank's interest in the Debtor's assets are $643,975.81, giving Commerce Bank an equity cushion of 107%. *See In re Anderson-Walker Indus., Inc.*, 3 B.R. 551, 552 (Bankr. C.D. Cal. 1980) (advising a creditor it would be "well-advised to cooperate with a debtor who is seeking to reorganize under Chapter 11, when is it as over-secured as it is[.]").

---

[4] Per Commerce Bank's assertions at the preliminary hearing, the equipment has a forced liquidation value of $150,000. Even though forced liquidation value is not the appropriate valuation method, for argument's sake, the Debtor will adopt it for illustrative purposes.

[5] Based on Commerce Bank's representations at the preliminary hearing.

Page 15 - MEMORANDUM IN SUPPORT OF MOTIONS AT DOCKET NOS. 17 AND 24

37. At the first-day hearing, Commerce Bank asserted that it needed to investigate the value of its interest in the Debtor's general intangibles. But everyone in the Portland area knows who the Debtor is, just as almost anyone could tell you what a doughnut is. The Debtor is not in the business of making fungible widgets, but rather doughnuts that travelers from around the country carry onto airplanes on return trips home. The brand alone provides Commerce Bank with sufficient adequate protection – at least at the outset of the case and for the first ninety days. And as the Proposed Final Order provides, if the Debtor is unable to propose a plan of reorganization by November 16, the Debtor submits that Commerce Bank should have the right to argue for a termination of the Debtor's use of cash collateral.

**F.    Section 363(e) does not require dollar for dollar replacement of cash collateral.**

38. Bankruptcy courts have broad discretion to decide what constitutes "adequate protection" in connection with a debtor's motion to use cash collateral, especially at the outset of the case. *See In re Pawtuxet Valley Prescription & Surgical Ctr., Inc.*, No. BK 07-11767, 2008 WL 1990887, at *2–3 (Bankr. D.R.I. Mar., 10, 2008) ("[C]ourts are reluctant to terminate a reorganization at the outset of a case unless reorganization is clearly impossible[.] It is probable that the court will authorize the use of cash collateral if the debtor makes a credible showing of adequate protection."); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) ("[E]arly in the reorganization proceeding, the Court will generally permit the business operation to continue, at least to the point of plan formulation, if the debtors make a solid evidentiary showing to support their projections[.]"). The creditor will only "prevail at a cash collateral hearing at the early stage of the chapter 11 case only if . . . there is no realistic prospect of reorganization . . . [and the] hopes of the debtor are nothing more than wishful thinking." *Id.*

39. Moreover, adequate protection under 363(e) must protect Commerce Bank's interest in the value of its ***collateral*** — not in the value of its ***cash collateral***. "Collateral" includes the Debtor's brand. If the Court requires the Debtor to replace every dollar of cash collateral that it spends on critical supplies, wages and rent with one dollar in adequate protection

payments to Commerce Bank, this Debtor will fail immediately, as would most debtors.[6] That is not how adequate protection works under section 363(e). *See, e.g.*, *Dynaco*, 162 B.R. at 396 n.10 ("Cash collateral usage in the early stages of a chapter 11 reorganization proceeding is simply unique in that if the debtor were to be required to provide dollar-for-dollar new money replacement to cover a temporary decline in the cash collateral level few debtors coming into the bankruptcy court for reorganization would be able to comply."); *see also In re Las Vegas Monorail Co.*, 429 B.R. 317, 329 (Bankr. D. Nev. 2010) (explaining it would pose an "impossible adequate protection burden" to require a debtor "to give dollar-for-dollar adequate payments to the Trustee [because] it would have to have a profit margin of at least 100% just to break even. Neither it nor any other bankruptcy debtor could meet that requirement; debtors with 100% profit margins rarely need bankruptcy protection.").

40. Moreover, the policy implications for such a requirement would be damaging. Requiring the Debtor to replace every dollar of cash collateral that it spends with a new dollar of adequate protection payment to Commerce Bank will effectively foreclose hundreds of small businesses in Oregon from seeking relief from this Court under subchapter V of chapter 11. Because the effects of Covid-19 (i.e., the shutdown of retail and related change in consumer patterns) and now the unprecedented wildfires have directly and drastically impaired business revenues across the State of Oregon, causing thousands of business borrowers to almost immediately trip their financial covenants in their loan agreements. *See, e.g.*, *White House Approves Funding to Oregon for Wildfires, Representative DeFazio Says*, The Oregonian, Sept. 10, 2020 (discussing the combined human and economic devastation faced by "tens of thousands

---

[6] With the 2000 Amendments to UCC Article 9, it has been exceedingly rare to find a business in distress that files for chapter 11 protection before it has encumbered every asset with one or multiple liens. As a result, unless a distressed debtor covered with all assets security can cash flow and make adequate protection payments to its lenders from its operations, or otherwise obtain consent from its lenders to use cash collateral – perhaps with conditions on its use – chapter 11 just isn't really a viable option, unless debtors are prepared to litigate cash collateral at a first-day hearing or otherwise quickly pivot to an asset sale or secure a DIP loan.

Page 17 - MEMORANDUM IN SUPPORT OF MOTIONS AT DOCKET NOS. 17 AND 24

107980715.5 0056668-00010

Case 20-32485-pcm11    Doc 76    Filed 09/14/20

of Oregonians — who are already dealing with public health concerns and economic uncertainty due to the COVID-19 pandemic.").

41. Here, the Debtor has two secured creditors, Wells Fargo and Commerce Bank. Wells Fargo has not made an appearance. Commerce Bank has appeared but will not negotiate in good faith. So, what does a chapter 11 debtor do when one lender is absent (and cannot provide affirmative consent under section 363(c)(2) to use cash collateral, as is required) and another will not negotiate in good faith? The only thing the chapter 11 debtor can do is litigate its way through the process, or alternatively pivot to an asset sale. That is not what Congress intended when it passed the SBRA, and this Court should not permit an unreasonable lender to subvert the intent of Congress.

42. The Debtor submits that – as a subchapter V debtor – it should be afforded the statutorily-fixed amount of time (i.e., 90 days) to propose a plan of reorganization. Congressional intent with the SBRA was to provide small business entrepreneurs – like Ms. House – an opportunity to reorganize their businesses through a stream-lined and cost effective way and, in doing so, retain their equity investment in their businesses or otherwise participate in the reorganized debtor's capital structure if indeed they could propose a confirmable plan. However, the SBRA's intent can only be realized if bankruptcy courts take an expansive view of adequate protection under section 363(e). And by expansive view, the Debtor merely requests that this Court **not** adopt – as a presumption – that adequate protection for use of "cash collateral" requires the Debtor to pay Commerce Bank dollar-for-dollar replacement value for every dollar of cash collateral that the Debtor spends during the first four months of the case.

### Reservation of Rights

43. For the avoidance of doubt, the Debtor objects to any attempt by Commerce Bank to turn the cash collateral hearing into a hearing on whether the Debtor expects to obtain full forgiveness, of the PPP loan for two reasons. There is no requirement in the CARES Act or in the PPP that requires the Debtor – as a condition to obtaining authority to use Commerce Bank's

cash collateral in a chapter 11 case – to verify that it is entitled to 100% forgiveness on the Commerce Bank PPP loan. The PPP loan from Commerce Bank is an unsecured loan with no personal guaranty. And at least one Bankruptcy Court has already ruled that a chapter 11 debtor's PPP loan is a contingent obligation as of the Petition Date. Haker Decl., at ¶ 4. ("Memorandum Decision, *In re Parking Management, Inc.*, No. 20-15026 (Bankr. D. Md.).

44.     The reality is that Commerce Bank has no legal right to condition its consent to the Debtor's use of its cash collateral on anything relating to the PPP loan – including for the avoidance of doubt, to assume that – in connection with its request for adequate protection – all of the cash in the Debtor's deposit accounts at Wells Fargo on the Petition Date constitute Commerce Bank's cash collateral unless the Debtor can prove otherwise. The foregoing assumption egregiously misinterprets section 363(c) of the Bankruptcy Code.

45.     Moreover, Commerce Bank's insistence that the Debtor bears the burden to prove that, as of the Petition Date, it held $88,938.08 in available PPP loan proceeds is a brazen and indefensible attempt to collateralize the PPP Loan that it made to the Debtor on April 8, 2020.

46.     In connection with the Debtor's reservation of its rights, the Debtor submits that the deadline to submit the forgiveness application is in 2021, though it does not have the exact date in hand. Accordingly, the Debtor reserves all its rights against Commerce Bank in connection with any action, or failure to take any action, in connection with the Debtor's PPP Loan, including without limitation its rights (a) under section 552(b)(1), to move this Court for an order seeking an "equities of the case" exception to the extension of Commerce Bank's lien on proceeds, products, offspring or profits acquired by the Debtor after the Petition Date, and (b) to file a complaint for violation of the automatic stay.

### VI.     Conclusion

47.     For the foregoing reasons, the Debtor submits it is unnecessary, and, in fact, destructive to the Debtor's efforts to reorganize at this early stage of this subchapter V case to require the Debtor to make dollar-for-dollar cash adequate protection payments to Commerce

Bank, where (i) Commerce Bank has a substantial equity cushion such that these proceedings are arguably frivolous or, at a minimum, detrimental to the value of the estate because of their cost; (ii) Commerce Bank's interests in the cash collateral can be adequately protected by means other than cash payments to Commerce; (iii) this is a subchapter V case which necessarily must proceed quickly, thus mitigating any purported risk to Commerce's collateral, however speculative.

DATED: September 13, 2020.

STOEL RIVES LLP

*/s/ Oren B. Haker*
Oren B. Haker, OSB No. 130162
oren.haker@stoel.com
Kristin E. Russell, OSB No. 200074
kristin.russell@stoel.com
Daniel R. Kubitz, OSB No. 181381
daniel.kubitz@stoel.com
Telephone: 503.224.3380
Facsimile: 503.220.2480

*Proposed Attorneys for Debtor
and Debtor-in-Possession*