UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| In re | Case No. 20-32485-pcm11 |
|---|---|
| BLUE STAR DOUGHNUTS LLC, dba Blue Star Donuts, | |
| Debtor. | |

**BLUE STAR DOUGHNUTS LLC'S FIRST AMENDED PLAN OF REORGANIZATION PURSUANT TO SUBCHAPTER V OF CHAPTER 11 OF THE BANKRUPTCY CODE, DATED NOVEMBER 18, 2020**

Oren B. Haker, OSB No. 130162
Daniel R. Kubitz, OSB No. 181381
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone: 503.224.3380
Facsimile: 503.220.2480

*Attorneys for Debtor and Debtor-in-Possession*

# TABLE OF CONTENTS

PAGE

SECTION I      INTRODUCTION ........................................................ 1

SECTION II      DEFINED TERMS; RULES OF INTERPRETATION; TIME
PERIODS ............................................................ 3

2.1    Defined Terms ............................................................... 3

2.2    Rules of Interpretation; Time Periods ................................. 8

SECTION III      THE DEBTOR'S HISTORICAL PERFORMANCE AND
TURNAROUND BUSINESS PLAN ............................. 9

3.1    History of the Debtor's Business ......................................... 9

3.2    The Debtor's Business Model and Performance Prior to Covid-19 ................... 10

3.3    The Debtor's Performance During Covid-19 ...................... 10

3.4    Events Leading to the Filing of the Chapter 11 Case ......................... 11

3.5    Events during the Bankruptcy Case and the Debtor's Post-Petition
Performance ....................................................... 12

3.6    Turnaround Business Plan; Recapitalization ....................... 14

SECTION IV      TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER
THE PLAN ........................................................ 14

4.1    Unclassified Claims ..................................................... 14

4.2    Classified Claims and Equity Interests under the Plan ...................... 15

SECTION V      EXECUTORY CONTRACTS AND UNEXPIRED LEASES..................... 18

SECTION VI      BANKRUPTCY ESTATE CLAIMS ............................. 19

6.1    Avoidance Claims ...................................................... 19

6.2    Treatment of Avoidance Claims Under the Plan .................... 20

6.3    Bankruptcy Estate Claims Against Morrison Development.................... 20

6.4    Trustee's Investigation; Reservation of Rights.................... 22

SECTION VII      MEANS FOR IMPLEMENTATION OF THE PLAN................ 22

7.1    Title to Assets ......................................................... 22

7.2    Second Amended and Restated LLC Operating Agreement ................ 22

7.3    New Unit Offering ..................................................... 23

108812337.3 0056668-00010

Case 20-32485-pcm11    Doc 149    Filed 11/19/20

# TABLE OF CONTENTS

| | | |
|---|---|---|
| 7.4 | Management and Compensation of Reorganized Debtor's Officers | 23 |
| 7.5 | Feasibility Pursuant to Section 1129(a)(11) | 23 |
| 7.6 | The Effective Date of the Plan | 24 |
| 7.7 | Consummation of the Plan | 24 |
| 7.8 | Alternatives to the Plan; Fiduciary Duties | 24 |
| 7.9 | Contingencies; Risk Factors | 25 |
| SECTION VIII | LIQUIDATION ANALYSIS | 26 |
| SECTION IX | CLAIMS OBJECTIONS AND TREATMENT OF DISPUTED CLAIMS | 26 |
| SECTION X | TAX CONSEQUENCES OF THE PLAN | 27 |
| SECTION XI | SETTLEMENT, RELEASE, INJUNCTION, AND DISCHARGE | 27 |
| 11.1 | Binding Effect of Plan Confirmed by Bankruptcy Court | 27 |
| 11.2 | Discharge; Plan Injunction | 27 |
| 11.3 | Release of Liens | 29 |
| 11.4 | Exculpation and Injunction | 29 |
| SECTION XII | GENERAL PROVISIONS | 30 |
| 12.1 | Binding Effect | 30 |
| 12.2 | Severability | 30 |
| 12.3 | Retention of Jurisdiction by the Bankruptcy Court | 30 |
| 12.4 | Captions | 30 |
| 12.5 | Modification of the Plan | 31 |
| 12.6 | Final Decree | 31 |
| EXHIBIT A | FEASIBILITY ANALYSIS | 36 |
| EXHIBIT B | CURE SCHEDULE | 41 |
| EXHIBIT C | REJECTION SCHEDULE | 44 |
| EXHIBIT D | PREFERENCE ANALYSIS | 46 |
| EXHIBIT E | VOIDABLE TRANSFER ANALYSIS PURSUANT TO SECTIONS 544 AND 548 | 49 |

# TABLE OF CONTENTS

PAGE

EXHIBIT F  REDLINE OF LLC OPERATING AGREEMENT ........................................ 54

EXHIBIT G  SUBSCRIBERS AND EXECUTED SUBSCRIPTION
AGREEMENTS ........................................................................................ 93

EXHIBIT H  REORGANIZED DEBTOR CAPITAL STRUCTURE ............................. 116

EXHIBIT I  MANAGEMENT AND COMPENSATION OF REORGANIZED
DEBTOR'S OFFICERS ........................................................................... 118

EXHIBIT J  LIQUIDATION ANALYSIS ...................................................................... 120

# SECTION I
# INTRODUCTION

Blue Star Doughnuts LLC, dba Blue Star Donuts, is the Debtor[1] in the Chapter 11 Case currently pending in the Bankruptcy Court before the Honorable Peter C. McKittrick. Pursuant to section 1189 of the Bankruptcy Code, the Debtor has prepared the Plan that sets forth how it will treat Creditors with Allowed Claims against the Debtor and Equity Interest Holders with Allowed Equity Interests in the Debtor.

Because the Debtor constitutes a "small business debtor" under section 101(51D) of the Bankruptcy Code that has elected to be administered pursuant to Subchapter V of the Bankruptcy Code, the Debtor is not required to obtain approval of a disclosure statement prior to soliciting votes from Creditors and Equity Interest Holders unless the Bankruptcy Court, for cause, orders otherwise.

On October 5, 2020, the Bankruptcy Court held a scheduling conference pursuant to section 1188(a) of the Bankruptcy Code, and on October 14, 2020, the Bankruptcy Court entered the Confirmation Scheduling Order that includes deadlines for Creditors and Equity Interest Holders to vote on the Plan and to file objections to confirmation of the Plan.

On October 16, 2020, the Debtor filed the Plan with the Court and served by U.S. First-Class Mail: (i) on each Creditor holding a Claim for which the proposed Plan's treatment renders such Allowed Claim Unimpaired, the Plan [dkt. no. 131], the Confirmation Scheduling Order [dkt. no. 123], and the Notice to Non-Voting Classes; and (ii) on each Creditor holding a Claim for which the proposed Plan's treatment renders such Allowed Claim Impaired, the Plan [dkt. no. 131], the Confirmation Scheduling Order (dkt. no. 123), the Notice to Voting Classes, and a Ballot. [Dkt. No. 135 (Certificate of Service), amended by Dkt. No. 138.]

In addition, because the Debtor was not required to file a disclosure statement and obtain an order approving the disclosure statement from the Bankruptcy Court, the Debtor filed with the Court – for disclosure purposes only – a copy of the Ballot for each of the Voting Classes, a copy of the Notice to Voting Classes and Notice to Non-Voting Classes, so that the Bankruptcy Court, the UST and the Trustee could inspect the Ballots, the Notice to Voting Classes and the Notice to Non-Voting Classes. [Dkt. No. 134 (Declaration of Oren Haker).]

The Debtor seeks your vote to accept the Plan. **IF YOU HAVE QUESTIONS ABOUT HOW YOUR CLAIM OR EQUITY INTEREST IS BEING TREATED UNDER THE PLAN, THE DEBTOR RECOMMENDS THAT YOU DISCUSS THE PLAN WITH AN ATTORNEY.**

**YOUR BALLOT STATING HOW YOU ARE VOTING ON THE PLAN MUST BE RECEIVED BY THE DEBTOR, C/O STOEL RIVES LLP, ATTN: OREN B. HAKER, 760 SW 9TH AVENUE, # 3000, PORTLAND, OREGON 97205 NO LATER THAN**

---

[1] Capitalized terms are defined in Section II.

108812337.3 0056668-00010
Case 20-32485-pcm11    Doc 149    Filed 11/19/20

**NOVEMBER 6, 2020.** IF THE PLAN IS CONFIRMED, YOU WILL RECEIVE A DISTRIBUTION ON ACCOUNT OF YOUR ALLOWED CLAIM AND WILL BE SUBJECT TO THE INJUNCTION IMPOSED BY THE CONFIRMATION ORDER.

IN ADDITION TO CASTING YOUR VOTE TO ACCEPT OR REJECT THE PLAN, YOU MAY OBJECT TO CONFIRMATION OF THE PLAN. IF YOU WISH TO OBJECT TO CONFIRMATION OF THE PLAN, YOU MUST DO SO BY **NOVEMBER 16, 2020.** THE COURT WILL HOLD A STATUS CONFERENCE VIA TELEPHONE ON **NOVEMBER 19, 2020,** AT 9:00 A.M. (PT), CALL IN #: 888-684-8852, ACCESS CODE: 1238244.

THE CONFIRMATION HEARING WILL BE HELD VIA TELEPHONE ON **NOVEMBER 23, 2020,** AT 9:30 A.M. (PT), CALL IN NUMBER: 888-684-8852, ACCESS CODE: 1238244.

**[remainder of page intentionally left blank]**

108812337.3 0056668-00010
Case 20-32485-pcm11    Doc 149    Filed 11/19/20

# SECTION II
## DEFINED TERMS; RULES OF INTERPRETATION; TIME PERIODS

**2.1**     **Defined Terms.**

2.1.1    "**Administrative Expense Bar Date**" is the date fixed by the Bankruptcy Court for Creditors holding Administrative Expense Claims to request Allowance.

2.1.2    "**Administrative Expense Claim**" means a Claim entitled to priority under section 507(a)(2) of the Bankruptcy Code, including (i) obligations incurred by the Debtor since the Petition Date and Allowed by the Bankruptcy Court of a type described in section 503(b) of the Bankruptcy Code; and (b) all expenses of Professional Persons pursuant to sections 330 and 331 of the Bankruptcy Code and Bankruptcy Rule 2016.

2.1.3    "**Allowed**" means (i) with respect to a Claim, any Claim in the amount and of the priority classification set forth in the proof of such Claim that has been filed timely in the Chapter 11 Case, or in the absence of such proof, as set forth in one of the Debtor's schedules of liabilities filed in the Chapter 11 Case, unless: (x) such Claim has been listed in the schedules as disputed, contingent, unliquidated, in which case such Claim shall be allowed only in such amount and such classification as is authorized by a Final Order of the Bankruptcy Court; (y) such Claim has been objected to or is objected to after entry of a Confirmation Order, in which case such Claim is authorized by Final Order of the Bankruptcy Court; or (z) such Claim has been paid in full, withdrawn, or otherwise deemed satisfied in full; and (ii) with respect to an Equity Interest, the Equity Interests in the Debtor.

2.1.4    "**Avoidance Claims**" means any Claim of the Bankruptcy Estate arising out of or maintainable pursuant to chapter 11, Subchapter V of the Bankruptcy Code or under any other similar applicable law.

2.1.5    "**Ballot**" means the form of acceptance or rejection of the Plan distributed by the Debtor to those Creditors and Equity Interest Holders entitled to vote on the Plan. Any Ballot that is executed by the holder of an Allowed Claim or Allowed Equity Interest, but which does not indicate an acceptance or rejection of the Plan, shall be deemed to be an acceptance of the Plan.

2.1.6    "**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978, as amended and codified in title 11 of the United States Code.

2.1.7    "**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Oregon.

2.1.8    "**Bankruptcy Estate**" means the estate created pursuant to section 541 of the Bankruptcy Code, as supplemented by section 1186 of the Bankruptcy Code.

2.1.9    "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

2.1.10   "**Board of Directors**" means the manager of the Reorganized Debtor, which shall be comprised of three directors as further set forth in the Second Amended and Restated LLC Operating Agreement.

2.1.11   "**Business Day**" means any day except Saturday, Sunday or a "legal holiday" as defined in Bankruptcy Rule 9006(a).

2.1.12   "**CARES Act**" means the Coronavirus Aid, Relief, and Economic Security Act, Public Law 116-136.

Case 20-32485-pcm11     Doc 149     Filed 11/19/20

2.1.13 "**Cash**" means cash or cash equivalents including, but not limited to, bank deposits, wire transfers, checks, and other similar items.

2.1.14 "**Cash Collateral Motion**" means the *Notice of Preliminary Hearing and Motion for Authority to Use Cash Collateral.* [Dkt. No. 17.]

2.1.15 "**Cash Collateral Order**" means, collectively, the *Second Interim Order Authorizing Use of Cash Collateral and Granting Related Relief* [dkt. no. 99] and the *Amended Order (I) Authorizing Interim Use of Cash Collateral, (II) Scheduling a Final hearing, and (III) Granting Related Relief.* [Dkt. No. 49.]

2.1.16 "**Cash Management Motion**" means the *Motion for Interim and Final Orders (I) Authorizing Continued Use of Existing Bank Accounts, (II) Scheduling a Final Hearing, and (III) Granting Related Relief.* [Dkt. No. 10, as amended by Dkt. No. 24.]

2.1.17 "**Chapter 11 Case**" means case no. 20-32485-pcm11 pending in the Bankruptcy Court.

2.1.18 "**Claim**" means any right to payment from the Debtor or any right to an equity remedy from the Debtor as defined in section 101(5) of the Bankruptcy Code.

2.1.19 "**Claims Bar Date**" means the deadline for filing Proofs of Claim in the Chapter 11 Case, being (i) November 4, 2020, for non-governmental Creditors, and (ii) February 22, 2021, for each Creditor that is a "governmental unit" for purposes of section 101(27) of the Bankruptcy Code.

2.1.20 "**Class**" means a class of Allowed Claims or Allowed Equity Interests as set forth in Section IV of this Plan.

2.1.21 "**Commerce Bank**" means Zions Bancorporation, N.A. (dba Commerce Bank of Oregon).

2.1.22 "**Commerce Bank Loan Agreement**" means that certain Business Loan Agreement dated February 26, 2019 between the Debtor and Commerce Bank in connection with the Commerce Bank Operating Line of Credit.

2.1.23 "**Commerce Bank Loan Documents**" means the Commerce Bank Loan Agreement, the Commerce Bank Note, the Commerce Bank Member Guaranty, and any other agreement, document or notice relating directly to the Commerce Bank Operating Line of Credit.

2.1.24 "**Commerce Bank Member Guaranty**" means that certain Commercial Guaranty dated February 26, 2019 and executed by Poppe in favor of Commerce Bank.

2.1.25 "**Commerce Bank Note**" means that certain promissory note dated February 26, 2019 in the amount of $300,000 executed by the Debtor in favor of Commerce Bank.

2.1.26 "**Commerce Bank Operating Line of Credit**" means that certain Variable Rate Nondisclosable Revolving Line of Credit Loan extended to the Debtor by Commerce Bank in the amount of $300,000.

2.1.27 "**Commerce Bank Stipulated Allowed Claim Amount**" means the amount that the Debtor agrees it owes to Commerce Bank on the Commerce Bank Operating Line of Credit, which amount is comprised of outstanding principal as of October 30 in the amount of $269,950.81; interest through November 26 in the amount of $622.76; estimated costs relating to a UCC termination fee in the amount of $50; unbilled and unpaid default interest from May 20 to the Petition Date in the amount of $3,300; unbilled and unpaid default interest from the Petition Date

through November 26 in the amount of $2,903.14; and unreimbursed legal fees incurred by Commerce Bank prior to the Petition Date in the amount of $8,478.90.

2.1.28 "**Common Units**" means 91 common units held by and among the Equity Interest Holders as of the Petition Date, plus the New Common Units issued by the Reorganized Debtor for sale to Subscribers participating in the New Unit Offering.

2.1.29 "**Confirmation Date**" means the date on which the Confirmation Order has been entered by the Bankruptcy Court.

2.1.30 "**Confirmation Hearing**" means the hearing before the Bankruptcy Court to consider confirmation of the Plan.

2.1.31 "**Confirmation Hearing Date**" means November 23, 2020, the date on which the Bankruptcy Court holds the Confirmation Hearing.

2.1.32 "**Confirmation Order**" means an order entered by the Bankruptcy Court confirming the Plan.

2.1.33 "**Confirmation Scheduling Order**" means the *Order Setting Deadlines in Connection with Confirmation Hearing and Notice of Confirmation Hearing* entered by the Bankruptcy Court on October 14, 2020. [Dkt. No. 123.]

2.1.34 "**Creditor**" means "creditor" within the meaning of section 101(10) of the Bankruptcy Code.

2.1.35 "**Debtor**" means Blue Star Doughnuts LLC, dba Blue Star Donuts, as a debtor and debtor-in-possession.

2.1.36 "**Disallowed**" means, with respect to a Claim, any Claim that is not Allowed.

2.1.37 "**Effective Date**" means the first Business Day following the date on which certain conditions have been satisfied, including: (i) the Confirmation Order has become a Final Order; provided, however, in the discretion of the Debtor, a Confirmation Order that is subject to a pending appeal or certiorari proceeding may be relied upon by the Reorganized Debtor as a Final Order if no court of competent jurisdiction has entered an order staying the effect of the Confirmation Order; (ii) all actions, documents, and agreements deemed necessary in the Debtor's discretion to implement the Plan have been effected or executed; (iii) the Debtor has received, to the extent necessary, all authorizations, consents, rulings, opinions, or other documents that are determined by the Debtor to be necessary to implement the Plan; and (iv) in the event the Debtor determines that distributions on account of Allowed Claims will exceed $800,000, the Plan Sponsor has waived, in writing, its right to revoke its offer to purchase New Common Units from the Reorganized Debtor for $1,000,000.

2.1.38 "**Equity Interests**" means the ownership interests in the Debtor as of the Petition Date.

2.1.39 "**Equity Interest Holder**" means each of Katherine J. Poppe, Basil Bullard, Gary "Chip" Rothenberger, Jr., Micah L. Camden, and W.P. Price Tax and Accounting, LLC in their capacities as owners of the Debtor as of the Petition Date.

2.1.40 "**Final Order**" means an order or judgment of the Bankruptcy Court (i) that has not been reversed, rescinded, stayed, modified or amended; (ii) that remains in full force and effect; and (iii) with respect to which (x) the time to appeal or seek review, remand, rehearing, or a writ of certiorari has expired and as to which no timely filed appeal or petition for review, rehearing, remand, or writ of certiorari is pending, or (y) any such appeal or petition has been dismissed or resolved by

108812337.3 0056668-00010

agreement of the parties or by the highest court to which the order or judgment was appealed or from which review, rehearing, remand, or a writ of certiorari was sought.

2.1.41 "**Ford Transit Vehicles**" means the three delivery vans owned by the Debtor as of the Petition Date.

2.1.42 "**Ford Transit Installment Contracts**" means the three contracts between the Debtor and Ford Motor Credit Company (as assignee of Courtesy Ford Lincoln) dated May 12, 2017, September 7, 2017, and November 23, 2018.

2.1.43 "**Gift Card Motion**" means the *Motion for Order Authorizing the Debtor to Maintain and Administer its Existing Gift Card Program and Honor Prepetition Obligations Related Thereto.* [Dkt. No. 11.]

2.1.44 "**Impaired**" means, with respect to an Allowed Claim or Allowed Equity Interest, the legal, equitable, and/or contractual rights to which its Creditor or Equity Interest Holder is entitled when altered by the Plan.

2.1.45 "**IRS**" means the Internal Revenue Service.

2.1.46 "**Katherine J. Poppe**" or "**Poppe**" means Katherine J. House.

2.1.47 "**Lien**" means charge against or interest in property to secure payment of a debt or performance of any obligation.

2.1.48 "**LLC Operating Agreement**" means that certain Amended and Restated Operating Agreement of Blue Star Doughnuts LLC, dated August 22, 2016.

2.1.49 "**Members**" means a holder of Common Units.

2.1.50 "**Menashe Parties**" means Morrison Development, Menashe Properties, LLC and its affiliated entities and principals, managers and other individuals in control of or employed with Menashe Properties LLC.

2.1.51 "**Morrison Development**" means Morrison Development, LLC.

2.1.52 "**Morrison/SW12th Lease**" means that certain Retail Lease Agreement dated September 11, 2017 between Morrison Development and the Debtor.

2.1.53 "**New Common Units**" means the common units offered for sale by the Reorganized Debtor and purchased by the Subscribers participating in the New Unit Offering on the Effective Date.

2.1.54 "**New Unit Offering**" means the offering for sale of New Common Units in the Reorganized Debtor on the Effective Date.

2.1.55 "**Notice to Non-Voting Classes**" means that certain *Notice to Non-Voting Classes of (I) Non-Voting Status Under Debtor's Plan of Reorganization and (II) Confirmation Hearing*.

2.1.56 "**Notice to Voting Classes**" means that certain *Notice to Voting Classes of (I) Deadline for Casting Votes to Accept or Reject Debtor's Plan of Reorganization and (II) Confirmation Hearing*.

2.1.57 "**Objection Deadline**" is November 16, 2020, the deadline by which Creditors and Equity Interest Holders must object to confirmation of the Plan.

2.1.58 "**Petition Date**" means August 26, 2020.

2.1.59 "**Plan**" means the Plan of Reorganization proposed by the Debtor, as such may be amended from time to time, and includes for avoidance of doubt the *First Amended Plan of Reorganization Pursuant to Subchapter V of Chapter 11 of the Bankruptcy Code, dated November 18, 2020.*

108812337.3 0056668-00010

Case 20-32485-pcm11   Doc 149   Filed 11/19/20

2.1.60 "**Plan Sponsor**" means Sortis Holdings, Inc., in its capacity as a new investor in the Reorganized Debtor and sponsor of the Plan.

2.1.61 "**Post-petition Fee Cap**" means the Administrative Expense Claim of Stoel Rives on account of legal services provided to the Debtor in the Chapter 11 Case, as further defined in Section 4.1 of the Plan.

2.1.62 "**PPP**" means the Paycheck Protection Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116-136 (2020), as amended by the PPPFA, and as implemented by the SBA and Treasury regulations and implementing guidance.

2.1.63 "**PPPFA**" means the Paycheck Protection Program Flexibility Act of 2020, Pub. L. 116-142 (2020).

2.1.64 "**PPP Loan**" means the unsecured loan made by Commerce Bank to the Debtor pursuant to the PPP on or around April 8, 2020.

2.1.65 "**PPP Loan Documents**" means the agreements between Commerce Bank and the Debtor evidencing and relating to the PPP Loan.

2.1.66 "**Priority Tax Claims**" means Claims of Taxing Agencies for the principal amount of a tax within the meaning of section 507(a)(8) of the Bankruptcy Code, and statutory interest accruing thereon prior to the Petition Date.

2.1.67 "**Professional Persons**" means persons, including a trustee, retained or to be compensated pursuant to sections 326, 327, 328, 330, and/or 1103 of the Bankruptcy Court.

2.1.68 "**Profits Interest Units**" means profits interest units issued by the Reorganized Debtor to its senior officers and management on the Effective Date of the Plan.

2.1.69 "**Profits Interest Unit Agreement**" means that certain agreement between the Reorganized Debtor and any entity or individual that is issued Profits Interest Units by the Reorganized Debtor on the Effective Date.

2.1.70 "**Progress Ridge Landlord**" means DS Progress Ridge LLC.

2.1.71 "**Progress Ridge Lease**" means that certain Lease between the Progress Ridge Landlord and the Debtor dated August 2, 2017.

2.1.72 "**Proof of Claim**" means a proof of claim as defined in Bankruptcy Rule 3001(a).

2.1.73 "**Pro Rata**" means proportionally so that the ratio of the amount distributed on account of a particular Allowed Claim to the amount of such Allowed Claim is the same as the ratio of the amount distributed on account of all Allowed Claims in the Class of which such particular Allowed Claim is a member to the total amount of all Allowed Claims in such Class.

2.1.74 "**Reorganized Debtor**" means the Debtor as reorganized pursuant to the Plan on and following the Effective Date.

2.1.75 "**SBA**" means the United States Small Business Administration.

2.1.76 "**Second Amended and Restated LLC Operating Agreement**" means the LLC Operating Agreement as amended and restated pursuant to the Plan.

2.1.77 "**Secured Claim**" means an Allowed Claim that is secured by a Lien against the Debtor's assets in accordance with sections 502 and 506(a) of the Bankruptcy Code.

2.1.78 "**Schedules**" means the schedules of assets, liabilities and contracts, and the statement of financial affairs filed on behalf of the Debtors pursuant to section 521

108812337.3 0056668-00010

of the Bankruptcy Code, and in accordance with the Bankruptcy Rules, as each has been, or may be, amended and supplemented from time to time.

2.1.79 "**Solicitation Date**" means October 16, 2020.

2.1.80 "**State Court Action**" means *Morrison Development LLC v. Blue Star Doughnuts LLC*, case no. 20cv19836, currently pending in the Multnomah County Circuit Court.

2.1.81 "**Stoel Rives**" means Stoel Rives LLP.

2.1.82 "**Subchapter V**" means sections 1181 through 1195 of the Bankruptcy Code.

2.1.83 "**Subscriber**" means a person who purchases New Common Units by participating in the New Unit Offering on the Effective Date.

2.1.84 "**Subscription Agreement**" means that certain agreement pursuant to which Subscribers offer to purchase New Common Units issued by the Reorganized Debtor.

2.1.85 "**Taxing Agency(ies)**" means any governmental or municipal agency holding a Claim that is not a Secured Claim and that is otherwise entitled to treatment as a Priority Tax Claim.

2.1.86 "**Treasury**" means the United States Department of the Treasury.

2.1.87 "**Trustee**" means the Subchapter V trustee, Amy E. Mitchell, appointed pursuant to section 1183(a) of the Bankruptcy Code in the Chapter 11 Case.

2.1.88 "**Unimpaired**" means, with respect to an Allowed Claim or Allowed Equity Interest, the legal, equitable, and/or contractual rights to which the respective Creditor or Equity Interest Holder is entitled, as unaltered by the Plan.

2.1.89 "**UST**" means the United States Trustee.

2.1.90 "**Unsecured Claim**" means a Claim that is (a) based upon (i) a Proof of Claim executed and filed in accordance with Bankruptcy Rule 3003(c) prior to the Claims Bar Date, or (ii) the listing of the Claim in one of the Debtor's Schedules as other than disputed, contingent, or unliquidated, and (b) not a Secured Claim or an Unclassified Claim.

2.1.91 "**Wages Motion**" means the *Motion for Interim and Final Orders (I) Authorizing Payment of Prepetition Wages, Salaries, Compensation, Expenses, Benefits, and Related Taxes, (II) Authorizing Continuation of Employee Benefits Post-Petition, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief.* [Dkt. No. 12.]

2.1.92 "**Wells Fargo**" means Wells Fargo Bank, N.A.

2.1.93 "**Wells Fargo Credit Line**" means that certain $100,000 credit line extended by Wells Fargo to the Debtor on or around March 2020 in connection with the issuance of a "Business Elite" credit card.

## 2.2 Rules of Interpretation; Time Periods.

For purposes of the Plan:

2.2.1 Whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural.

2.2.2 Any payment required under this Plan on a certain date shall be made on such date or as soon thereafter as practicable.

2.2.3 Any reference in the Plan to a contract, instrument, release, or other agreement or document being in a certain form or on certain terms and conditions means that

108812337.3 0056668-00010

such document shall be substantially in such form or substantially on such terms and conditions.

2.2.4 Any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit, as it may have been or may be amended, modified, or supplemented through and including the Confirmation Date which, after such documents or exhibits are filed, may be amended, modified, or supplemented only with the express written consent of the Debtor or the Reorganized Debtor.

2.2.5 Unless otherwise specified, all references in the Plan to sections, articles, and exhibits are references to sections, articles, and exhibits of or to this Plan.

2.2.6 The words "herein," "hereof," "hereto," hereunder" and others of similar import refer to the Plan in its entirety rather than to only a particular portion of the Plan.

2.2.7 Captions and headings to articles and sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan.

2.2.8 All exhibits and schedules referenced in the Plan are incorporated in the Plan as if expressly incorporated in the Plan, regardless of when those exhibits are filed with the Bankruptcy Court, and all contracts, instruments, releases or other agreements or documents referred to in the Plan or in any of the foregoing, shall be deemed necessary to the Plan's implementation and a part of the Plan as if expressly incorporated in the Plan.

2.2.9 To the extent any discrepancy exists between the description contained herein of an exhibit or schedule referenced in the Plan, or the description in the Plan of a contract, instrument, release or other agreement necessary to the implementation of the Plan, the actual agreement or document shall govern.

2.2.10 The rules of construction set forth in section 102 of the Bankruptcy Code shall apply.

2.2.11 To the extent of any inconsistence, contradiction, or ambiguity between the Plan and the Confirmation Order, the terms of the Confirmation Order shall control.

2.2.12 In computing any period of time prescribed by or allowed under the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**SECTION III**
**THE DEBTOR'S HISTORICAL PERFORMANCE**
**AND TURNAROUND BUSINESS PLAN**

**3.1    History of the Debtor's Business.**

The Debtor is a manager-managed limited liability corporation registered under the laws of the State of Oregon that was founded by Katherine J. Poppe and Micah L. Camden in 2012. As of the Petition Date, the Equity Interest Holders with Equity Interests in the Debtor were as follows:

- Katherine J. Poppe (46 common units (50.5%));
- Basil Bullard (15 common units (16.5%));
- Gary "Chip" Rothenberger, Jr. (15 common units (16.5%));
- Micah L. Camden (14 common units (14.4%)); and
- W.P. Price Tax and Accounting, LLC (1 common unit (1%)).

Prior to the Petition Date, Poppe was the sole manager of the Debtor. On the Petition Date and thereafter during the post-petition period, Poppe shared management duties with William Price, the Debtor's chief financial officer.

**3.2    The Debtor's Business Model and Performance Prior to Covid-19.**

Prior to March 17, 2020, on which date Oregon's Governor Brown issued Executive Order 20-07 that prohibited all restaurants and cafes in Oregon from offering in premises consumption of food and beverages, the Debtor operated a "hub-and-spoke" model pursuant to which all of its products were prepared in one central production kitchen – at the location on the corner of Morrison Street and SW 12th – and delivered to the Debtor's seven other retail locations across the Portland metropolitan area. 100% of the Debtor's revenues prior to March 17, 2020, were driven from in-store, in-person, retail sales.

Prior to March 17, 2020, the Debtor's business model was profitable. For the year 2018, the Debtor had net sales of $6,287,405, gross profit of $2,606,315, and net income of $244,349. For the year 2019, the Debtor had net sales of $6,780,174, gross profit of $2,785,411, and net income of $518,018. As of December 31, 2019, the Debtor's balance sheet reflected a Current Ratio of 3.17, Cash to Debt Ratio of 2.45 and a debt to equity ratio of just 0.2. Moreover, for the two-month period ending February 29, 2020, the Debtor had net sales of $940,703, gross profit of $262,388 and a net loss of $65,843. During the same two-month period in 2019, the Debtor had net sales of $850,322, gross profit of $300,247, and a net loss of $40,814.

**3.3    The Debtor's Performance During Covid-19.**

As a result of Executive Order 20-07, the Debtor was forced to cease operations at its eight retail locations in and around Portland, Oregon. The Debtor's retail operations remained closed from mid-March through end of May 2020, during which period the Debtor was unable to generate any revenue from its retail operation.

Faced with an uncertain retail environment, the Debtor continued to work out of its production kitchen on Morrison Street and SW 12th in an effort to generate revenues from the launch of a new wholesale product line. In April 2020, the Debtor's wholesale product line generated net sales of $29,969 and a net loss of $165,132. Net sales in May 2020 were $34,404, wholly from its wholesale product line, and the Debtor suffered a net loss in May 2020 of $151,487.

In June 2020, Governor Brown authorized the reopening of retail establishments and the Debtor reopened its Division Street retail location for online preorders and walk-up business. By the end of June 2020, the Debtor was able to reopen its retail location on Mississippi Avenue. The Debtor's June net sales were $85,031 and it suffered a net loss of $75,935, which was a significant improvement from May 2020. The Debtor's upward trajectory continued in July, in which month the Debtor had net sales of $117,824 and a net loss of $45,375.

By business necessity, the shutdown of retail establishments in Oregon forced the Debtor to make a hard pivot to diversify its revenue sources, and during this period the Debtor's senior management worked hard to build from scratch a wholesale and e-commerce product line. At the

same time, the Debtor realized that it needed new capital to build out its production capacity to enable the Debtor to produce, store and package its wholesale and e-commerce products.

In addition, at the beginning of April 2020, the Debtor applied for and obtained a PPP Loan from Commerce Bank on or about April 8, 2020. The PPP Loan was a critical component of the Debtor's ability to manage its affairs during the immediate period prior to the Petition Date.

**3.4    Events Leading to the Filing of the Chapter 11 Case.**

During the period between March 17, 2020, and the Petition Date, the Debtor focused its efforts on generating new revenue from its wholesale product line and conserving cash on hand. Cash conservation required the Debtor to lay off 80 employees and to negotiate rent deferrals with its landlords. Ultimately, the Debtor was unable to negotiate rent deferral with Morrison Development, the landlord of the Debtor's retail location and production kitchen at Morrison Street and SW 12th Avenue.

3.4.1    Termination of the Morrison/SW 12th Avenue Lease

On May 6, 2020, Morrison Development sent the Debtor an email informing the Debtor that it had applied the Debtor's security deposit to unpaid April rent, notwithstanding that the Debtor disputed certain common area maintenance charges assessed during the prior year, and that it intended to exercise all of its remedies under the Morrison/SW 12th Lease. By mid to late May, with its relationship with Morrison Development deteriorating, the Debtor decided to open a temporary kitchen location in order to protect its beta-rollout of its new wholesale product to local grocers. On May 26, 2020, Morrison Development terminated the Morrison/SW 12th Avenue Lease, changed the locks at the premises, and refused to turn over a doughnut fryer that was critical to the Debtor's ongoing operations. On June 5, 2020, Morrison Development sued the Debtor in Multnomah County Circuit Court.

Notwithstanding the commencement of formal litigation, the Debtor and Morrison Development continued negotiating a resolution to their disputes through late August 2020, at which point the Debtor determined that it was simply unable to structure a settlement with Morrison Development out of court.

3.4.2    Commerce Bank Default

On May 20, 2020, Commerce Bank, through counsel, sent the Debtor a notice of default and cessation of advances under the Commerce Bank Operating Line of Credit. During the subsequent months, the Debtor worked with Commerce Bank on assessing the latter's collateral position. Discussions ended when the Debtor filed for chapter 11 protection on the Petition Date but have resumed during the Chapter 11 Case in an effort by both parties to enable the Debtor to pay Commerce Bank on its Secured Claim and emerge from chapter 11 protection.

**3.5    Events during the Bankruptcy Case and the Debtor's Post-Petition Performance.**

### 3.5.2    First Day Papers

The Debtor, a small business debtor pursuant to section 101(51D) of the Bankruptcy Code, filed for chapter 11 protection on August 26, 2020, and elected to be administered pursuant to Subchapter V on its petition.  On or about the Petition Date, the Debtor filed its First Day Papers and, at the first day hearing on August 28, 2020, obtained interim relief on its Cash Management Motion [dkt. no. 10] and its Cash Collateral Motion [dkt. no. 17], and final relief on its Gift Card Motion [dkt. no. 11] and its Wages Motion [dkt. no. 12].

At a continued hearing on September 15, 2020 on the Cash Collateral Motion and the Cash Management Motion, the Debtor and Commerce Bank negotiated terms of a second interim order authorizing the Debtor to use Commerce Bank's cash collateral, subject to certain conditions and milestones.  On September 24, 2020, the Court entered the *Second Interim Order Authorizing Use of Cash Collateral and Granting Related Relief* [dkt. no. 99], pursuant to which the Debtor agreed to make monthly adequate protection payments in the amount of $15,000, to use cash collateral in accordance with an agreed-upon budget, to provide Commerce Bank with certain financial reporting, and to comply with certain milestones including filing the Plan by November 16, 2020, obtaining the Confirmation Order by December 31, 2020, and an Effective Date no later than January 15, 2021, pursuant to which Plan the Debtor stipulated to pay off Commerce Bank on its Allowed Claim relating to the Commerce Bank Operating Line of Credit in full.

### 3.5.2    Section 1188(a) Status Conference

On September 1, 2020, the Court entered the *Order Setting Case Management Conference and Notice of Possible Dismissal*.  [Dkt. No. 44].  On September 21, 2020, the Debtor filed its *Subchapter V Status Report Pursuant to Section 1188(c) of the Bankruptcy Code*.  [Dkt. No. 96.]  On October 5, 2020, the Bankruptcy Court held a status conference and ordered the following milestones and deadlines in connection with confirmation of the Plan in its Confirmation Scheduling Order:

- By October 7th, the Debtor shall circulate a copy of its draft Plan to the United States Trustee, the Trustee and counsel to parties in interest who have filed notices of appearance in the Chapter 11 Case or otherwise reached out informally to Stoel Rives;

- By October 13th, parties who have received copies of the Debtor's draft Plan shall provide comments to Stoel Rives;

- By October 15th, the Debtor shall file its Plan with the Bankruptcy Court and include an exhibit highlighting unresolved comments by parties in interest to the Plan;

- By October 16th, the Debtor shall mail, by first-class mail, solicitation packages to all Creditors and Equity Interest Holders;

- October 30th is the record date by which Creditors and Equity Interest Holders must be the holder of any Claim or Equity Interest based on a security in order to vote on the Plan;

- Ballots must be received by Stoel Rives by November 6;

- The Debtor shall file a ballot tabulation summary by November 9;

- The deadline to object to confirmation of the Plan is November 16th;

- The deadline for the Debtor to file its memorandum in support of confirmation of the Plan along with a proposed Confirmation Order is November 18th;

- The Bankruptcy Court shall hold a status conference hearing via telephone on November 19th at 9:00 a.m. (PT), call in number (888) 684-8852, access code: 1238244; and

- The Confirmation Hearing Date is November 23rd, at 9:30 a.m. (PT), call in number (888) 684-8852, access code: 1238244.

### 3.5.3 Recapitalization of the Debtor Pursuant to Section 1129 of the Bankruptcy Code

Historically, the Debtor's financial performance depended 100% on retail sales, and the Debtor's performance prior to Covid-19 was healthy: in 2018, the Debtor had net income of $244,348.88, and in 2019, the Debtor had net income of $518,017.85, all of which was generated through the Debtor's operation of eight retail locations in the Portland metropolitan area. While the Debtor's financial performance in the first ten weeks of 2020 was in line with its historical performance, the shutdown caused by Executive Order 20-07 caused the business's retail locations to cease operating and the Debtor's revenues generated from its retail locations to dry up completely. But for the Debtor's receipt of the PPP Loan and its timely pivot to wholesale, the Debtor would have been unable to generate any revenue during the shutdown. Even so, the Debtor's financial performance from January 2020 through July 2020 generated a net loss of $695,905.39. *See* Dkt. No. 96, Ex. B.

Since June, when the Debtor was able to start reopening certain of its locations, the Debtor's performance has steadily improved. *See* Dkt. No. 96, Ex. A. However, notwithstanding the positive trend, the Debtor continues to be unable to generate sufficient receipts to cover its operating expenses, due in part to a production bottleneck – *i.e.*, the Debtor simply cannot produce sufficient volume to operate the three reopened locations seven (7) days a week or to generate positive cash flows on its new wholesale product line. Moreover, the Debtor simply lacks the capital to invest in increased production capacity to grow its wholesale and e-commerce line. As set forth in the budget attached to the Second Interim Cash Collateral Order [dkt. no. 99], the Debtor projects cash on hand as of November 16th of $173,716.34. For this reason, it is imperative that the Debtor confirm its Plan and that the Effective Date occur on or prior to December 15, 2020, because the Debtor needs an infusion of new capital to bridge its operations through the first quarter in 2021, by which time the Debtor expects to have increased production capacity to

Case 20-32485-pcm11   Doc 149   Filed 11/19/20

generate significant additional sales through its wholesale and e-commerce line that will generate net income. For avoidance of doubt, the Debtor's projections are based on certain assumptions, including that the Executive Order (EO 20-65) issued by Governor Brown on November 17, 2020, will not have a material adverse effect on the Debtor's business operations.

**3.6      Turnaround Business Plan; Recapitalization.**

The Debtor's Plan is predicated on an infusion of at least $1,150,000 of new capital, of which $800,000 shall be allocated to satisfy Allowed Claims under the Plan and the remaining funds shall be allocated to capital expenditures and working capital needs of the Reorganized Debtor. As set forth in **Exhibit A** attached hereto, the Reorganized Debtor anticipates that it will generate positive cash flow early in the second quarter of 2021, subject to certain assumptions, including without limitation that the Executive Order (EO 20-65) issued by Governor Brown on November 17, 2020, will not have a material adverse effect on the Debtor's business operations.

**SECTION IV**
**TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN**

**4.1      Unclassified Claims.**

Administrative Expense Claims and Priority Tax Claims that are Allowed are not classified under the Plan, and Creditors holding Allowed Administrative Expense Claims and Priority Tax Claims do not vote on the Plan but may object to confirmation of the Plan if, in their view, the Plan's treatment does not comply with section 1129(a)(9) of the Bankruptcy Code. Because the Debtor elected to be administered pursuant to Subchapter V of the Bankruptcy Code, section 1191(e) applies in the Chapter 11 Case, which provides that the Plan may be confirmed over the objections of Creditors holding Allowed Claims of a kind in sections 507(a)(2) and 507(a)(3) of the Bankruptcy Code – including Allowed Administrative Expense Claims pursuant to section 503(b) of the Bankruptcy Code – if all of the conditions of section 1191(b) are otherwise satisfied.

As set forth in the Debtor's feasibility analysis in **Exhibit A**, the Debtor does not anticipate significant Administrative Expense Claims in the Chapter 11 Case on the Effective Date for two reasons: first, the Debtor is paying operating expenses in the ordinary course, including production expenses that are paid cash on delivery; and second, the Debtor's bankruptcy counsel, Stoel Rives, has agreed to the Post-petition Fee Cap, which caps post-petition legal fees incurred on account of and in connection with the confirmation of a Plan that satisfies section 1191(a) of the Bankruptcy Code in the amount of $25,000 subject to the Bankruptcy Court's determination that its fees should be Allowed, provided that the Post-petition Fee Cap shall not include and shall expressly exclude any legal fees incurred by the Debtor for legal services provided by Stoel Rives that relate to (i) a litigation matter in the Chapter 11 Case, including an adversary proceeding or contested matter involving a binary debtor-creditor dispute, (ii) a sale of substantially all of the Debtor's assets under section 363 or 1129 of the Bankruptcy Code, or (iii) confirmation of a Plan that relies on the "disposable income" test under section 1191(c) of the Bankruptcy Code.

Priority Tax Claims are unsecured income, employment, and other taxes described by section 507(a)(8) of the Bankruptcy Code. Unless Creditors holding Allowed Priority Tax Claims

agree otherwise, they must receive the present value of their Allowed Claims, in regular installments paid over a period not exceeding five years from the Petition Date. Two Creditors filed Proofs of Claim asserting Priority Tax Claims: the Oregon Department of Revenue in the amount of $5,943.76; and the IRS in the amount of $1,007.33. The Debtor does not dispute the validity, amount or priority of these Claims. Under the Plan, the Oregon Department of Revenue will receive full payment on account of its Allowed Claim within three (3) Business Days following the Effective Date.

Counsel for the IRS has informed Debtor's counsel in writing that (i) the IRS's Claim, including the portion that is a Priority Tax Claim, consists entirely of unassessed 2020 returns, (ii) the IRS expects to receive payment from the Reorganized Debtor in the ordinary course rather than in connection with the occurrence of the Effective Date, and (iii) the IRS intends to withdraw its Claim or amend its Claim to $0 upon receipt of the 2020 returns and the payment by the Reorganized Debtor of any remaining balance. Accordingly, under the Plan, no payment will be made to the IRS within (3) Business Days following the Effective Date.

**4.2    Classified Claims and Equity Interests under the Plan.**

All Allowed Claims against, and Allowed Equity Interests in, the Debtor are classified below. An Allowed Claim is in a Class only to the extent it qualifies within the definition of such Class and is in a different Class to the extent it qualifies within the definition of such different Class. Because there is only one type of Equity Interest in the Debtor, all Equity Interests are classified in Class 8. The Classes of Allowed Claims and Allowed Equity Interests, and the Plan's treatment of each Class, are set forth below:

| Class | Description | Amount Owed | Treatment |
|---|---|---|---|
| 1 | Commerce Bank Allowed Secured Claim | $285,305.61 (consisting of outstanding principal as of October 30 in the amount of $269,950.81; interest through Nov. 26 in the amount of $622.76; UCC termination fee in an estimated amount of $50; unbilled and unpaid default interest from 5/20 to Petition Date in the amount of $3,300; unbilled and unpaid default interest from Petition Date through November 26 in the amount of $2,903.14); plus unreimbursed legal fees incurred by Commerce Bank from June 20 through August 20 in the amount of $8,478.90). The Amount Owed does not include legal fees incurred by Commerce Bank's counsel since the Petition Date, which remain subject to dispute, and if litigated, subject to a reasonableness determination by the Bankruptcy Court. | Impaired; Entitled to Vote.<br><br>(1) Payment in satisfaction of the Commerce Bank Stipulated Claim Amount as follows:<br>• $15,000.00 payment by the Debtor on November 20, 2020 (as adequate protection payment pursuant to Cash Collateral Order);<br>• Setoff by Commerce Bank of $20,420.11 in Debtor's Commerce Bank checking account on Effective Date;<br>• $249,885.50 payment by the Reorganized Debtor to be received by Commerce Bank no later than three (3) Business Days following the Effective Date.<br>(2) Commerce Bank retains its liens (including replacement liens), its rights under the Commerce Bank Loan Documents (including the personal guaranty by Katherine Poppe) pending receipt by Commerce Bank of Commerce Bank Stipulated Claim Amount, plus a payment in satisfaction of the reasonable attorneys' fees incurred by Commerce Bank from the Petition Date through the Effective Date as determined by the Bankruptcy Court if necessary.<br>(3) Upon entry of an order of the Bankruptcy Court determining the Allowed amount of the legal fees incurred by Commerce Bank between the Petition Date and the Effective Date, the Reorganized Debtor shall satisfy the Allowed amount within fifteen (15) Business Days following entry of the order fixing the Allowed amount.<br>(4) Within five (5) Business Days following receipt of the payment on account of the Allowed amount of legal fees incurred by Commerce Bank, Commerce Bank shall file a UCC termination with the Oregon Secretary of State. |
| 2 | Wells Fargo Secured Claim | $106,582.43 | Unimpaired; Deemed to Accept<br><br>Payment in Cash of approximately $10,000 on revolving line to satisfy (i) post-petition default interest and fees incurred in connection with the Chapter 11 Case and (ii) principal in an amount that reduces the outstanding balance to less than the credit line limit no later than three (3) Business Days following Effective Date; interest rate returned to non-default rate on Effective Date and revolving credit line reinstated. |

108812337.3 0056668-00010

| Class | Description | Amount Owed | Treatment |
|---|---|---|---|
| 3 | Ford Motor Secured Claim | $50,442.83 | Unimpaired; Deemed to Accept<br><br>Payment in Cash in amount of $1,281.31 to satisfy past-due obligations owed on all three Ford Transit Installment Contracts no later than three (3) Business Days following Effective Date, and post-Effective Date payments in accordance with Ford Transit Installment Contracts. |
| 4 | Priority Unsecured Claims | $369.72 | Unimpaired; Deemed to Accept<br><br>Payment in Cash in full amount of Allowed Claims no later than three (3) Business Days following Effective Date. |
| 5 | Unsecured PPP Claim of Commerce Bank | $559,392.41 (consisting of outstanding principal amount of $545,900, plus interest through November 26, 2020 in the amount of $3,439.91, plus actual legal fees incurred by Commerce Bank in the amount of $6,052.50, plus *estimated* legal fees to be incurred by Commerce Bank in the amount of $4,000 through Effective Date). | Unimpaired; Deemed to Accept<br><br>Commerce Bank has consented to the change of control in the Debtor's ownership structure that will occur on the Effective Date; *provided that*, the Reorganized Debtor shall repay the portion of the PPP Loan not forgiven, if any, pursuant to and in accordance with (i) applicable law, federal regulations, and interim final rules promulgated by the SBA and Treasury implementing sections 1102 and 1106 of the CARES Act and the PPPFA, and (ii) the PPP Loan Documents; and *provided further that*, in the event of a conflict, applicable law, federal regulations and the interim final rules will control. Neither the Plan nor the Confirmation Order shall be construed in any manner that alters the Reorganized Debtor's obligations under the federal regulations, interim final rules, the CARES Act and the PPPFA. Upon full satisfaction of the unforgiven portion, if any, of the Unsecured PPP Claim of Commerce Bank, Commerce Bank's claim as set forth in its Proof of Claim shall be deemed fully satisfied by the Reorganized Debtor without need for any further order from the Bankruptcy Court. |
| 6 | Morrison Development, LLC Unsecured 502(b)(6) Claim | $330,000.00<br><br>Per stipulation between the Debtor and Morrison Development in an amount that includes all attorney's fees, costs and accrued interest through the Effective Date. | [Impaired; Entitled to Vote]<br><br>Payment in Cash in full no later than three (3) Business Days following the Effective Date.<br><br>Upon receipt of payment, the damages sought by Morrison Development in its Proof of Claim shall be deemed fully satisfied by the Reorganized Debtor without need for any further order from the Bankruptcy Court. |
| 7 | General Unsecured Claims (other than Claims in Class 4, Class 5 and Class 6) | Approximately $157,000 | Impaired; Entitled to Vote<br><br>Payment in Cash in full amount of Allowed Claims no later than three (3) Business Days following the later of (i) the Effective Date and (ii) the date on which the Bankruptcy Court enters a Final Order on |

108812337.3 0056668-00010

Case 20-32485-pcm11    Doc 149    Filed 11/19/20

| Class | Description | Amount Owed | Treatment |
|-------|-------------|-------------|-----------|
|       |             |             | Allowance of each Claim; *provided that* total Allowed Claims in Class 7 does not exceed $157,000.00, Class 1 Allowed Claim does not exceed $330,000.00, and Class 6 Allowed Claim does not exceed $330,000.00.  If foregoing is not satisfied, Class 7 Creditors shall receive at least 75% of their Allowed Claims no later than three (3) Business Days following the later of (i) the Effective Date and (ii) the date on which the Bankruptcy Court enters a Final Order on allowance, and the remaining amounts owed on account of Class 7 Allowed Claims in two equal payments on August 1, 2021, and November 1, 2021.  Interest shall accrue on deferred payments at 2.5%.<br><br>Note:  Total amount of Allowed Claims depends on Allowed Claim of Progress Ridge Landlord in the event Proof of Claim for rejection damages is filed. |
| 8 | Equity Interests | N/A | Impaired; Entitled to Vote<br><br>Holders of Allowed Equity Interests shall retain their Common Units in the Reorganized Debtor, subject to the Second Amended and Restated LLC Operating Agreement. |

Multnomah County has filed a Proof of Claim asserting a Secured Claim in the amount of $3,545,14.  In the Plan filed on October 16, 2020, the Debtor included Multnomah County's Claim, which the Debtor does not dispute with respect to validity, amount or priority, as an unclassified Priority Tax Claim.  The Debtor does not intend to object to Multnomah County's Proof of Claim as an Allowed Secured Claim in the amount of $3,545.14, which shall be satisfied within three (3) Business Days following the Effective Date.

## SECTION V
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Executory contracts are contracts where significant performance of the contract remains for both the Debtor and its counterparty.  Pursuant to section 365 of the Bankruptcy Code, the Debtor has the right to reject, assume, or assume and assign these types of contracts to another party, subject to the Bankruptcy Court's approval.  The Debtor's rights to assume and reject executory contracts also extends to unexpired leases.

Assumption means that the Debtor has elected to continue to perform the obligations under such executory contracts and unexpired leases, and to cure monetary defaults that must be cured under the Bankruptcy Code.  The Debtor's cure schedule, attached hereto as **Exhibit B**, identifies each counterparty to an executory contract or unexpired lease that the Debtor believes may require a cure payment, in addition to the amount owed by the Debtor to cure any monetary defaults.

Unless the Plan expressly provides otherwise, the Plan assumes all executory contracts and unexpired leases in which the Debtor is a party, and the Reorganized Debtor shall assume – as of the Effective Date – all of the rights and prospective obligations of the Debtor under any such executory contract or unexpired lease, except to the extent the Plan restructures the rights and obligations of the executory contract or unexpired lease by agreement or by order of the Bankruptcy Court.

Rejection means that the Debtor has elected not to continue to perform the obligations under such executory contract or unexpired lease. If the Debtor has elected to reject an executory contract or unexpired lease, the counterparty to the contract or lease will be treated as a Creditor holding an Unsecured Claim that arose before the Petition Date. The executory contracts and unexpired leases that the Debtor intends to reject pursuant to the Plan are set forth on the Rejection Schedule attached hereto as **Exhibit C**. For the avoidance of doubt, if a contract or lease is not identified on Exhibit C, the Plan constitutes a motion to assume such executory contract or unexpired lease and the Confirmation Order shall constitute an order assuming such contract or lease.

Any Creditor to an executory contract or unexpired lease set forth on Exhibit C shall have 30 days from the Confirmation Date to file Claims for damages arising from the rejection of such executory contract or unexpired lease. Failure to file a Proof of Claim within 30 days of the Confirmation Date shall forever bar any Creditor whose executory contract or unexpired lease is listed on Exhibit C from asserting a claim for damages in connection with the rejection of its executory contract or unexpired lease and from receiving distributions on account of its rejection in accordance with and pursuant to the Plan.

The Debtor expressly reserves the right to amend or supplement Exhibit B and Exhibit C prior to the Confirmation Hearing, including the right to supplement Exhibit C by identifying the LLC Operating Agreement as an executory contract that the Debtor may reject pursuant to confirmation of the Plan.

IF YOU OBJECT TO THE REJECTION OR ASSUMPTION OF YOUR UNEXPIRED LEASE OR EXECUTORY CONTRACT, THE PROPOSED CURE OF ANY DEFAULTS, OR THE ADEQUACY OF ASSURANCE OF FUTURE PERFORMANCE, YOU MUST FILE WITH THE COURT AND SERVE YOUR OBJECTION ON THE DEBTOR NO LATER THAN THE DEADLINE FOR OBJECTING TO THE CONFIRMATION OF THE PLAN.

## SECTION VI
## BANKRUPTCY ESTATE CLAIMS

### 6.1    Avoidance Claims

The Debtor has conducted an analysis of Avoidance Claims that belong to the Bankruptcy Estate, which analysis assesses the likelihood that the Debtor's prosecution of the Avoidance Claims will generate a recovery by the Debtor for the benefit of the Bankruptcy Estate in excess of the costs of prosecution. The Debtor's analysis of Avoidance Claims that arise under section 547 of the Bankruptcy Code is set forth on **Exhibit D**. The Debtor's analysis of Avoidance Claims that arise under sections 544 and 548 of the Bankruptcy Code is set forth on **Exhibit E**.

108812337.3 0056668-00010

**6.2     Treatment of Avoidance Claims Under the Plan**

If the Plan is confirmed, the Avoidance Claims will be waived *in toto* by the Debtor and the recipients of the transfers set forth in Exhibit D and Exhibit E will be released ***by the Debtor*** from any potential liability on account of the transfers they received from the Debtor prior to the Petition Date on the Effective Date.

The Debtor's decision to release the recipients from any claims that could be asserted on account of Avoidance Actions is informed by the following determinations made by the Debtor's management:  first, Avoidance Claims pursuant to section 547 of the Bankruptcy Code are subject to valid defenses; and second, Avoidance Claims pursuant to section 548 of the Bankruptcy Code arose while the Debtor was solvent, but even assuming *arguendo* that the Debtor was insolvent on or about the date on which certain transfers were made, certain Equity Interest Holders of the Debtor have agreed to recapitalize the Debtor pursuant to the Plan in an amount no less than $150,000.00.  But for the Debtor's release of each Equity Interest Holder with respect to any Claims constituting property of the Bankruptcy Estate, new capital from certain of the Equity Interest Holders will not be contributed pursuant to the Plan.  In addition, but for the Debtor's release of each Equity Interest Holder from any Claims constituting property of the Bankruptcy Estate, it is unlikely the Debtor would be able to obtain sufficient votes in favor of the Plan from the Equity Interest Holders in Class 8 to render Class 8 an accepting Class, which would likely impact the Plan Sponsor's support for the Plan.

**6.3     Bankruptcy Estate Claims Against Morrison Development**

**6.3.1     <u>Turnover of Property of the Bankruptcy Estate</u>**

As of the Petition Date, Morrison Development had possession of certain property of the Debtor, most critically a doughnut fryer, in addition to a cooling refrigerator, oven hoods and signage.  The replacement cost of the doughnut fryer is approximately $125,000.00.  The doughnut fryer is critical to the Debtor's ongoing operation, and in connection with settlement discussions, Morrison Development returned the doughnut fryer to the Debtor.

**6.3.2     <u>Avoidance of Landlord Lien Pursuant to Section 545</u>**

As set forth in Section 6.3.4 below, Morrison Development and the Debtor have reached a settlement that is conditioned on the occurrence of an Effective Date and receipt of payment of the Morrison Development Allowed Unsecured Claim prior to December 31, 2020.  Pursuant to the terms of the settlement, Morrison Development waives any right to assert a Lien on property of the Bankruptcy Estate that revests in the Reorganized Debtor on the Effective Date.

**6.3.3     <u>State Court Action</u>**

With respect to the State Court Action, the Debtor has asserted affirmative defenses and counterclaims against Morrison Development for violation of Executive Order 20-13 and HB 4213.  HB 4213 entitles the Debtor to statutory damages from Morrison Development in an amount up to three months' periodic rent plus any actual damages.  The Debtor has asserted total damages in the amount of $271,500.00.  Because the issues raised by the Debtor's counterclaims

108812337.3 0056668-00010

Case 20-32485-pcm11     Doc 149     Filed 11/19/20

involve legal questions of first impression, the Debtor does not take a position in the Plan on the likelihood of success of the Debtor's affirmative defenses and counterclaims.

The settlement set forth in Section 6.3.4 below resolves the State Court Action.

### 6.3.4    Plan Treatment of Morrison Development's Claim; Settlement

Morrison Development's Claim for damages resulting from the termination of the Morrison/SW12th Lease is capped as set forth in section 502(b)(6) of the Bankruptcy Code. In addition, the Debtor has counterclaims against Morrison Development that, if prosecuted successfully, would reduce the Allowed amount of Morrison Development's 502(b)(6) Claim dollar for dollar. Notwithstanding the foregoing, the Debtor submits that a consensual resolution of the Debtor's disputes with Morrison Development is in the best interest of the Bankruptcy Estate, and the Debtor will seek to achieve a consensual settlement prior to the Objection Deadline.

The Debtor and Morrison Development have engaged in good faith and constructive negotiations since the Petition Date and have reached a settlement in connection with their respective Claims. The terms of the settlement are as follows:

1. Morrison Development Allowed Unsecured Claim. Morrison Development shall have an Allowed Unsecured Claim in the amount of $330,000.00, which shall be paid in full by the Reorganized Debtor within three (3) Business Days following the Effective Date;

2. Mutual Release of Rights to Personal Property. On the Effective Date, the Debtor relinquishes all interest in, and rights to, any property remaining in the premises governed by the Morrison/SW 12th Lease, and Morrison Development releases any Lien rights it has or may have against the Debtor's property that constitutes property of the Bankruptcy Estate that revests in the Reorganized Debtor on the Effective Date.

3. Dismissal of State Court Action with Prejudice. Within fourteen (14) Business Days following the Effective Date, the Debtor and Morrison Development shall stipulate to dismissal of the State Court Action with prejudice.

4. Mutual Releases. The Menashe Parties agree to release the Debtor and Reorganized Debtor from any Claims they have or may have against the Debtor that arise under or relate to the Morrison/SW 12th Lease and the related premises. The Debtor and the Reorganized Debtor agrees to release the Menashe Parties from any claims the Debtor has or may have against any of the Menashe Parties that arise under or relate to the Morrison/SW 12th Lease and related premises. For the avoidance of doubt, the mutual releases conveyed herein are limited (a) to and for the benefit of the Debtor, Reorganized Debtor and the Menashe Parties, and (b) to apply only to Claims that arise under or directly relate to the Morrison/SW 12th Lease.

108812337.3 0056668-00010

5. <u>Conditions Precedent to Effectiveness of Mutual Releases</u>.  The effectiveness of the releases is conditioned on (x) entry of the Confirmation Order that confirms the Plan in a form that waives any claims of the Bankruptcy Estate against the Menashe Parties; (y) payment by the Reorganized Debtor of the Morrison Development Allowed Unsecured Claim within three (3) Business Days following the Effective Date, and (z) dismissal with prejudice of the State Court Action within fourteen (14) days following the date on which the Confirmation Order becomes a Final Order.

**6.4     Trustee's Investigation; Reservation of Rights**

The Trustee is reviewing Avoidance Claims belonging to the Bankruptcy Estate.  In particular, the Trustee reserves its rights with respect to (i) the Debtor's claims against Morrison Development, (ii) the Debtor's analysis of the likelihood of recovery from transferees, and (iii) the impact that prosecution of certain of the Avoidance Claims may have on consummation of the Plan, which depends upon $1,000,000 of new capital from the Plan Sponsor and at least $150,000 of new capital from Equity Interest Holders including Katherine J. Poppe and William Price.  In the event the Trustee determines that the Bankruptcy Estate has Avoidance Claims that, in its own determination, are likely to augment the value of the Bankruptcy Estate if prosecuted, the Trustee may seek standing to prosecute Avoidance Claims.  In the event the Trustee seeks standing to prosecute Avoidance Action or Claims the Bankruptcy Estate may have against Morrison Development, the Debtor intends object to any reservation in the Plan that preserves such Claims on the Effective Date for the Trustee to prosecute.

**SECTION VII**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

**7.1     Title to Assets.**

On the Effective Date, (i) all property of the Bankruptcy Estate shall automatically vest in the Reorganized Debtor, and (ii) all property of the Reorganized Debtor is free and clear of all Claims of Creditors, provided that Commerce Bank shall retain its liens (including replacement liens granted in the Cash Collateral Order) pending full payment of the Commerce Bank Secured Claim.  Pending the Effective Date, the Debtor shall remain in possession of all property of the Bankruptcy Estate, and property of the Bankruptcy Estate shall include the property specified in section 541, all property of the kind specified in that section that the Debtor acquires, as well as earnings from services performed by the Debtor, after the date of the commencement of the case through the Effective Date.

**7.2     Second Amended and Restated LLC Operating Agreement.**

On the Effective Date, the LLC Operating Agreement shall be deemed amended and restated as set forth in **<u>Exhibit F</u>** to (i) allow the Reorganized Debtor to issue additional Common Units and two series (voting and non-voting) of Profits Interest Units, which will have the effect of diluting the Equity Interest Holders' interests in the Reorganized Debtor *Pro Rata*, (ii) designate that the manager of the Reorganized Debtor shall be three directors to serve on the Board of Directors, a majority of whom may take action, (iii) designate that Basil Bullard is entitled to select one board observer, (iv) provide that Katherine J. Poppe shall be entitled to elect two directors and

108812337.3 0056668-00010

the Plan Sponsor one director to the Board of Directors, (v) allow the Board of Directors to designate officers of the Reorganized Debtor and to delegate authority to them, (vi) modify the vote of Members on specified items to a super-majority standard, and (vii) make certain other changes to the LLC Operating Agreement.

## 7.3 New Unit Offering.

As of the Solicitation Date, the Debtor has received executed Subscription Agreements from the Subscribers set forth on **Exhibit G** to purchase New Common Units in the Reorganized Debtor. Since the Solicitation Date, the Debtor has received a Subscription Agreement from Basil Bullard. True and correct copies of the Subscription Agreements executed by the Subscribers, as may be amended from time to time on terms agreeable to the Debtor and each and every Subscriber, are included in Exhibit G.

On the Effective Date, the Reorganized Debtor shall close on the sale of New Common Units in the Reorganized Debtor to the Subscribers who have executed Subscription Agreements with the Debtor. The Plan Sponsor is a Subscriber who has offered to purchase $1,000,000.00 of New Common Units and Katherine Poppe, William Price and Basil Bullard have offered to purchase $500,000.00 of New Common Units, provided that: (i) the Plan is confirmed by December 15, 2020; (ii) at least $350,000.00 of the proceeds of the New Unit Offering are used for working capital and capital expenditures by the Reorganized Debtor and no more than $800,000 of the proceeds of the New Unit Offering are distributed to holders of Allowed Claims under the Plan; and (iii) the Reorganized Debtor issues up to 995 Profits Interest Units to management of the Reorganized Debtor.

Upon the closing of the New Unit Offering, the Reorganized Debtor's capital structure shall be substantially in the form as set forth in **Exhibit H** attached hereto; *provided that*, in the event any of the other Equity Interest Holders of the Debtor decide to participate in the New Unit Offering, the Reorganized Debtor's capital structure shall be revised to reflect the participation of the other Equity Interest Holders.

## 7.4 Management and Compensation of Reorganized Debtor's Officers.

As of the Effective Date, Katherine J. Poppe shall be the chief executive officer and William Price shall be the chief financial officer. Compensation for Ms. Poppe and Mr. Price is set forth on **Exhibit I**.

## 7.5 Feasibility Pursuant to Section 1129(a)(11).

In order to confirm the Plan and for the Plan to become effective on the Effective Date, the Bankruptcy Court must find that the Plan is feasible pursuant to section 1129(a)(11), which requires the Bankruptcy Court to determine that confirmation of the Plan is unlikely to be followed by a liquidation or the need for further financial reorganization of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

The Debtor's Plan is a reorganization plan that does not propose to liquidate assets or to further reorganize or reconstitute itself after the Effective Date. The Debtor's Plan will be funded by the Plan Sponsor and capital contributions by certain Equity Interest Holders of the Debtor,

including Katherine J. Poppe, William Price and Basil Bullard, which the Debtor believes will provide the Reorganized Debtor with (i) sufficient available cash to make distributions on account and in full satisfaction of Allowed Claims within a few days following the Effective Date of the Plan, and (ii) sufficient capital make the necessary investments in the Reorganized Debtor's production capacity. Upon confirmation of the Plan, the Debtor shall execute the Subscription Agreements, and, on the Effective Date, the Reorganized Debtor shall issue New Common Units to the Subscribers and distribute proceeds from the New Unit Offering to holders of Allowed Claims in accordance with Exhibit A.

**7.6     The Effective Date of the Plan**.

The Effective Date of the Plan shall be the day on which the Confirmation Order becomes a Final Order, provided that the Effective Date shall occur no later than December 15, 2020. Prior to the Effective Date and upon entry of the Confirmation Order by the Bankruptcy Court, the Debtor shall be authorized to (i) execute Subscription Agreements evidencing new capital in an amount no less than $1,150,000; (ii) constitute the Reorganized Debtor's Board of Directors; and (iii) take all necessary actions to prepare for and consummate the New Unit Offering on the Effective Date.

**7.7     Consummation of the Plan.**

On the Effective Date, the Reorganized Debtor shall issue New Common Units and Profit Interest Units to the Subscribers in exchange for their capital contributions, which shall be received by the Reorganized Debtor on the Effective Date. Within three (3) Business Days of the Effective Date, the Reorganized Debtor shall make distributions in satisfaction of Allowed Claims in accordance with and pursuant to the Plan by issuing checks to holders of Allowed Claims at each Creditor's address listed on its Proof of Claim or on the Debtor's Schedules, or alternatively, initiating wire transfers in accordance with separate instructions provided by Creditors to the Debtor.

**7.8     Alternatives to the Plan; Fiduciary Duties.**

The Debtor is a debtor in possession under chapter 11 of the Bankruptcy Code, which requires the Debtor to administer the Bankruptcy Estate in a manner that maximizes the going-concern value of the Debtor's assets for the benefit of all stakeholders. In the event the Debtor is unable to confirm the Plan for whatever reason, or alternatively, in the event the Plan is confirmed but the Debtor is unable to consummate the New Unit Offering on the Effective Date, the Debtor reserves its rights under applicable law to take reasonable steps to preserve the value of its going-concern, including, if necessary, by seeking alternative financing and/or moving the Court for an order to sell substantially all of its assets pursuant to sections 363(b) or 1129 of the Bankruptcy Code.

As a fiduciary, the Debtor may modify the Plan prior to the Confirmation Hearing if the Debtor determines that such modifications are in the best interest of the Bankruptcy Estate and the best interest of the Creditors and Equity Interest Holders.

108812337.3 0056668-00010

**7.9    Contingencies; Risk Factors.**

7.9.1    <u>Feasibility</u>.  In the event the PPP Loan is not forgiven by the SBA by the Confirmation Hearing Date, the Debtor intends to present evidence at the Confirmation Hearing of the likelihood that the PPP Loan will be forgiven. Moreover, and to the extent necessary, the Debtor will present evidence of its ability to service loan repayments to the extent a portion of the PPP Loan is not forgiven.

7.9.2    <u>PPP Loan; SBA/Commerce Bank Consent to Change-of-Control Plan</u>. Consummation of the Plan results in a dilution of the Equity Interests held by the Equity Interest Holders of less than 50%.  SBA Procedural Notice 5000-20057, effective as of October 2, 2020, specifies that SBA prior consent to a change-of-control in a borrower who has received PPP funds is not required if the sale or other transfer is of 50% or less of the common stock or other ownership interest. However, if the Debtor determines that certain of the Subscribers may decide not to purchase New Common Units on the Effective Date, the effect of which would result in a change-of-control of greater than 50%, the Debtor may seek to further amend the Plan, which will delay the occurrence of the Effective Date. Furthermore, Commerce Bank's consent is conditioned its consent on SBA consent in the event consummation of the Plan results in a change-of-control of greater than 50%.

7.9.3    <u>Administrative Insolvent Bankruptcy Estate</u>.  In the event the Debtor determines that it is unable to confirm the Plan prior to the Confirmation Hearing Date, or alternatively, determines that it is unable to consummate the New Unit Offering on the Effective Date, there is a significant risk that the Debtor will need to immediately pivot to a sale of substantially all of its assets pursuant to section 363 or section 1129 of the Bankruptcy Code in light of the likelihood that the Bankruptcy Estate will be administratively insolvent.

7.9.4    <u>Loss of Equity Interest Holder Support for Plan Confirmation</u>.  The Debtor's Plan is a recapitalization plan that requires the support of, and new capital from, the Class of Equity Interest Holders.  Pursuant to the Plan, the Debtor waives all Claims it has or may have against the Equity Interest Holders on account of transfers made by the Debtor to the Equity Interest Holders prior to the Petition Date.  In the event one or more of the Equity Interest Holders is sued on account of transfers made by the Debtor to the Equity Interest Holders prior to the Petition Date, or alternatively, in the event the Bankruptcy Court does not confirm the Plan unless such Claims are preserved, the Debtor will need to resolicit the votes from Class 8, which in turn may cause the Plan Sponsor to withdraw its support for the Plan due to the delay that resolicitation will have on the Debtor's exit from chapter 11 protection.

7.9.5    <u>Settlement with Morrison Development</u>.  Prior to the Petition Date, Morrison Development sued the Debtor for breach of the Morrison/SW12th Lease and the Debtor asserted counterclaims.  In the event the Effective Date does not occur by, and Morrison Development is not paid prior to, December 31, 2020, the settlement with Morrison Development may not be consummated.

108812337.3 0056668-00010
Case 20-32485-pcm11    Doc 149    Filed 11/19/20

7.9.6 <u>Conditions of Plan Sponsor's Support</u>. The Plan Sponsor's irrevocable offer to purchase New Common Units of the Reorganized Debtor for $1,000,000 is contingent on the following conditions:

(a) Total distributions on account of Allowed Claims does not exceed $800,000;

(b) The Reorganized Debtor obtains a discharge on the Effective Date of the Plan;

(c) Management of the Debtor participates in the recapitalization of the Debtor in an amount no less than $150,000 and the Debtor's senior management team is retained by the Reorganized Debtor;

(d) The Plan that is confirmed, and the Confirmation Order, are each in a form reasonably acceptable to the Plan Sponsor;

(e) The Plan's Effective Date occurs, and the New Unit Offering closes, no later than December 15, 2020.

## SECTION VIII
## LIQUIDATION ANALYSIS

To confirm the Plan, the Bankruptcy Court must find that all Creditors and Equity Interest Holders who do not accept the Plan will received at least as much under the Plan as such Creditors and Equity Interest Holders would receive in a Chapter 7 liquidation. A liquidation analysis is attached hereto as **Exhibit J**.

## SECTION IX
## CLAIMS OBJECTIONS AND TREATMENT OF DISPUTED CLAIMS

Except as otherwise provided for herein, each Claim shall be Allowed or Disallowed, as the case may be, in such amount as the Bankruptcy Court shall determine, if necessary, whether prior to or following the Confirmation Date or the Effective Date, and whether pursuant to this Plan or otherwise, upon such notice as the Bankruptcy Court or Bankruptcy Rules shall permit except that, after the Effective Date, the Debtor may and shall have the authority to settle or compromise any controversies regarding Claims without notice or further order of the Bankruptcy Court.

On the Effective Date, the Debtor shall be deemed to have assigned to the Reorganized Debtor, and the Reorganized Debtor shall be deemed to have acquired and become the successor to, all defenses, counterclaims and setoffs, whether equitable or legal, of the Debtor to Claims held or asserted to be held against the Debtor. Any objection to Claims must be filed and served in accordance with Bankruptcy Rule 3007.

108812337.3 0056668-00010

Notwithstanding any provision of the Plan specifying the time for payment of distributions to holders of Claims, no payment or distribution shall be made to the holder of any Claim until the time such Claim has been determined to be an Allowed Claim. Notwithstanding the existence of a Claim that has not been Allowed in a Class to which a distribution under this Plan is due, such distribution to other Creditors with Allowed Claims shall not be affected by any delay in the resolution of the Claim subject to dispute. Upon the allowance of a Claim, the holder shall be paid the amount that such holder would have received had its Claim been an Allowed Claim on the Effective Date.

**The deadline to file Proofs of Claim is <u>November 4, 2020</u>. In the event the Debtor objects to your Proof of Claim and the Debtor's objection is not resolved prior to the Confirmation Hearing, the Debtor may request that the Bankruptcy Court estimate the amount of your Claim that should be Allowed for voting and feasibility purposes only.**

At the Confirmation Hearing, the Debtor will request that the Bankruptcy Court fix a bar date for the filing of Administrative Expense Claims not otherwise covered by the Plan, including the Administrative Expense Claims of the Trustee and Stoel Rives, as well as any disputed expenses incurred by parties-in-interest seeking Allowance of such expenses in connection with their Claims.

**SECTION X**
**<u>TAX CONSEQUENCES OF THE PLAN</u>**

The Debtor provides no advice whatsoever, either in the Plan or in any other communication, with respect to the tax consequences (if any) that the Plan may have on holders of Claims and Equity Interests and observes that such consequences may vary from holder to holder. The Debtor therefore recommends that all holders of Allowed Claims and Equity Interests confer with their own tax advisors regarding the possible tax consequences of the Plan.

**SECTION XI**
**<u>SETTLEMENT, RELEASE, INJUNCTION, AND DISCHARGE</u>**

**11.1    Binding Effect of Plan Confirmed by Bankruptcy Court.**

Upon the Effective Date of the Plan, the Debtor as the Reorganized Debtor, all Creditors, and any other party in interest are bound by the provisions of the Plan. Upon confirmation of the Plan by the Bankruptcy Court, the treatment of Allowed Claims and Allowed Equity Interests as set forth in the Plan supersedes and replaces any agreements or rights the Creditors or Equity Interest Holders have in or against the Debtor and/or the Bankruptcy Estate, except to the extent that such rights are assumed under the Plan.

**11.2    Discharge; Plan Injunction**

Except as specifically provided in this Plan or in the Confirmation Order, the distributions made to the various Creditors and the treatment afforded the Equity Interest Holders as provided for in the Plan shall be in full and complete satisfaction of their Allowed Claims and Allowed Equity Interests respectively. Except as specifically provided in the Plan or the Confirmation Order, confirmation by the Bankruptcy Court of the Plan shall operate, upon the Effective Date,

108812337.3 0056668-00010

as a discharge of any and all Claims as defined in section 101(5) of the Bankruptcy Code against the Bankruptcy Estate and against the Debtor that arose at any time prior to the Effective Date. The discharge of the Debtor with respect to Claims against the Debtor, whether asserted against the Debtor prior to or after the Petition Date, shall be effective as to each Claim, regardless of whether or not (a) the Claim was scheduled, (b) a Proof of Claim was filed, (c) the Claim is an Allowed Claim, or (d) the holder thereof voted to accept or reject the Plan; *provided,* that if the Debtor amends its Schedules prior to the Effective Date, Creditors holding Claims that are affected by amendments to the Schedules shall have the rights afforded them under the Bankruptcy Code and Bankruptcy Rules, including without limitation, the right to file a Proof of Claim.

The rights afforded Creditors and Equity Interest Holders in the Plan and the treatment of all Claims and Equity Interests herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims of any nature whatsoever against the Debtor and the Bankruptcy Estate, and, on the Effective Date, all Claims against the Debtor or the Bankruptcy Estate shall be deemed satisfied, discharged and released in full, except as otherwise provided for herein. All Persons shall be precluded and forever barred from asserting against the Reorganized Debtor, the Debtor, and the Bankruptcy Estate any Claims arising from any event, occurrence, condition, thing, act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, whether or not the facts of or legal bases therefor were known or existed prior to the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to the occurrence of the Effective Date.

On the Effective Date, all Creditors who have been, are, or may be holders of Claims against the Debtor and all Equity Interest Holders who have been, are, or may be holders of Equity Interests are permanently enjoined from taking any of the following actions against or affecting Reorganized Debtor, the Reorganized Debtor's property, and the Bankruptcy Estate (other than actions brought to enforce any rights or obligations under the Plan): (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including all suits, actions, and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice); (b) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance; and (d) asserting any setoff, right of subrogation or recoupment of any kind; *provided*, that any defenses, offsets or counterclaims which the Debtor may have or assert in respect of the above referenced Claims are fully preserved and inherited by the Reorganized Debtor unless otherwise expressly waived or released herein or in the Confirmation Order.

In addition, entry of the Confirmation Order shall permanently enjoin the commencement or continued prosecution by any person, whether directly, derivatively or otherwise, of any Claims satisfied pursuant to the Plan. By accepting distributions on account of Allowed Claims and by retaining Common Units on account of Allowed Equity Interests pursuant to this Plan, each holder of a Claim or Equity Interest shall be deemed to have specifically consented to the injunction set forth herein.

108812337.3 0056668-00010

Subject only to Section 11.4 of the Plan, no term or provision in the Plan or Confirmation Order is intended as, or shall be construed to effectuate, a release of liability with respect to any Claim, whether known or unknown, contingent or noncontingent, liquidated or unliquidated, that any Creditor has or may have against any entity or individual other than the Debtor. For avoidance of doubt, confirmation of the Plan shall not impair or enjoin, or otherwise preclude the enforcement by Commerce Bank of the Commerce Bank Member Guaranty in the event the Commerce Bank Secured Claim is not fully satisfied by January 15, 2020.

**11.3    Release of Liens.**

Except as set forth in any contract, instrument, release, or other agreement or document created pursuant to the Plan, or as otherwise stated in the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, Liens against any property of the Bankruptcy Estate shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, liens, pledges, or other security interests shall revert to Reorganized Debtor and its successors and assigns.

**11.4    Exculpation and Injunction.**

On or after the Effective Date, each of (i) the Debtor, the Debtor's officers and managers, and its advisors and attorneys that were employed or engaged as of the date the Plan was filed, (ii) the Trustee and any advisor or attorney to the Trustee engaged by the Trustee as of the date the Plan was filed,[2] (iii) the Plan Sponsor, the Plan Sponsor's officers and managers, and its advisors and attorneys that were employed or engaged by the Plan Sponsor as of the date the Plan was filed (collectively, the "**Exculpated Parties**") shall not have or incur any liability for, and are expressly exculpated, released, and discharged from any Claim or any past or present actions taken or omitted to be taken in furtherance of (i) the Debtor's decision to file for chapter 11 protection; (ii) the preparation of the Debtor for the Chapter 11 Case prior to the Petition Date; (iii) the administration of the Debtor as a debtor in possession after the Petition Date; (iv) the formulation of the Plan and any document or pleading relating to (a) the administration of the Debtor as a debtor in possession after the Petition Date, and (b) confirmation and consummation of the Plan ("**Released Acts**"); *provided*, Released Acts shall exclude (i) any actions or omissions to act to the extent determined by a court of competent jurisdiction (with such order becoming a final, non-appealable order) to be by reason of such party's gross negligence, willful misconduct, or fraud and (ii) any actions taken or omitted to be taken on the Effective Date and thereafter; *provided further*, the Debtor, the Trustee and the Plan Sponsor shall be entitled in all instances to rely upon advice of counsel with respect to its duties and responsibilities under the Plan, with it being expressly understood that any act or omission with the approval of the Bankruptcy Court shall be conclusively deemed not to constitute gross negligence, willful misconduct, or fraud, unless the approval by the Bankruptcy Court was obtained by fraud or misrepresentation.

**As of the Effective Date, all past or present Creditors or Equity Interest Holders, directly or indirectly, shall release, and be deemed to forever release and discharge, the**

---

[2] The Trustee takes no position on whether she (and her advisors, if any) should be included as one of the Exculpated Parties. The Debtor includes the Trustee (and her advisors, if any) because it is the Debtor's position that the Trustee is entitled to be included as one of the Exculpated Parties in connection with the Released Acts.

108812337.3 0056668-00010
Case 20-32485-pcm11    Doc 149    Filed 11/19/20

Exculpated Parties from the Released Acts and shall be precluded and permanently enjoined – with respect to the Released Acts – from: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance; (iv) asserting a right of subrogation of any kind against any debt, liability, or obligation due to the Debtor and/or the Bankruptcy Estate; and (v) commencing or continuing any action, in any manner or in any place, against the Exculpated Parties that does not comply with or that is inconsistent with the provisions of this Plan.

## SECTION XII
## GENERAL PROVISIONS

### 12.1    Binding Effect.

If the Plan is confirmed, the provisions of the Plan will bind the Debtor, the Reorganized Debtor, and all Creditors and Equity Interest Holders, along with the Plan Sponsor and Subscribers. The rights and obligations of any entity named or referred to in the Plan will be binding upon and will inure to the benefit of the successors or assigns of such entity.

### 12.2    Severability.

If any provision of this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of the Plan.

### 12.3    Retention of Jurisdiction by the Bankruptcy Court.

Except as otherwise ordered by the Bankruptcy Court, the Bankruptcy Court shall retain jurisdiction of the Chapter 11 Case with regard to, among other things, the following matters: (i) to make such orders as are necessary or appropriate to implement the provisions of the Plan and to resolve any disputes arising from the implementation of the Plan; (ii) to rule on any modification of the Plan proposed under section 1193 of the Bankruptcy Code, (iii) to hear and allow all applications for compensation of Professional Persons and payment of other Allowed Administrative Expense Claims; (iv) to resolve all issues regarding Claims, objections, and issues arising from the amendment by the Debtor of its Schedules, and the assumption or rejection by the Debtor of executory contracts or unexpired leases, (v) to adjudicate any cause of action which may exist in favor of the Debtor, including Avoidance Claims, and (vi) any other matter in which the Court believes it is appropriate to exercise jurisdiction.

### 12.4    Captions.

The headings contained in the Plan are for convenience of reference only and do not affect the meaning or interpretation of the Plan.

108812337.3 0056668-00010
Case 20-32485-pcm11    Doc 149    Filed 11/19/20

**12.5 Modification of the Plan.**

The Debtor may modify the Plan at any time before confirmation of the Plan pursuant to section 1193(a) of the Bankruptcy Code. However, the Bankruptcy Court may require additional actions including soliciting new votes on the Plan as modified.

If the Plan is confirmed under section 1191(a) of the Bankruptcy Code, the Debtor may also seek to modify the Plan at any time after confirmation only if (a) the Plan has not been substantially consummated and (b) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

If the Plan is confirmed under section 1191(b), the Debtor may seek to modify the Plan at any time over the term of the Plan.

**12.6 Final Decree.**

Once the Bankruptcy Estate has been fully administered, as provided in Bankruptcy Rule 3022, the Reorganized Debtor will file a motion with the Bankruptcy Court to obtain a final decree to close the case. Alternatively, the Bankruptcy Court may enter such a final decree on its own motion.

DATED: November 18, 2020.

STOEL RIVES LLP


/s/ Oren B. Haker
Oren B. Haker, OSB No. 130162
oren.haker@stoel.com
Daniel R. Kubitz, OSB No. 181381
daniel.kubitz@stoel.com
Telephone: 503.224.3380
Facsimile: 503.220.2480

*Attorneys for Debtor*
*and Debtor-in-Possession*

# EXHIBIT A

# Feasibility Analysis

# Blue Star Doughnuts LLC
# Feasibility Analysis

| Sources (available as of Effective Date) | Amount |
|---|---|
| Plan Sponsor | $1,000,000.00 |
| Katherine J. House aka Katherine J. Poppe | $100,000.00 |
| W.P. Price Tax and Accounting, LLC | $50,000.00 |
| Basil Bullard | $350,000.00 |
| Gary "Chip" Rothenberger, Jr. | $50,000.00 |
| **Total** | **$1,550,000.00** |

| Uses (on or after Effective Date) | Amount |
|---|---|
| Unclassified (Priority Tax Claims & Administrative Expenses – paid in full within three (3) Business Days following Effective Date) | $9,488.90 |
| Class 1 (Commerce Bank Stipulated Claim Amount – paid in full within three (3) Business Days following Effective Date) | $285,305.61 |
| Class 2 (Wells Fargo Secured Claim – cure amount paid within three (3) Business Days following Effective Date) | $10,000.00 |
| Class 3 (Ford Motor Secured Claim – cure amount paid within three (3) Business Days following Effective Date) | $1,281.31 |
| Class 4 (Priority Unsecured Claims – paid in full within three (3) Business Days following Effective Date) | $369.72 |
| Class 6 (Morrison Landlord Claim – paid in full within three (3) Business Days following Effective Date) | $330,000.00 |
| Class 7 (General Unsecured Claims – paid in full within three (3) Business Days following Effective Date if total amount of Allowed Claims does not exceed $157,000, subject to conditions set forth in Section 4.2 of the Plan) | $157,000.00 |
| **Subtotal: Estimated Total Amount of Allowed Claims** | **$793,445.54** |
| Working Capital and CapEx | $756,554.46 |
| **Total New Capital Investment** | **$1,550,000.00** |

**Blue Star Doughnuts, LLC**
36 Month Pro Forma - Recapitalized Scenario

| Consolidated | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 | May-21 | Jun-21 | Jul-21 | Aug-21 | Sep-21 | Oct-21 | Nov-21 | 12 Mo Total | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | | | |
| 4010 Retail Sales | $ 80,000 | $ 70,000 | $ 70,000 | $ 85,000 | $ 120,000 | $ 125,000 | $ 135,000 | $ 160,000 | $ 160,000 | $ 160,000 | $ 150,000 | $ 150,000 | $ 1,465,000 | 59% |
| 4030 Grocery Sales | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 65,000 | $ 75,000 | $ 75,000 | $ 70,000 | $ 75,000 | $ 80,000 | $ 80,000 | $ 770,000 | 31% |
| 4040 Expanded Wholesale | $ 5,000 | $ 5,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 110,000 | 4% |
| 4050 E-Commerce | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 10,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 125,000 | 5% |
| | | | | | | | | | | | | | $ - | |
| **Total Revenue** | **$ 140,000** | **$ 130,000** | **$ 135,000** | **$ 150,000** | **$ 185,000** | **$ 210,000** | **$ 235,000** | **$ 260,000** | **$ 255,000** | **$ 260,000** | **$ 255,000** | **$ 255,000** | **$ 2,470,000** | **100%** |
| **Cost of Goods Sold** | | | | | | | | | | | | | | |
| 5010 Delivery/Shipping-Commissary | $ 250 | $ 250 | $ 250 | $ 250 | $ 250 | $ 250 | $ 350 | $ 350 | $ 350 | $ 350 | $ 350 | $ 350 | $ 3,600 | 0% |
| 5020 Labor-Commissary | $ 31,000 | $ 31,000 | $ 31,000 | $ 31,000 | $ 31,000 | $ 31,000 | $ 35,000 | $ 35,000 | $ 35,000 | $ 35,000 | $ 35,000 | $ 35,000 | $ 396,000 | 16% |
| 5030 Purchases-Commissary | $ 21,000 | $ 19,500 | $ 20,250 | $ 22,500 | $ 27,750 | $ 31,500 | $ 35,250 | $ 39,000 | $ 38,250 | $ 39,000 | $ 38,250 | $ 38,250 | $ 370,500 | 15% |
| 5040 Rents-Commissary | $ 6,600 | $ 6,600 | $ 6,600 | $ 6,600 | $ 6,600 | $ 6,600 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 129,600 | 5% |
| 5050 Repairs & Maint-Commissary | $ 600 | $ 600 | $ 600 | $ 600 | $ 600 | $ 600 | $ 600 | $ 600 | $ 600 | $ 600 | $ 600 | $ 600 | $ 7,200 | 0% |
| 5060 Supplies-Commissary | $ 1,820 | $ 1,690 | $ 1,755 | $ 1,950 | $ 2,405 | $ 2,730 | $ 3,055 | $ 3,380 | $ 3,315 | $ 3,380 | $ 3,315 | $ 3,315 | $ 32,110 | 1% |
| 5070 Utilities-Commissary | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 8,400 | 0% |
| 5100 Cost of labor - FOH | $ 7,300 | $ 7,300 | $ 7,300 | $ 7,300 | $ 7,300 | $ 7,300 | $ 11,500 | $ 12,500 | $ 12,500 | $ 13,500 | $ 13,500 | $ 13,500 | $ 120,800 | 5% |
| Payroll Taxes - Comm and FoH (Calc Field) | $ 3,830 | $ 3,830 | $ 3,830 | $ 3,830 | $ 3,830 | $ 3,830 | $ 4,650 | $ 4,750 | $ 4,750 | $ 4,850 | $ 4,850 | $ 4,850 | $ 51,680 | 2% |
| 5120 Kitchen Supplies - FOH | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 6,000 | 0% |
| 5130 Purchases - FOH | $ 3,200 | $ 2,800 | $ 2,800 | $ 3,400 | $ 4,800 | $ 5,000 | $ 5,400 | $ 6,400 | $ 6,400 | $ 6,400 | $ 6,000 | $ 6,000 | $ 58,600 | 2% |
| 5140 Packaging | $ 6,000 | $ 6,000 | $ 7,000 | $ 7,000 | $ 7,000 | $ 7,000 | $ 8,000 | $ 8,000 | $ 8,000 | $ 8,000 | $ 8,000 | $ 8,000 | $ 88,000 | 4% |
| **Total Cost of Goods Sold** | **$ 82,600** | **$ 80,570** | **$ 82,385** | **$ 85,430** | **$ 92,535** | **$ 96,810** | **$ 120,205** | **$ 126,380** | **$ 125,565** | **$ 127,480** | **$ 126,265** | **$ 126,265** | **$ 1,272,490** | **52%** |
| **Gross Profit** | **$ 57,400** | **$ 49,430** | **$ 52,615** | **$ 64,570** | **$ 92,465** | **$ 113,190** | **$ 114,795** | **$ 133,620** | **$ 129,435** | **$ 132,520** | **$ 128,735** | **$ 128,735** | **$ 1,197,510** | **48%** |
| **Operating Expenses** | | | | | | | | | | | | | | |
| 7200 Marketing | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 9,000 | 0% |
| 6010 Rent or Lease | $ 11,699 | $ 11,699 | $ 11,699 | $ 11,699 | $ 11,699 | $ 11,699 | $ 16,699 | $ 16,699 | $ 16,699 | $ 16,699 | $ 16,699 | $ 16,699 | $ 170,393 | 7% |
| 6020 Repair & Maintenance | $ 2,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 13,000 | 1% |
| 6030 Utilities | $ 1,100 | $ 1,100 | $ 1,100 | $ 1,100 | $ 1,100 | $ 1,100 | $ 1,100 | $ 1,100 | $ 1,100 | $ 1,100 | $ 1,100 | $ 1,100 | $ 13,200 | 1% |
| 6100 Auto Expense | $ 200 | $ 200 | $ 200 | $ 200 | $ 200 | $ 200 | $ 200 | $ 200 | $ 200 | $ 200 | $ 200 | $ 200 | $ 2,400 | 0% |
| 6200 Bank Charges (calc field) | $ 2,550 | $ 2,250 | $ 2,250 | $ 2,700 | $ 3,750 | $ 4,050 | $ 4,500 | $ 5,250 | $ 5,250 | $ 5,250 | $ 4,950 | $ 4,950 | $ 47,700 | 2% |
| 6650 Insurance | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 4,000 | $ 4,000 | $ 4,000 | $ 4,000 | $ 4,000 | $ 4,000 | $ 42,000 | 2% |
| 6750 Legal & Professional Fees | $ 1,000 | $ 3,500 | $ 3,500 | $ 1,000 | $ 1,000 | $ 7,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 23,000 | 1% |
| 6800 Dues & Subscriptions | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 10,800 | 0% |
| 6900 Meals and Entertainment | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 3,600 | 0% |
| 6910 Cell Phone | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 1,800 | 0% |
| 6950 Office Expenses | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 1,800 | 0% |
| 7170 Parking | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 1,200 | 0% |
| 7190 Travel & Lodging | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 1,800 | 0% |
| 7400 Taxes & Licenses | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 1,200 | 0% |
| 7000 Admin Payroll Taxes (Calc Field) | $ 4,208 | $ 4,208 | $ 4,208 | $ 4,208 | $ 4,508 | $ 4,708 | $ 4,708 | $ 4,708 | $ 4,708 | $ 4,708 | $ 4,708 | $ 4,708 | $ 54,298 | 2% |
| 7010 Employee Benefit Expense | $ 1,900 | $ 1,900 | $ 1,900 | $ 1,900 | $ 1,900 | $ 1,900 | $ 1,900 | $ 2,300 | $ 2,300 | $ 2,300 | $ 2,300 | $ 2,300 | $ 24,800 | 1% |
| 7020 Admin Payroll | $ 42,081 | $ 42,081 | $ 42,081 | $ 42,081 | $ 42,081 | $ 42,081 | $ 42,081 | $ 42,081 | $ 42,081 | $ 42,081 | $ 42,081 | $ 42,081 | $ 504,976 | 20% |
| 7025 Expanded Admin Payroll - Wholesale/Ecomm | | | | | $ 3,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 38,000 | 2% |
| 7050 Guaranteed Payments | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 150,000 | 6% |
| **Total Expenses** | **$ 84,589** | **$ 85,789** | **$ 85,789** | **$ 83,739** | **$ 88,089** | **$ 96,589** | **$ 97,539** | **$ 98,689** | **$ 98,689** | **$ 98,689** | **$ 98,389** | **$ 98,389** | **$ 1,114,967** | **45%** |
| **Net Operating Income** | **$ (27,189)** | **$ (36,359)** | **$ (33,174)** | **$ (19,169)** | **$ 4,376** | **$ 16,601** | **$ 17,256** | **$ 34,931** | **$ 30,746** | **$ 33,831** | **$ 30,346** | **$ 30,346** | **$ 82,543** | **3%** |
| **Other Expenses** | | | | | | | | | | | | | | |
| 6700 Interest Expense | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 20,400 | 1% |
| **Total Other Expenses** | **$ 1,700** | **$ 1,700** | **$ 1,700** | **$ 1,700** | **$ 1,700** | **$ 1,700** | **$ 1,700** | **$ 1,700** | **$ 1,700** | **$ 1,700** | **$ 1,700** | **$ 1,700** | **$ 20,400** | **1%** |
| **Net Other Income** | **$ (1,700)** | **$ (1,700)** | **$ (1,700)** | **$ (1,700)** | **$ (1,700)** | **$ (1,700)** | **$ (1,700)** | **$ (1,700)** | **$ (1,700)** | **$ (1,700)** | **$ (1,700)** | **$ (1,700)** | **$ (20,400)** | **-1%** |
| **Net Income** | **$ (28,889)** | **$ (38,059)** | **$ (34,874)** | **$ (20,869)** | **$ 2,676** | **$ 14,901** | **$ 15,556** | **$ 33,231** | **$ 29,046** | **$ 32,131** | **$ 28,646** | **$ 28,646** | **$ 62,143** | **3%** |

**Exhibit A - Page 3 of 5**

| Consolidated | Dec-21 | Jan-22 | Feb-22 | Mar-22 | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Oct-22 | Nov-22 | 12 Mo Total | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | | | |
| 4010 Retail Sales | $ 150,000 | $ 130,000 | $ 160,000 | $ 170,000 | $ 190,000 | $ 205,000 | $ 210,000 | $ 220,000 | $ 230,000 | $ 210,000 | $ 205,000 | $ 205,000 | $ 2,285,000 | 63% |
| 4030 Grocery Sales | $ 100,000 | $ 100,000 | $ 100,000 | $ 90,000 | $ 90,000 | $ 80,000 | $ 80,000 | $ 80,000 | $ 80,000 | $ 80,000 | $ 90,000 | $ 90,000 | $ 1,060,000 | 29% |
| 4040 Expanded Wholesale | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 120,000 | 3% |
| 4050 E-Commerce | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 180,000 | 5% |
| | | | | | | | | | | | | | $ - | |
| **Total Revenue** | $ 275,000 | $ 255,000 | $ 285,000 | $ 285,000 | $ 305,000 | $ 310,000 | $ 315,000 | $ 325,000 | $ 335,000 | $ 315,000 | $ 320,000 | $ 320,000 | $ 3,645,000 | 100% |
| **Cost of Goods Sold** | | | | | | | | | | | | | | |
| 5010 Delivery/Shipping-Commissary | $ 350 | $ 350 | $ 350 | $ 400 | $ 400 | $ 400 | $ 400 | $ 400 | $ 400 | $ 400 | $ 400 | $ 400 | $ 4,650 | 0% |
| 5020 Labor-Commissary | $ 40,000 | $ 40,000 | $ 40,000 | $ 40,000 | $ 40,000 | $ 40,000 | $ 40,000 | $ 40,000 | $ 40,000 | $ 40,000 | $ 40,000 | $ 40,000 | $ 480,000 | 19% |
| 5030 Purchases-Commissary | $ 41,250 | $ 38,250 | $ 42,750 | $ 42,750 | $ 45,750 | $ 46,500 | $ 47,250 | $ 48,750 | $ 50,250 | $ 47,250 | $ 48,000 | $ 48,000 | $ 546,750 | 22% |
| 5040 Rents-Commissary | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 180,000 | 7% |
| 5050 Repairs & Maint-Commissary | $ 600 | $ 600 | $ 600 | $ 600 | $ 600 | $ 600 | $ 600 | $ 600 | $ 600 | $ 600 | $ 600 | $ 600 | $ 7,200 | 0% |
| 5060 Supplies-Commissary | $ 3,575 | $ 3,315 | $ 3,705 | $ 3,705 | $ 3,965 | $ 4,030 | $ 4,095 | $ 4,225 | $ 4,355 | $ 4,095 | $ 4,160 | $ 4,160 | $ 47,385 | 2% |
| 5070 Utilities-Commissary | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 10,800 | 0% |
| 5100 Cost of labor - FOH | $ 14,850 | $ 14,850 | $ 17,350 | $ 17,350 | $ 17,350 | $ 17,350 | $ 17,350 | $ 17,350 | $ 17,350 | $ 17,350 | $ 17,350 | $ 17,350 | $ 203,200 | 8% |
| Payroll Taxes - Comm and FoH (Calc Field) | $ 5,485 | $ 5,485 | $ 5,735 | $ 5,735 | $ 5,735 | $ 5,735 | $ 5,735 | $ 5,735 | $ 5,735 | $ 5,735 | $ 5,735 | $ 5,735 | $ 68,320 | 3% |
| 5120 Kitchen Supplies - FOH | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 6,000 | 0% |
| 5130 Purchases - FOH | $ 6,000 | $ 5,200 | $ 6,400 | $ 6,800 | $ 7,600 | $ 8,200 | $ 8,400 | $ 8,800 | $ 9,200 | $ 8,400 | $ 8,200 | $ 8,200 | $ 91,400 | 4% |
| 5140 Packaging | $ 9,000 | $ 9,000 | $ 9,000 | $ 9,000 | $ 9,000 | $ 9,000 | $ 9,000 | $ 9,000 | $ 9,000 | $ 9,000 | $ 9,000 | $ 9,000 | $ 108,000 | 4% |
| **Total Cost of Goods Sold** | $ 137,510 | $ 133,450 | $ 142,290 | $ 142,740 | $ 146,800 | $ 148,215 | $ 149,230 | $ 151,260 | $ 153,290 | $ 149,230 | $ 149,845 | $ 149,845 | $ 1,753,705 | 48% |
| **Gross Profit** | $ 137,490 | $ 121,550 | $ 142,710 | $ 142,260 | $ 158,200 | $ 161,785 | $ 165,770 | $ 173,740 | $ 181,710 | $ 165,770 | $ 170,155 | $ 170,155 | $ 1,891,295 | 52% |
| **Operating Expenses** | | | | | | | | | | | | | | |
| 7200 Marketing | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 24,000 | 1% |
| 6010 Rent or Lease | $ 16,699 | $ 16,699 | $ 20,699 | $ 20,699 | $ 20,699 | $ 20,699 | $ 20,699 | $ 20,699 | $ 20,699 | $ 20,699 | $ 20,699 | $ 20,699 | $ 240,389 | 10% |
| 6020 Repair & Maintenance | $ 1,000 | $ 1,000 | $ 1,200 | $ 1,200 | $ 1,200 | $ 1,200 | $ 1,200 | $ 1,200 | $ 1,200 | $ 1,200 | $ 1,200 | $ 1,200 | $ 14,000 | 1% |
| 6030 Utilities | $ 1,100 | $ 1,100 | $ 1,300 | $ 1,300 | $ 1,300 | $ 1,300 | $ 1,300 | $ 1,300 | $ 1,300 | $ 1,300 | $ 1,300 | $ 1,300 | $ 15,200 | 1% |
| 6100 Auto Expense | $ 200 | $ 200 | $ 200 | $ 200 | $ 200 | $ 200 | $ 200 | $ 200 | $ 200 | $ 200 | $ 200 | $ 200 | $ 2,400 | 0% |
| 6200 Bank Charges (calc field) | $ 4,950 | $ 4,350 | $ 5,250 | $ 5,550 | $ 6,150 | $ 6,600 | $ 6,750 | $ 7,050 | $ 7,350 | $ 6,750 | $ 6,600 | $ 6,600 | $ 73,950 | 3% |
| 6650 Insurance | $ 4,000 | $ 4,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 58,000 | 2% |
| 6750 Legal & Professional Fees | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 12,000 | 0% |
| 6800 Dues & Subscriptions | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 10,800 | 0% |
| 6900 Meals and Entertainment | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 3,600 | 0% |
| 6910 Cell Phone | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 1,800 | 0% |
| 6950 Office Expenses | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 1,800 | 0% |
| 7170 Parking | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 1,200 | 0% |
| 7190 Travel & Lodging | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 1,800 | 0% |
| 7400 Taxes & Licenses | $ 900 | $ 900 | $ 900 | $ 900 | $ 1,400 | $ 1,400 | $ 1,400 | $ 1,400 | $ 1,400 | $ 1,400 | $ 1,400 | $ 1,400 | $ 14,800 | 1% |
| 7000 Admin Payroll Taxes (Calc Field) | $ 5,379 | $ 5,379 | $ 5,379 | $ 5,379 | $ 5,379 | $ 5,379 | $ 5,379 | $ 5,379 | $ 5,379 | $ 5,379 | $ 5,379 | $ 5,379 | $ 64,547 | 3% |
| 7010 Employee Benefit Expense | $ 2,600 | $ 2,600 | $ 2,600 | $ 2,600 | $ 2,600 | $ 2,600 | $ 2,600 | $ 2,600 | $ 2,600 | $ 2,600 | $ 2,600 | $ 2,600 | $ 31,200 | 1% |
| 7020 Admin Payroll | $ 48,289 | $ 48,289 | $ 48,289 | $ 48,289 | $ 48,289 | $ 48,289 | $ 48,289 | $ 48,289 | $ 48,289 | $ 48,289 | $ 48,289 | $ 48,289 | $ 579,469 | 23% |
| 7025 Expanded Admin Payroll - Wholesale/Ecomm | $ 5,500 | $ 5,500 | $ 5,500 | $ 5,500 | $ 5,500 | $ 5,500 | $ 5,500 | $ 5,500 | $ 5,500 | $ 5,500 | $ 5,500 | $ 5,500 | $ 66,000 | 3% |
| 7050 Guaranteed Payments | $ 14,583 | $ 14,583 | $ 14,583 | $ 14,583 | $ 14,583 | $ 14,583 | $ 14,583 | $ 14,583 | $ 14,583 | $ 14,583 | $ 14,583 | $ 14,583 | $ 175,000 | 7% |
| **Total Expenses** | $ 109,951 | $ 109,351 | $ 115,650 | $ 115,950 | $ 117,050 | $ 117,500 | $ 117,650 | $ 117,950 | $ 118,250 | $ 117,650 | $ 117,500 | $ 117,500 | $ 1,391,955 | 38% |
| **Net Operating Income** | $ 27,539 | $ 12,199 | $ 27,060 | $ 26,310 | $ 41,150 | $ 44,285 | $ 48,120 | $ 55,790 | $ 63,460 | $ 48,120 | $ 52,655 | $ 52,655 | $ 499,340 | 14% |
| **Other Expenses** | | | | | | | | | | | | | | |
| 6700 Interest Expense | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 20,400 | 1% |
| **Total Other Expenses** | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 20,400 | 1% |
| **Net Other Income** | $ (1,700) | (1,700) | (1,700) | (1,700) | (1,700) | (1,700) | (1,700) | (1,700) | (1,700) | (1,700) | (1,700) | (1,700) | (20,400) | -1% |
| **Net Income** | $ 25,839 | $ 10,499 | $ 25,360 | $ 24,610 | $ 39,450 | $ 42,585 | $ 46,420 | $ 54,090 | $ 61,760 | $ 46,420 | $ 50,955 | $ 50,955 | $ 478,940 | 13% |

**Exhibit A - Page 4 of 5**

| Consolidated | Dec-22 | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 | Oct-23 | Nov-23 | 12 Mo Total | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | | | |
| 4010 Retail Sales | $ 200,000 | $ 180,000 | $ 180,000 | $ 190,000 | $ 200,000 | $ 250,000 | $ 220,000 | $ 240,000 | $ 240,000 | $ 240,000 | $ 235,000 | $ 235,000 | $ 2,620,000 | 66% |
| 4030 Grocery Sales | $ 100,000 | $ 100,000 | $ 100,000 | $ 90,000 | $ 90,000 | $ 80,000 | $ 80,000 | $ 80,000 | $ 80,000 | $ 80,000 | $ 90,000 | $ 90,000 | $ 1,060,000 | 27% |
| 4040 Expanded Wholesale | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 120,000 | 3% |
| 4050 E-Commerce | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 180,000 | 5% |
| | | | | | | | | | | | | | $ - | |
| **Total Revenue** | $ 325,000 | $ 305,000 | $ 305,000 | $ 305,000 | $ 315,000 | $ 355,000 | $ 325,000 | $ 345,000 | $ 355,000 | $ 345,000 | $ 350,000 | $ 350,000 | $ 3,980,000 | 100% |
| **Cost of Goods Sold** | | | | | | | | | | | | | | |
| 5010 Delivery/Shipping-Commissary | $ 400 | $ 400 | $ 400 | $ 400 | $ 400 | $ 400 | $ 400 | $ 400 | $ 400 | $ 400 | $ 400 | $ 400 | $ 4,800 | 0% |
| 5020 Labor-Commissary | $ 44,000 | $ 44,000 | $ 44,000 | $ 44,000 | $ 44,000 | $ 44,000 | $ 44,000 | $ 44,000 | $ 44,000 | $ 44,000 | $ 44,000 | $ 44,000 | $ 528,000 | 21% |
| 5030 Purchases-Commissary | $ 48,750 | $ 45,750 | $ 45,750 | $ 45,750 | $ 47,250 | $ 53,250 | $ 48,750 | $ 51,750 | $ 53,250 | $ 51,750 | $ 52,500 | $ 52,500 | $ 597,000 | 24% |
| 5040 Rents-Commissary | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 180,000 | 7% |
| 5050 Repairs & Maint-Commissary | $ 600 | $ 600 | $ 600 | $ 600 | $ 600 | $ 600 | $ 600 | $ 600 | $ 600 | $ 600 | $ 600 | $ 600 | $ 7,200 | 0% |
| 5060 Supplies-Commissary | $ 4,225 | $ 3,965 | $ 3,965 | $ 3,965 | $ 4,095 | $ 4,615 | $ 4,225 | $ 4,485 | $ 4,615 | $ 4,485 | $ 4,550 | $ 4,550 | $ 51,740 | 2% |
| 5070 Utilities-Commissary | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 10,800 | 0% |
| 5100 Cost of labor - FOH | $ 19,085 | $ 19,085 | $ 19,085 | $ 19,085 | $ 19,085 | $ 19,085 | $ 19,085 | $ 19,085 | $ 19,085 | $ 19,085 | $ 19,085 | $ 19,085 | $ 229,020 | 9% |
| Payroll Taxes - Comm and FoH (Calc Field) | $ 6,309 | $ 6,309 | $ 6,309 | $ 6,309 | $ 6,309 | $ 6,309 | $ 6,309 | $ 6,309 | $ 6,309 | $ 6,309 | $ 6,309 | $ 6,309 | $ 75,702 | 3% |
| 5120 Kitchen Supplies - FOH | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 6,000 | 0% |
| 5130 Purchases - FOH | $ 8,000 | $ 7,200 | $ 7,200 | $ 7,600 | $ 8,000 | $ 10,000 | $ 8,800 | $ 9,600 | $ 10,000 | $ 9,600 | $ 9,400 | $ 9,400 | $ 104,800 | 4% |
| 5140 Packaging | $ 9,000 | $ 9,000 | $ 9,000 | $ 9,000 | $ 9,000 | $ 9,000 | $ 9,000 | $ 9,000 | $ 9,000 | $ 9,000 | $ 9,000 | $ 9,000 | $ 108,000 | 4% |
| **Total Cost of Goods Sold** | $ 156,769 | $ 152,709 | $ 152,709 | $ 153,109 | $ 155,139 | $ 163,659 | $ 157,569 | $ 161,629 | $ 163,659 | $ 161,629 | $ 162,244 | $ 162,244 | $ 1,903,062 | 48% |
| **Gross Profit** | $ 168,232 | $ 152,292 | $ 152,292 | $ 151,892 | $ 159,862 | $ 191,342 | $ 167,432 | $ 183,372 | $ 191,342 | $ 183,372 | $ 187,757 | $ 187,757 | $ 2,076,938 | 52% |
| **Operating Expenses** | | | | | | | | | | | | | | |
| 7200 Marketing | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 24,000 | 1% |
| 6010 Rent or Lease | $ 20,699 | $ 20,699 | $ 20,699 | $ 20,699 | $ 20,699 | $ 20,699 | $ 20,699 | $ 20,699 | $ 20,699 | $ 20,699 | $ 20,699 | $ 20,699 | $ 248,388 | 10% |
| 6020 Repair & Maintenance | $ 1,200 | $ 1,200 | $ 1,200 | $ 1,200 | $ 1,200 | $ 1,200 | $ 1,200 | $ 1,200 | $ 1,200 | $ 1,200 | $ 1,200 | $ 1,200 | $ 14,400 | 1% |
| 6030 Utilities | $ 1,300 | $ 1,300 | $ 1,300 | $ 1,300 | $ 1,300 | $ 1,300 | $ 1,300 | $ 1,300 | $ 1,300 | $ 1,300 | $ 1,300 | $ 1,300 | $ 15,600 | 1% |
| 6100 Auto Expense | $ 200 | $ 200 | $ 200 | $ 200 | $ 200 | $ 200 | $ 200 | $ 200 | $ 200 | $ 200 | $ 200 | $ 200 | $ 2,400 | 0% |
| 6200 Bank Charges (calc field) | $ 6,450 | $ 5,850 | $ 5,850 | $ 6,150 | $ 6,450 | $ 7,950 | $ 7,050 | $ 7,650 | $ 7,950 | $ 7,650 | $ 7,500 | $ 7,500 | $ 84,000 | 3% |
| 6650 Insurance | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 60,000 | 2% |
| 6750 Legal & Professional Fees | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 12,000 | 0% |
| 6800 Dues & Subscriptions | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 900 | $ 10,800 | 1% |
| 6900 Meals and Entertainment | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 3,600 | 0% |
| 6910 Cell Phone | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 1,800 | 0% |
| 6950 Office Expenses | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 1,800 | 0% |
| 7170 Parking | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 1,200 | 0% |
| 7190 Travel & Lodging | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 | $ 1,800 | 0% |
| 7400 Taxes & Licenses | $ 1,400 | $ 1,400 | $ 1,400 | $ 1,400 | $ 1,400 | $ 1,400 | $ 1,400 | $ 1,400 | $ 1,400 | $ 1,400 | $ 1,400 | $ 1,400 | $ 16,800 | 1% |
| 7000 Admin Payroll Taxes (Calc Field) | $ 5,912 | $ 5,912 | $ 5,912 | $ 5,912 | $ 5,912 | $ 5,912 | $ 5,912 | $ 5,912 | $ 5,912 | $ 5,912 | $ 5,912 | $ 5,912 | $ 70,941 | 3% |
| 7010 Employee Benefit Expense | $ 2,600 | $ 2,600 | $ 2,600 | $ 2,600 | $ 2,600 | $ 2,600 | $ 2,600 | $ 2,600 | $ 2,600 | $ 2,600 | $ 2,600 | $ 2,600 | $ 31,200 | 1% |
| 7020 Admin Payroll | $ 53,118 | $ 53,118 | $ 53,118 | $ 53,118 | $ 53,118 | $ 53,118 | $ 53,118 | $ 53,118 | $ 53,118 | $ 53,118 | $ 53,118 | $ 53,118 | $ 637,415 | 26% |
| 7025 Expanded Admin Payroll - Wholesale/Ecomm | $ 6,000 | $ 6,000 | $ 6,000 | $ 6,000 | $ 6,000 | $ 6,000 | $ 6,000 | $ 6,000 | $ 6,000 | $ 6,000 | $ 6,000 | $ 6,000 | $ 72,000 | 3% |
| 7050 Guaranteed Payments | $ 16,667 | $ 16,667 | $ 16,667 | $ 16,667 | $ 16,667 | $ 16,667 | $ 16,667 | $ 16,667 | $ 16,667 | $ 16,667 | $ 16,667 | $ 16,667 | $ 200,000 | 8% |
| **Total Expenses** | $ 125,295 | $ 124,695 | $ 124,695 | $ 124,995 | $ 125,295 | $ 126,795 | $ 125,895 | $ 126,495 | $ 126,795 | $ 126,495 | $ 126,345 | $ 126,345 | $ 1,510,144 | 38% |
| **Net Operating Income** | $ 42,936 | $ 27,596 | $ 27,596 | $ 26,896 | $ 34,566 | $ 64,546 | $ 41,536 | $ 56,876 | $ 64,546 | $ 56,876 | $ 61,411 | $ 61,411 | $ 566,794 | 14% |
| **Other Expenses** | | | | | | | | | | | | | | |
| 6700 Interest Expense | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 20,400 | 1% |
| **Total Other Expenses** | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 1,700 | $ 20,400 | 1% |
| **Net Other Income** | $ (1,700) | (1,700) | (1,700) | (1,700) | (1,700) | (1,700) | (1,700) | (1,700) | (1,700) | (1,700) | (1,700) | (1,700) | (20,400) | -1% |
| **Net Income** | $ 41,236 | $ 25,896 | $ 25,896 | $ 25,196 | $ 32,866 | $ 62,846 | $ 39,836 | $ 55,176 | $ 62,846 | $ 55,176 | $ 59,711 | $ 59,711 | $ 546,394 | 14% |

**Exhibit A - Page 5 of 5**

# EXHIBIT B

# Cure Schedule

# Blue Star Doughnuts LLC
## Cure Schedule

| Counterparty | Description of Contract[1] | Proposed Cure |
|---|---|---|
| 650 Gaines, LLC | Lease dated August 24, 2016 | $0.00 |
| Aflac Inc. | Flexible Benefits Plan dated 1/1/2018 | $0.00 |
| Auto-Chlor System of Oregon, Inc. | Dishwashing Machine Agreement | $0.00 |
| Automatic Data Processing, Inc., dba ADP | Client Account Agreement and Authorization to Debit/Credit dated 4/19/2019 | $0.00 |
| Automatic Data Processing, Inc., dba ADP | Major Accounts Services Master Services Agreement dated 4/19/2019 | $0.00 |
| Brannon Ritner Lobdell, Architecture LLC | Architecture Agreement dated 8/23/2020 | $0.00 |
| Cascade Centers Inc. | Subscription Agreement dated 2/1/2020 | $0.00 |
| Comcast Cable Communications, LLC, dba Xfinity | Comcast Business Service Order Agreement, Order No. 25192561 (1650 SE 3rd Ave) | $0.00 |
| Comcast Cable Communications, LLC, dba Xfinity | Comcast Business Service Order Agreement, Order No. 25586070 (3325 SE Division St) | $0.00 |
| Comcast Cable Communications, LLC, dba Xfinity | Comcast Business Service Order Agreement, Order No. 25490436 (3753 N. Mississippi Ave) | $0.00 |
| Comcast Cable Communications, LLC, dba Xfinity | Comcast Business Service Order Agreement, Order No. 25687347 (0672 SW Gaines St) | $657.06 |
| Dermer Holdings, LLC | Trademark License Agreement dated 8/21/2020 | $0.00 |
| Theory 33 - SPE 1, LLC, as successor in interest to Division33 LLC | Lease dated 4/30/2018 (Property: 3325 SE Division Street, Portland, Oregon) | $5,928.76 |
| DoorDash, Inc. | Merchant Signup Agreement dated 7/13/2020 (re 3753 N. Mississippi Ave, Portland, OR 97227) | $0.00 |
| DoorDash, Inc. | Merchant Signup Agreement dated 7/27/2020 (re 0672 SW Gaines St, #2, Portland, OR 97239) | $0.00 |

---

[1] The inclusion of a Contract on this list does not constitute an admission as to the executory or non-executory nature of the Contract or as to the existence or validity of any claims held by the counterparty to such Contract. The Debtor reserves the right to supplement this Exhibit prior to the Confirmation Hearing Date.

# Blue Star Doughnuts LLC
## Cure Schedule

| Counterparty | Description of Contract[1] | Proposed Cure |
|---|---|---|
| DoorDash, Inc. | Merchant Signup Agreement dated 7/27/2020 (re 3325 SE Division St, Ste 1, Portland, OR 97202) | $0.00 |
| Ford Motor Credit Company | Retail Installment Contract dated 5/12/2017 | $659.82 |
| Ford Motor Credit Company | Oregon Vehicle Retail Installment Contract dated 9/7/2017 | $526.59 |
| Ford Motor Credit Company | Oregon Vehicle Retail Installment Contract dated 11/23/2018 | $693.70 |
| JKR, LLC dba Service Linen Supply | Textile Rental Service Agreement | $0.00 |
| Kaiser Foundation Health Plan of the NW | Large Group Medical Plan Group Agreement, Group No. 22237-001, 002 | $0.00 |
| Kaiser Foundation Health Plan of the NW | Large Group Dental Plan Group Agreement, Group No 22237-007, 008 | $0.00 |
| Madison 34 Ray LLC | Lease dated 7/28/2014 (Property: 3753 N. Mississippi, Portland, Oregon) | $0.00 |
| MBA Administrators | Business Associate Agreement dated 3/19/2019 | $0.00 |
| Pension Plan Specialists, PC | Client Services Agreement dated 11/12/2018 - 401(k) Plan Administrator | $0.00 |
| Pitman Properties V, LLC | Lease dated 5/18/2020 (Property: 1640 SE 3rd Avenue, Portland, Oregon) | $606.58 |
| The Port of Portland | Lease dated 2016 (Property: Space T2320 located at the Portland International Airport in Portand, Oregon) | $0.00 |
| Restaurant Technologies, Inc. | Supply and Fryer Filtration Monitoring Agreement No. 4940.0 dated 11/30/2018 | $559.34 |
| Stoel Rives LLP | Engagement Letter dated May 7, 2020 | $0.00 |

# EXHIBIT C

# Rejection Schedule

**Exhibit C - Page 1 of 2**

Case 20-32485-pcm11    Doc 149    Filed 11/19/20

# Blue Star Doughnuts LLC
## Rejection Schedule

| Counterparty | Description of Contract[1] |
|---|---|
| DS Progress Ridge, LLC | Lease dated 12/1/2017 (Property: 14985 SW Barrows Road, #127, Beaverton, Oregon) |

---

[1] The inclusion of a Contract on this list does not constitute an admission as to the executory or non-executory nature of the Contract or as to the existence or validity of any claims held by the counterparty to such Contract. The Debtor reserves the right to supplement this Exhibit prior to the Confirmation Hearing Date.

# EXHIBIT D

# Preference Claims Analysis

# Blue Star Doughnuts LLC
## Preference Analysis

| Transferee | Relationship to Debtor | Date(s) of Transfer(s) | Transfer Amount | Basis for Transfer | Applicable Defenses[1] |
|---|---|---|---|---|---|
| City Houses Inc. | Lessor | 07/01/2020; 08/04/2020 | $7,785.80 | Rent payments | § 547(c)(2) |
| Coava Coffee Roasters, Inc. | Trade Vendor | 23 transfers from 06/05/2020 to 08/24/2020 | $8,909.95 | Coffee purchases | § 547(c)(1), (2) |
| Farmers Insurance Group | Insurer | 07/03/2020; 07/03/2020; 08/03/2020 | $9,024.06 | Insurance premiums | § 547(c)(2) |
| Food Services of America | Trade Vendor | 8 transfers from 06/02/2020 to 08/11/2020 | $5,146.01 | Inventory purchases | § 547(c)(1), (2) |
| Legacy Property Management | Lessor | 07/01/2020; 08/04/2020 | $9,588.64 | Rent payments | § 547(c)(2) |
| Portland Custom Packaging | Trade Vendor | 06/23/2020; 07/07/2020; 07/29/2020; 07/29/2020; 08/20/2020 | $19,206.80 | Packaging services | § 547(c)(1), (2) |
| Pitman Properties V, LLC | Lessor | 07/01/2020; 08/04/2020 | $12,908.00 | Rent payments | § 547(c)(2) |
| Pitman Properties V, LLC | Lessor | 08/04/2020 | $351.99 | Utilities payment | § 547(c)(2), (9) |
| Puratos Corporation | Trade Vendor | 7 transfers from 06/04/2020 to 08/18/2020 | $9,530.00 | Inventory purchases | § 547(c)(1), (2), (4) |
| Puratos Corporation | Trade Vendor | 3 transfers on 08/25/2020 | $5,492.50 | Antecedent trade debt | § 547(c)(9) |
| Riva Portland, LLC | Lessor | 06/01/2020; 07/01/2020; 08/04/2020 | $9,066.84 | Rent payments | § 547(c)(2) |
| The Chefs Warehouse West Coast | Trade Vendor | 26 transfers from 06/13/2020 to 08/22/2020 | $11,792.21 | Inventory purchases | § 547(c)(1), (2) |
| US Foods, Inc. | Trade Vendor | 24 transfers from 06/18/2020 to 08/14/2020 | $13,168.70 | Inventory purchases | § 547(c)(1), (2) |

---

[1] The Debtor's citation to an applicable defense does not constitute an admission that no other defense may be applicable. The Debtor's due diligence with respect to a transferee's affirmative defenses is ongoing and the Debtor reserves the right to supplement this Exhibit any time prior to the Confirmation Hearing Date.

# Blue Star Doughnuts LLC
## Preference Analysis

| Transferee | Relationship to Debtor | Date(s) of Transfer(s) | Transfer Amount | Basis for Transfer | Applicable Defenses[1] |
|---|---|---|---|---|---|
| Katherine J. House | CEO, Member, Manager | 22 transfers from 09/03/2019 to 08/03/2020 | $213,083.34 | Guaranteed payment (salary) | § 547(c)(2) |
| Micah L. Camden | Member | 7 transfers from 09/06/2019 to 03/16/2020 | $50,000.00 | Guaranteed payment (salary) | § 547(c)(2) |
| W.P. Price Tax and Accounting, LLC | Member | 17 transfers from 09/04/2019 to 05/18/2020 | $101,269.67 | Compensation | § 547(c)(2) |
| W.P. Price Tax and Accounting, LLC | Member | 10/22/2019; 02/05/2020; 03/16/2020 | $522.35 | Expense reimbursements | § 547(c)(2), (9) |
| William Price | CFO | 6 transfers from 05/05/2020 to 08/05/2020 | $52,083.34 | Regular employee compensation | § 547(c)(2) |

# EXHIBIT E

# Voidable Transfer Claims Analysis Pursuant to Sections 544 and 548

# Blue Star Doughnuts LLC
## Voidable Transfer Analysis Pursuant to Sections 544 and 548

| Transferee | Relationship to Debtor | Time of Transfer(s) | Amount Transferred | Description of Transfer(s) | Reason Debtor Will Not Pursue Avoidance |
|---|---|---|---|---|---|
| Katherine J. House | CEO, Member, Manager | April 2020 | $20,000.00 | 2013 Member loan reclassified as distribution pursuant to IRS guidelines | Actual transfer occurred in 2013; action taken in 2020 was an accounting correction, not a transfer; Debtor was not insolvent at time of transfer. |
| Micah L. Camden | Member | April 2020 | $20,000.00 | 2013 Member loan reclassified as distribution pursuant to IRS guidelines | Actual transfer occurred in 2013; action taken in 2020 was an accounting correction, not a transfer; Debtor was not insolvent at time of transfer. |
| Micah L. Camden | Member | April 2020 | $16,844.82 | 2014 & 2016 Member loans reclassified as distributions pursuant to IRS guidelines | Actual transfers occurred in 2014 and 2016; action taken in 2020 was an accounting correction, not a transfer; Debtor was not insolvent at time of transfer. |
| Katherine J. House | CEO, Member, Manager | 10/30/2019<br>02/04/2020 | $11,500.00<br>$11,500.00 | Member distributions | Debtor was not insolvent at times of transfers; Member will contribute new capital pursuant to Chapter 11 Plan |
| Micah L. Camden | Member | 08/29/2019<br>09/20/2019<br>10/21/2019<br>11/20/2019<br>12/20/2019<br>01/21/2020<br>02/20/2020<br>03/20/2020<br>04/20/2020 | $3,500.00<br>$399.00<br>$399.00<br>$399.00<br>$399.00<br>$399.00<br>$399.00<br>$399.00<br>$399.00 | Member distributions | Debtor was not insolvent at times of transfers |
| Basil Bullard | Member | 10/30/2019<br>02/04/2020 | $5,000.00<br>$3,750.00 | Member distributions | Debtor was not insolvent at times of transfers |
| Gary "Chip" Rothenberger, Jr. | Member | 10/30/2019<br>02/04/2020 | $4,750.00<br>$3,750.00 | Member distributions | Debtor was not insolvent at times of transfers |

# Blue Star Doughnuts LLC
## Voidable Transfer Analysis Pursuant to Sections 544 and 548

| Transferee | Relationship to Debtor | Time of Transfer(s) | Amount Transferred | Description of Transfer(s) | Reason Debtor Will Not Pursue Avoidance |
|---|---|---|---|---|---|
| W.P. Price Tax and Accounting, LLC | Member | 10/30/2019<br>02/04/2020 | $250.00<br>$250.00 | Member distributions | Debtor was not insolvent at time of transfer; Member will contribute new capital pursuant to Chapter 11 Plan; amount is *de minimis* |
| Basil Bullard | Member | 01/02/2020 | $152,700.00 | Member unit redemption | Debtor received reasonably equivalent value in exchange for units redeemed. |
| Gary "Chip" Rothenberger, Jr. | Member | 01/02/2020 | $122,160.00 | Member unit redemption | Debtor received reasonably equivalent value in exchange for units redeemed. |
| Micah L. Camden | Member | 08/29/2019 | $63,255.16 | Member distribution on account of tax obligations from LLC income for tax year 2018 | Debtor was not insolvent at time of transfer; distribution authorized by LLC Operating Agreement |
| Micah L. Camden | Member | 04/03/2020 | $47,402.74 | Member distribution on account of tax obligations from LLC income for tax year 2019 | Debtor was not insolvent at time of transfer; distribution authorized by LLC Operating Agreement |
| W.P. Price Tax and Accounting, LLC | Member | 04/01/2020 | $353.01 | Member distribution on account of tax obligations from LLC income for tax year 2019 | Debtor was not insolvent at time of transfer; distribution authorized by LLC Operating Agreement; Member will contribute new capital pursuant to Chapter 11 Plan; amount is *de minimis* |
| Basil Bullard | Member | 04/01/2020 | $17,718.05 | Member distribution on account of tax obligations from LLC income for tax year 2019 | Debtor was not insolvent at time of transfer; distribution authorized by LLC Operating Agreement; Member may contribute new capital pursuant to Chapter 11 Plan |
| Gary "Chip" Rothenberger, Jr. | Member | 04/01/2020 | $16,830.92 | Member distribution on account of tax obligations from LLC income for tax year 2019 | Debtor was not insolvent at time of transfer; distribution authorized by LLC Operating Agreement |
| Katherine J. House | CEO, Member, Manager | 04/01/2020 | $95,973.50 | Member distribution on account of tax obligations from LLC income for tax year 2019 | Debtor was not insolvent at time of transfer; distribution authorized by LLC Operating Agreement; Member will contribute new capital pursuant to Chapter 11 Plan |

# Blue Star Doughnuts LLC
## Voidable Transfer Analysis Pursuant to Sections 544 and 548

| Transferee | Relationship to Debtor | Time of Transfer(s) | Amount Transferred | Description of Transfer(s) | Reason Debtor Will Not Pursue Avoidance |
|---|---|---|---|---|---|
| Micah L. Camden | Member | 09/06/2019<br>09/27/2019<br>10/03/2019<br>10/15/2019<br>10/30/2019<br>11/18/2019<br>12/02/2019<br>01/15/2020<br>02/04/2020<br>02/24/2020 | $5,000.00<br>$5,000.00<br>$5,000.00<br>$5,000.00<br>$5,000.00<br>$5,000.00<br>$5,000.00<br>$5,000.00<br>$5,000.00<br>$5,000.00 | Guaranteed payment (salary) | Services provided by Mr. Camden as consultant were reasonably equivalent value received by Debtor in exchange for the transfers. |
| Katherine J. House | CEO, Member, Manager | 09/03/2019<br>09/16/2019<br>10/01/2019<br>10/16/2019<br>11/01/2019<br>11/18/2019<br>12/02/2019<br>12/13/2019<br>12/16/2019<br>01/02/2020<br>01/16/2020<br>02/03/2020<br>02/18/2020<br>03/02/2020<br>03/16/2020<br>04/01/2020<br>04/16/2020<br>05/01/2020<br>05/18/2020<br>06/03/2020<br>07/03/2020<br>08/03/2020 | $9,916.67<br>$9,916.67<br>$9,916.67<br>$9,916.67<br>$9,916.67<br>$9,916.67<br>$9,916.67<br>$10,000.00<br>$9,916.67<br>$10,208.33<br>$10,208.33<br>$10,208.33<br>$10,208.33<br>$10,208.33<br>$10,208.33<br>$6,250.00<br>$6,250.00<br>$6,250.00<br>$6,250.00<br>$6,250.00<br>$6,250.00<br>$6,250.00 | Guaranteed payment (salary) | Services provided by Ms. House as chief executive officer were reasonably equivalent value received by Debtor in exchange for the transfers. |

# Blue Star Doughnuts LLC
## Voidable Transfer Analysis Pursuant to Sections 544 and 548

| Transferee | Relationship to Debtor | Time of Transfer(s) | Amount Transferred | Description of Transfer(s) | Reason Debtor Will Not Pursue Avoidance |
|---|---|---|---|---|---|
| W.P. Price Tax and Accounting, LLC | Member | 09/04/2019<br>09/18/2019<br>10/03/2019<br>10/17/2019<br>11/04/2019<br>11/19/2019<br>12/03/2019<br>12/17/2019<br>01/02/2020<br>01/22/2020<br>02/04/2020<br>02/19/2020<br>03/03/2020<br>03/17/2020<br>04/01/2020<br>05/05/2020<br>05/18/2020 | $6,250.00<br>$6,250.00<br>$6,250.00<br>$6,250.00<br>$6,250.00<br>$6,250.00<br>$6,250.00<br>$9,250.00<br>$6,250.00<br>$6,250.00<br>$6,250.00<br>$6,250.00<br>$6,250.00<br>$6,250.00<br>$6,250.00<br>$2,083.33<br>$2,083.33 | Compensation | Services provided by Mr. Price as an independent contractor were reasonably equivalent value received by Debtor in exchange for the transfers. |
| William Price | CFO | 05/05/2020<br>05/20/2020<br>06/02/2020<br>06/02/2020<br>07/02/2020<br>08/05/2020 | $4,166.67<br>$4,166.67<br>$6,250.00<br>$12,500.00<br>$12,500.00<br>$12,500.00 | Regular employee compensation | Services provided by Mr. Price as an employee were reasonably equivalent value received by Debtor in exchange for the transfers. |

# EXHIBIT F

# Redline of Proposed Changes to Debtor's LLC Operating Agreement

# SECOND AMENDED AND RESTATED
# OPERATING AGREEMENT
# OF
# BLUE STAR DOUGHNUTS LLC

*August 22, 2016*
**November    , 2020**

The limited liability company interests described herein have not been and will not be registered under the Securities Act of 1933, as amended (the "Securities Act"), or the securities laws of any state in the United States.  The offering of such limited liability company interests is being made in reliance upon an exemption from the registration requirements of the Securities Act for offers and sales of securities which do not involve any public offering, and analogous exemptions under state securities laws.

These securities are subject to restrictions on transferability and resale, and may not be transferred or resold except (i) as permitted under the Securities Act and applicable state securities laws pursuant to registration or exemption therefrom, and (ii) in accordance with the requirements and conditions set forth in this Operating Agreement.

**SECOND AMENDED AND RESTATED**
**OPERATING AGREEMENT**
**OF**
**BLUE STAR DOUGHNUTS LLC**

This Second Amended and Restated Operating Agreement (~~this~~ "**Agreement**") of Blue Star Doughnuts LLC, an Oregon limited liability company (~~the~~ "**Company**"), is entered into by and among the Company and the ~~other Persons that are signatories to this Agreement, whether as Members or otherwise, dated August 22, 2016 (the "Effective Date~~Members, effective as of the date on which the order confirming the Company's chapter 11 plan of reorganization ("**Chapter 11 Plan**") is entered ("**Effective Date**") by the United States Bankruptcy Court for the District of Oregon ("**Bankruptcy Court**"). Capitalized terms used in this Agreement and not otherwise defined have the meanings set forth on Exhibit A.

~~In connection with the formation of the Company, on or about July 5, 2012, Katherine J. Poppe ("Poppe"), Basil Bullard ("Bullard") and Gary "Chip" Rothenberger, Jr. ("Rothenberger") entered into an Operating Agreement (the "Original Operating Agreement") and a Buy Sell Agreement (the "Buy Sell Agreement") in each case with respect to their limited liability company interests in the Company.~~

~~Pursuant to the Stipulated General Judgment of Dissolution of Marriage *In the Matter of the Marriage of: Katherine Jane Camden and Micah Lael Camden, Case No. 15DR09647*, dated July 17, 2015 (the "Divorce Decree"), 50 percent of the limited liability company interests of the Company held by Poppe were transferred to Micah L. Camden ("Camden").~~

~~After giving effect to the Divorce Decree, Poppe holds a 30% limited liability company interest in the Company, Camden holds a 30% limited liability company interest in the Company, Bullard holds a 20% limited liability company interest in the Company and Rothenberger holds a 20% limited liability company interest in the Company.~~

~~Contemporaneously with the execution of this Agreement, the Company, Poppe, Camden, Bullard and Rothenberger entered into a Membership Interest Purchase Option~~This Agreement is entered into in connection with the Company's Chapter 11 Plan, which has been confirmed by the Bankruptcy Court in case number 20-32485 ("**Chapter 11 Case**"). Pursuant to section 1189 of title 11 of the United States Code ("**Bankruptcy Code**"), the Bankruptcy Court confirmed the Company's Chapter 11 Plan that, among other things, amended and restated the Agreement as of the Effective Date.

This Agreement amends and restates in its entirety the Amended and Restated Operating Agreement, ~~pursuant to which Poppe may purchase from each of Bullard and Rothenberger a 10% limited liability company interest in~~ of the Company dated August 22, 2016 (the "~~Purchase Option~~").

The Members wish to amend and restate in the entirety the Original**Prior** Operating Agreement and the Buy Sell Agreement with this Agreement**")**.

# 1. THE COMPANY

**1.1 Formation and Organization.** The Company has previously been formed and organized as an Oregon limited liability company by the execution and filing of the Articles with the Oregon Secretary of State on July 5, 2012 and the entry by Poppe, Bullard and Rothenberger into the Original Operating Agreement and the Buy Sell Agreement on or about that date. This Agreement shall amend, restate and supersede in the entirety the Original Operating Agreement and the Buy Sell Agreement. Notwithstanding anything to the contrary contained in this Agreement, the Members are hereby deemed to approve and ratify the execution and filing, on behalf of the Company, of all documentation (i) executed and filed through the date hereof by any authorized persons within the meaning of the Act, including the Articles, and (ii) necessary or convenient to give effect to this Agreement, including without limitation an amendment to the Articles to reflect that the Company is to be Manager-Managed.

**1.2 Term.** The Company shall have perpetual existence unless and until dissolved in accordance with this Agreement.

**1.3 Purpose and Powers.** The Company may engage in any lawful business activities permitted under the Act and determined from time to time by the Manager. The Company shall have the authority to do all things necessary or convenient to accomplish its purpose and operate its business.

**1.4 Name.** The name of the Company is Blue Star Doughnuts LLC. The Company may operate its business under such name or use such other names as the Manager may approve from time to time.

**1.5 No Partnership Other Than For Tax Purposes.** The Members intend that the Company not be a partnership, a limited partnership or joint venture, and that no Member be a partner or joint venturer of any other Member, for any purposes other than federal income tax and state income tax purposes.

# 2. CAPITAL STRUCTURE; ISSUANCE OF UNITS

**2.1 Capital Structure.**

(a) The Company is authorized to issue units in the Company designated as "**Common Units**" and two series of "**Profits Interest Units**" (designated as "**Series A Profits Interest** Units" and "**Series B** **Profits Interest Units**"), all of which constitute membership interests under the Act. Subject to the terms of this Agreement, the maximum number of Common Units authorized for issuance is 200 and the maximum number of Profits Interest Units authorized for issuance is 5. The Company is, subject to the terms of this Agreement, authorized to issue fractional Units. The preferences, rights, powers, limitations and restrictions of the Common Units and Profits Interest Units are as set forth in this Agreement, and, in the case of

the Profits Interest Units, in the Profits Interest Agreement between the Company and each holder of Profits Interest Units. The rights, powers, preferences and privileges of all Units within a class or series shall be the same except, with respect to Profits Interest Units, as may be set forth in any Profits Interest Agreement. The Company shall not authorize additional Common Units or Profits Interest Units, nor authorize any new class of Units, or otherwise change the capital structure of the Company, in each case, without the requisite approval under this Agreement.

(b)     Profits Interest Units are intended to represent "profits interests" for federal income tax purposes consistent with Rev Proc 93-27, 1993-2 CB 343 and Rev Proc 2001-43, 2001-2 CB 191, issued by the Internal Revenue Service, and the Company and each holder of Profits Interest Units agree to treat the Profits Interest Units as such for all tax purposes, including for federal income tax reporting and withholding purposes. Each holder of Profits Interest Units acknowledges that upon receipt of the Profits Interest Units, the holder will have an initial Capital Account balance of zero and will not be entitled to any portion of the capital of the Company as of the grant date.

**2.2     Certificates for Units.**  In the sole discretion of the Manager, the outstanding Units may be represented by certificates. Every certificate for Units that is subject to any restriction on Transfer pursuant to this Agreement, applicable securities laws, agreements among or between Members, or any agreement to which the Company is a party, will have conspicuously noted on the face or back of the certificate either the full text of such restriction or a statement of the existence of such restriction and that the Company retains a copy of the restriction.

~~**2.3     Issuance of Additional Units.**~~

~~(a)     **Generally.**  Subject to the terms of this Agreement, the Manager may cause the Company to issue authorized and not previously issued Units of any class or series (including without limitation Profits Interest Units to directors, officers, employees, consultants and advisors of the Company), for such consideration and upon such other terms, as the Manager may determine from time to time in its sole discretion, *provided, however*, that the Manager may cause the Company to issue authorized and not previously issued Profits Interest Units pursuant to this Section 2.3 if and only if such Profits Interest Units are dilutive only of the Units then held by Poppe and not dilutive of the Units then held by any other Member.~~

**2.3**     ~~(b)~~**Admission of Additional Members.**

Any Person who receives Units pursuant to this <u>Section 2.3</u> shall not be admitted to the Company as an additional Member until such Person (i) executes an instrument satisfactory to the Manager agreeing to be bound by all the terms of this Agreement; *provided, however,* that any Person that is already a Member need not execute any such instrument; (ii) provides to the Company the Person's taxpayer identification number, sufficient information to determine the transferee's initial tax basis in the Units and any other information reasonably necessary to permit the Company to file all required federal and state tax returns and other legally required information statements or returns; (iii) if a Person to whom additional Units are issued resides in a community property state, causes such Person's spouse or domestic partner, if any, to execute

and deliver to the Company a Consent of Spouse substantially in the form attached as <u>Exhibit B</u>, agreeing to be bound by the provisions of this Agreement; and (iv) executes and delivers to the Company such other documentation as is determined by the Manager to be necessary or appropriate to ensure compliance with applicable law (including but not limited to federal and state securities laws) and evidence the Unit issuance and the admission of the Person as a Member. A Person who acquires additional Units but who is not admitted as a Member pursuant to this <u>Section 2.3(b)</u> will be an Assignee only with respect to such Units, and will have no rights of a Member under the Act or this Agreement. In connection with the issuance of any additional interest in the Company, the Company shall allocate Profits, Losses and other items of Company income, gain, loss or deduction pursuant to <u>Section 4.4</u>.

## 3. CAPITAL ACCOUNTS; CAPITAL CONTRIBUTIONS

**3.1    Maintenance of Capital Accounts.**  The Company will establish and maintain Capital Accounts with respect to each Member, all in accordance with the capital accounting rules of Regulations Section 1.704-1(b)(2)(iv). The Manager may increase or decrease Capital Accounts to reflect revaluations of property in accordance with Regulations Section 1.704-1(b)(2)(iv)(f). The Manager may modify the manner in which Capital Accounts are computed to comply with the Regulations, provided that such modification is not likely to materially affect the amounts distributed to any Person under <u>Section 11.2</u> upon the dissolution of the Company. The Manager will also make any adjustments that are necessary or appropriate to maintain proportionality between the Capital Accounts of the Members and the amount of capital reflected on the Company's books, in accordance with Regulations Section 1.704-1(b)(2)(iv)(q).

**3.2    Capital Account Balance.**  As of ~~June 30~~November    , ~~2016~~2020, each Member has a Capital Account balance in the amount set forth on <u>Exhibit D</u>.

**3.3    Member Loans.**  The Manager may from time to time determine that additional funding is required by the Company. In such case the Manager may cause the Company to borrow from any Member or group of Members on terms and conditions on which any such Member or group of Members is willing to lend and that are equivalent to the terms and conditions (including the provision of security for any such loan) that otherwise would be required by a third party institutional lender, taking into account the circumstances of the Company at such time; provided that, Sortis Holdings, Inc. or its assignee ("**Sortis**") shall have the first right to lend to the Company, and if Sortis exercises its right to lend to the Company, then Katherine J. House and W.P. Price Tax and Accounting, LLC ("**W.P. LLC**") shall have the right to participate *pro rata* with Sortis in any borrowings by the Company. No Member will be required to make any additional Capital Contribution to the Company.

**3.4    Return of Contributions, Etc.**  No Member shall have the right to require or cause a return of any Capital Contribution from the Member's Capital Account. No Member will be permitted to receive a return of any Capital Contributions without the consent of the Members then holding a Supermajority of the Voting Units. The Company shall not pay any interest on the Capital Contributions of a Member. No Member shall have any deficit restoration obligation or personal liability for repayment of any Capital Contribution of any other Member.

## 4. ALLOCATIONS

**4.1 Profits and Losses.** Subject to and after giving effect to the special allocations set forth on Exhibit C, Profits, Losses and, to the extent necessary, individual items of income, gain, loss or deduction of the Company will be allocated as of the end of each Fiscal Year, at such times as the carrying value of any Company asset is adjusted under the Capital Account rules, and at such other times as the Manager determines is necessary in its discretion. Except as otherwise provided in this Agreement, Profits, Losses and, to the extent necessary, individual items of income, gain, loss or deduction of the Company will be allocated among the Members in a manner such that the Capital Account of each Member, immediately after making such allocation, is, as nearly as possible, equal (proportionately) to the distributions that would be made to such Member if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their carrying values for Capital Account purposes, all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the carrying value of the asset for Capital Account purposes securing such liability), and the net assets of the Company were distributed in accordance with Section 11.2, after subtracting for this purpose each Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain, computed immediately after the hypothetical sale of assets.

**4.2 Other Allocation Rules.**

(a) The Members will share "excess nonrecourse liabilities" of the Company within the meaning of Regulations Section 1.752-3(a)(3) in proportion to the number of Units held by each.

(b) For purposes of determining the Profits, Losses or any other items allocable to any period, Profits, Losses, and any such other items will be determined on a daily, monthly, or other basis, as determined by the Manager using any permissible method under Code Section 706 and the Regulations thereunder.

(c) The Members are aware of the income tax consequences of the allocations made by this Section 4 and will report their shares of Company income and loss for income tax purposes in accordance with this Section 4.

(d) In the event of the liquidation of the Company pursuant to Section 11.1, the Company shall make a special allocation of gross income, gain, loss or deduction in manner and to the extent necessary to cause the Capital Account balance of each Member, after the allocation of all other items of Profits or Loss, to equal, to the nearest extent possible, the amount each Member is entitled to receive as a distribution pursuant to Section 5.2 immediately prior to such distributions.

**4.3 Tax Allocations: Code Section 704(c).** In accordance with Code Section 704(c) and the related Regulations, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company or carried on its books for Capital Account purposes will, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of the property to the Company for federal income tax purposes and its initial fair market value for Capital Account purposes. If the value of any

Company asset is adjusted pursuant to Section 3.1, subsequent allocations of income, gain, loss and deduction with respect to the asset will take account of any variation between the adjusted basis of the asset for federal income tax purposes and its value for Capital Account purposes in the same manner as under Code Section 704(c) and the related Regulations. Any elections or other decisions relating to such allocations will be made by the Manager in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section 4.3 are solely for purposes of federal, state and local taxes and will not affect, or in any way be taken into account in computing, any Person's Capital Account or share of Profits, Losses, other items or distributions pursuant to any provision of this Agreement.

**4.4    Accounting Upon Admission of Additional Members.**  No additional Member, including without limitation any Profits Interest Member, shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company. In accordance with the provisions of Section 706(d) of the Code and the Regulations, the Manager may, at its option, at the time an additional Member is admitted, close the Company books (as though the Company's Fiscal Year had ended) or make pro rata allocations to the additional Member for that portion of the Company's Fiscal Year in which such Person is a Member.

## 5.    DISTRIBUTIONS

**5.1    General.**  No Member shall have the right or power to demand or receive a distribution in a form other than cash, and no Member shall be required or compelled to accept a distribution of any asset in kind to the extent that the interest distributed would exceed the Member's pro rata share of operating or liquidating distributions, as the case may be. No Member shall have the right to receive interest on any distribution by the Company to the Member.

**5.2    Distributions of Net Cash.**  Except as otherwise provided in Sections 5.3 and 11.2 and subject to any applicable restriction on distributions under the Act or any agreement by which the Company is bound, the Company shall from time to time distribute Net Cash in such amounts and at such times as the Manager may determine in its sole and reasonable discretion. Any distribution of Net Cash pursuant to this Section 5.2 will be distributed to the Members in proportion to the Units held by each.

**5.3    Tax Distributions.**  It is the intent of the Company to make tax distributions to the Members, unless the Manager otherwise determines in its reasonable discretion, taking into account the needs of the Company for capital and reserves. Distribution would be no less frequently than at least once each calendar year. Distribution to the Members would be in an amount intended to enable each Member to pay taxes on the net income of the Company that is allocable to the Members with respect to the prior calendar year. The amount distributable to cover taxes shall be made prior to April 1 with respect to the prior calendar year and shall be calculated using a reasonable hypothetical combined state and federal marginal tax rate determined from time to time by the Manager for all Members or, if the Manager does not determine such rate, 45% of the net income of the Company. If the full amount of such tax distribution cannot in the Manager's discretion be made, a lesser amount of the tax distribution is authorized, if appropriate, under the provisions of this Agreement. In addition to being subject to override by the determination of the Manager acting in its reasonable discretion, the obligation

7

of the Company to make the foregoing distribution for any year shall also be subject to any applicable restriction on distributions under the Act and to the Company's having available cash without having to resort to borrowing or any other source of funds.

**5.4    Tax Withholding.**  All amounts withheld pursuant to the Code or any provision of any state or local tax law with respect to any distribution or allocation shall be treated as amounts distributed pursuant to this <u>Section 5</u> for all purposes under this Agreement.  The Company is authorized to withhold from distributions or with respect to allocations and to pay over to any federal, state or local government any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state or local law and shall allocate any such amounts to the Members with respect to which such amounts were withheld.

**5.5    Profits Interest Thresholds.**  Notwithstanding anything in <u>Section 5.2</u> or <u>Section 5.3</u> to the contrary, and consistent with the intent of the parties hereto to treat certain Units designated as such by the Manager as "profits interests" within the meaning of IRS Revenue Procedure 93-27 and IRS Revenue Procedure 2001-43, a member holding Units designated as profits interests shall only be entitled to participate in and receive distributions of Net Cash to the extent the amount distributable to such Member represents such Member's allocable share of Profits of the Company (including any anticipated Profits of the Company that are reasonably expected to be allocated to such member pursuant to <u>Section 4</u> after the date of the relevant distribution) and appreciation in value of the Company and its assets from and after the date such Member received such Units (whether or not realized at such time).  All determinations and valuations necessary to establish the extent to which a Member holding Units designated as profits interests may participate in a distribution of Net Cash in light of the foregoing shall be made by the Manager in its sole and absolute discretion.

## 6.    MEMBERS

**6.1    Membership.**  The name and address of each Member, each Member's Capital Account Balance as of ~~June 30~~<u>November    </u>, ~~2016~~<u>2020</u> and the number of Units of each class or series held by such Member as of the Effective Date, are listed on <u>Exhibit D</u>.  <u>Exhibit D</u> shall be amended from time to time by the Manager as necessary or desirable to reflect, among other things, the issuance of additional Units, changes in the number of Units held by Members, and the addition or withdrawal of Members.

**6.2    Authority to Act.**  No Member will have any power or authority to bind the Company, unless the Member is a Manager acting expressly within the scope of his or her authority under this Agreement, or the Manager has expressly authorized the Member to act as an agent of the Company in accordance with this Agreement.

**6.3    Limitation of Liability.**  No Member shall have any personal liability whatsoever for the debts, acts, liabilities or obligations of the Company, including debts, liabilities or obligations arising under a judgment, decree or court order.  Such limited liability shall continue in full force regardless of any dissolution and winding up of the Company.

**6.4    Voting.**

(a)     Each Common Unit (or fraction thereof) and each Series A Profits Interest Unit (or fraction thereof) shall be entitled to one vote (or fraction thereof) on any matter submitted to the Members for approval.  The holders of Common Units and Profit Interest Units shall vote as one class.

(b)     To the maximum extent permitted by law, no Series B Profits Interest Unit will be entitled to vote on any matter submitted to the Members for approval.  ~~If the holders of Profits Interest Units are required by law to vote on matters submitted to the Members, each holder of Profits Interest Units shall be entitled to not more than one vote per Unit and the Common Units and Profit Interest Units shall vote as one class.  To avoid voting dilution to Members other than Poppe, the number of votes cast by holders of Profits Interest Units shall automatically reduce the same number of votes that could otherwise be cast by Poppe on the matter being voted upon.~~

(c)     Except where a different voting threshold is expressly specified herein, any action that requires a vote of Members shall be approved by Members then holding more than 50% of the Voting Units.

**6.5     Actions of Members.**

(a)     **Special Meetings.**  Special meetings of the Members, for any purposes, may be called by the Manager, and shall be called by the Manager upon written demand of the Members holding in the aggregate more than thirty percent of the outstanding Voting Units then held by all Members.  The demand shall describe the purposes for which the meeting is to be held and shall be signed, dated and delivered to the Manager.

(b)     **Place of Meetings.**  The Manager may designate any place in or out of Oregon as the location for any meeting of the Members.  If no designation is made, the place of meeting will be the principal executive office of the Company.

(c)     **Notice of Meetings.**  Except as provided in Section 6.5(d), written notice stating the place and time of the meeting and the purpose or purposes for which the meeting is called shall be delivered to each Member entitled to vote at the meeting in accordance with Section 12.2 not less than two and not more than 60 days before the date of the meeting.

(d)     **Waiver of Notice.**  A Member may at any time waive any notice required by this Agreement.  The waiver shall be in writing, be signed by the Member entitled to the notice and be delivered to the Manager.  A Member's attendance at a meeting waives objection to lack of notice or defective notice of the meeting, unless the Member at the beginning of the meeting objects to holding the meeting or transacting business at the meeting.

(e)     **Record Date.**  For the purposes of determining the Members entitled to vote at a meeting or execute a written consent, the date established by the Manager, or if no date is established, the date on which any required notice is sent, will be the record date for making such determination.

(f)     **Quorum Requirement.**  The quorum requirement for any meeting of Members shall be the presence, in person or by proxy, of the holders of more than 50% of the

9

80580165.9 0056979-00001
108165715.11 0056668-00010
Exhibit F - Page 10 of 39
Case 20-32485-pcm11    Doc 149    Filed 11/19/20

~~Common~~Voting Units then issued and outstanding.  Any action that requires a vote of Members shall be approved at a meeting at which a quorum is present only upon receiving the affirmative vote of Members holding at least the minimum number of votes necessary to take such action under this Agreement and, if applicable, any other necessary approval.

(g)     **Manner of Acting.**  Members who have an interest in the outcome of any particular matter upon which the Members vote or consent may vote in person or by proxy or consent in writing upon any such matter, and such vote or consent, as the case may be, will be counted in determining whether the matter was approved by the Members.

(h)     **Action by Members Without a Meeting.**  Members may take any action permitted by this Agreement without a meeting if the action is evidenced by one or more written consents signed by Members holding not less than the minimum number of votes that would be necessary to take such action at a meeting at which all Members entitled to vote on the action were present and voted.  Any such action by written consent shall be effective when the last Member necessary to approve such action signs the written consent, unless the consent specifies an earlier or later effective date.  The Members shall deliver any action by written consent to the Manager for filing in the records of the Company.

6.6     **Covenant Regarding Change in Marital Status.**  If a Member marries or remarries, or is married and moves to a community property state, or enters into a domestic partnership entitled to community property rights under applicable law, in each case after the date the Member acquired Units, the Member agrees that it will deliver an executed Consent of Spouse in the form attached to this Agreement as <u>Exhibit B</u>, duly signed by such Member's spouse or domestic partner, as applicable, to the Company.

6.7     **Withdrawal.**  No Member has the right or power to withdraw from the Company.  Any Member who purports to withdraw voluntarily from the Company shall be in breach of this Agreement, shall be liable to the Company for any damages arising directly or indirectly from such purported withdrawal, shall cease to be a Member but shall continue to hold an interest in the Company as an Assignee and shall not be entitled to any distribution from the Company by reason of the purported withdrawal.

80580165.9 0056979-00001
108165715.11 0056668-00010
**Exhibit F - Page 11 of 39**
Case 20-32485-pcm11    Doc 149    Filed 11/19/20

# 7. MANAGEMENT

**7.1 Management.** ~~The Company is manager-managed. The Company shall have one Manager, who may but need not be a Member, may be a natural person or Entity and need not be a resident of Oregon. The initial Manager shall be Poppe. The Manager shall serve in such capacity until the earliest of (i) death, (ii) incapacity rendering the Manager unable to function as Manager, (iii) the Manager's resignation and (iv) the Manager's removal, with or without cause, by the Members then holding a Supermajority of the Voting Units. In the event of a vacancy in the role of Manager, the Members then holding a Supermajority of the Voting Units shall appoint a successor Manager.~~

(a) **Manager-Managed**. The Company is manager-managed. The Manager of the Company shall be a board comprised of individuals (each, a "**Director**"), and the approval of a majority of the votes cast by the Directors constitutes approval by the Manager.

(b) **Directors; Board Observation Rights**. The initial number of Directors shall be three. The number of Directors may be changed from time to time with approval of the Manager and a Supermajority of the Voting Units, provided that in no instance shall there be less than one Director. As long as Katherine J. House ("**House**") owns any Common Units, she shall be entitled to appoint two Directors, initially to be House and William Price, and as long as Sortis owns a number of Common Units representing at least 10% of the issued and outstanding Common Units, it shall be entitled to appoint one Director, initially to be Butch Bannon. As long as Basil Bullard or his Affiliates ("**Bullard**") own a number of Common Units representing at least 10% of the issued and outstanding Common Units, Bullard shall be entitled to appoint one individual, initially to be Erica Bullard, to attend and observe meetings of the Board (subject to that individual's execution of a confidentiality agreement in a form reasonably acceptable to the Company).

(c) **Removal and Replacement of Directors**. A Director may be removed and replaced by the Members who appointed such Director, provided that any Director may be removed and replaced by a Supermajority of the Voting Units for Cause. Any such removal shall be effective as of the date of notice thereof. For purposes of this section, "**Cause**" means (a) theft, dishonesty, or falsification of any Company documents or records; (b) acts or omissions constituting gross negligence, recklessness or willful misconduct with respect to obligations to or otherwise relating to the business of Company; (c) repeated failure or inability to perform any reasonable assigned duties; (d) any material breach of this Agreement or the applicable employment or independent contractor agreement with the Company or any of its Subsidiaries; or (e) conviction (including any plea of guilty or nolo contendere) of any felony or any criminal act involving dishonesty or moral turpitude; provided, however, that prior to termination for Cause arising under either preceding subsection (c) or (d), the Director shall have a period of 30 days after written notice from Company or the applicable Subsidiary to cure the event or grounds constituting such Cause. If any provision of this section conflicts with the Director's written employment or independent contractor agreement with Company, the terms of such employment or independent contractor agreement will control.

(d) **Voting**. Unless otherwise provided for in this Agreement, actions by the Manager must be approved by a majority of the Directors *including*, while she is serving as a

Case 20-32485-pcm11    Doc 149    Filed 11/19/20

Director, House (a "**Majority of the Directors**"). For the avoidance of doubt, each Director shall have one vote.

(e)     **Meetings**. Meetings of the Manager may be held at any time and place, within or without the State of Oregon, designated in the notice of such meeting provided pursuant to Section 7.1(f) below to each of the Directors by a Majority of the Directors.

(f)     **Telephonic Participation**. Directors may participate in any regularly scheduled or special meetings of the Directors telephonically or through other similar communications equipment, as long as all of the individuals participating in the meeting can hear and speak to one another. Participation in a meeting pursuant to the preceding sentence shall constitute presence in person at such meeting for all purposes of this Agreement.

(g)     **Notice and Attendance**. Notice of any meeting of the Manager shall be given no less than two calendar days in advance thereof, shall provide the date, time, place and purpose of the meeting and may be given in the manner provided for in Section 12.2 (provided that such notice shall also be sent by email). Directors may waive notice of the date, time, place and purpose or purposes of a meeting. A waiver of notice is effective whether given before, at or after the meeting, and whether given in writing, orally or by attendance. A Director's attendance at any meeting (in person or telephonically or through other communications equipment) shall be deemed a waiver by such Director of notice with respect to such meeting.

(h)     **Quorum**. A quorum shall be required to conduct any business at any meeting of the Manager and shall be deemed present if a Majority of the Directors is present at the meeting.

(i)     **Actions without Meetings**. Any action required or permitted to be taken at a meeting of the Manager may be taken without a meeting by written consent of a Majority of the Directors, which consent shall set forth the actions to be so taken. Any such written consent shall have the same effect as an action of the Manager taken, at a duly called and constituted meeting of the Manager.

(j)     **Execution of Documents**. All contracts, agreements and other documents or instruments affecting or relating to the business and affairs of the Company shall be executed on the Company's behalf only by such Manager(s), Member(s), Officer(s), or such other authorized Person(s), in each case, as may be duly designated by the Manager. Any Person dealing with the Company or the Manager may rely upon a certificate signed by a Majority of the Directors as to (i) the identity of any Director or any Officer; (ii) the existence or non-existence of any facts which constitute a condition precedent to acts by the Manager or in any other manner germane to the affairs of the Company; (iii) the Persons who are authorized to execute and deliver any instrument or document for or on behalf of the Company; or (iv) any act or failure to act by the Company or as to any other matter whatsoever involving the Company or any Member.

(k)     **Compensation**. Directors will not receive any salary or other compensation for their services in their roles as Directors; provided that the Company shall reimburse (or shall cause its Affiliates to reimburse) the Directors for reasonable out-of-pocket

12

80580165.9 0056979-00001
108165715.11 0056668-00010
**Exhibit F - Page 13 of 39**
Case 20-32485-pcm11     Doc 149     Filed 11/19/20

costs and expenses incurred by them in connection with their services as Directors (subject to the presentation of reasonable supporting receipts and documentation). Notwithstanding the foregoing, nothing contained in this Agreement shall be construed to preclude any Director from serving the Company or its Affiliates in any other capacity and receiving compensation for such service; provided that any such compensation shall be approved by a Majority of the Directors.

(l)     **Unauthorized Actions**. None of the Members, Directors or Officers shall, without the prior consent of the Manager, take any action on behalf of or in the name of the Company, or enter into any commitment or obligation binding upon the Company, except for (i) actions expressly authorized by this Agreement, (ii) actions by any Director or Officer within the scope of such Director or Officer's authority expressly granted hereunder, and (iii) actions authorized by the Manager in the manner set forth herein.

(m)     **Meeting Procedures**. The Manager may provide for and set any other procedure for conducting meetings of the Manager not explicitly provided for herein by the consent of a Majority of the Directors.

**7.2     Power and Authority of Manager.**  The Manager shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters listed below in this Section 7.2 or that this Agreement does not make expressly subject to approval by the Members, and to perform any and all other acts or activities necessary, customary, desirable or incident to the management of the Company's business.  Notwithstanding any provision of the Act to the contrary, the Manager shall have authority to take the following actions on behalf of the Company without any consent of the Members, except as otherwise indicated:

(a)     Cause the Company to borrow money for any purpose of the Company, whether or not in the ordinary course of business, from financial institutions, a Manager, a Member, or any Affiliate of a Manager or a Member on such terms and conditions as are commercially reasonable in the judgment of the Manager;

(b)     In connection with any borrowing by or other transaction involving the Company, to hypothecate, encumber, pledge, mortgage and grant security interests in the assets of the Company to secure repayment of the borrowed sums;

(c)     Cause the Company to issue authorized but unissued Common Units and Profits Interest Units pursuant to Section 2.3 above;

(a)     (d) Acquire, improve, manage, charter, operate, lease, sell, transfer, exchange, or dispose of real property or personal property of the Company;

(e)     Redeem, or the taking of any action that will result in the redemption of, any Units;

(f)     With outside of the consentordinary course of business to the holders of Common Units representing a Supermajority vote, causeextent such action results in the

incurrence of indebtedness by the Company ~~to be a party to or engage in a merger, consolidation, conversion or reorganization~~ in excess of $100,000 during any calendar year;

(b) ~~(g)~~ Elect, appoint, employ, oversee and dismiss any and all employees, agents, independent contractors, attorneys and accountants of the Company, define their duties, and fix their compensation;

(c) ~~(h)~~ Indemnify a Member, Manager, director or any other Person as and to the extent not inconsistent with the provisions of the Act, the Articles and this Agreement;

(d) ~~(i)~~ Make any tax election to be made by the Company;

(e) ~~(j)~~ Execute instruments and documents, including without limitation, checks, drafts, notes and other negotiable instruments, leases, mortgages or deeds of trust, security agreements, financing statements, deeds and other documents providing for the acquisition, mortgage or disposition of Company property, assignments, bills of sale, partnership agreements, operating agreements of other limited liability companies, contracts and any other instruments or documents necessary or desirable, in the opinion of the Manager, to the business of the Company; and

(f) ~~(k)~~ Have and exercise all powers and do every other act not inconsistent with law, which is necessary or desirable to promote and effect any or all of the purposes for which the Company is organized.

Unless authorized to do so by this Agreement or by the Manager, no Member, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose.

**7.3** **Designation of Officers.**

The Manager may, from time to time, designate officers of the Company ("**Officers**") and delegate to such Officers such authority and duties as the Manager may deem advisable and may assign titles (including Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, President, Senior Vice-President, Vice-President, Secretary and Treasurer and any other titles as the Manager may assign) to any such Officer, it being understood that such delegation shall not cause any Director to cease being a Manager of the Company. Unless the Board of Directors otherwise determines, if the title assigned to an officer of the Company is one commonly used for officers of a business corporation formed under the Oregon Business Corporation Act, then the assignment of such title shall constitute the delegation to such officer of the authority and duties that are customarily associated with such office pursuant to the Oregon Business Corporation Act. Any number of titles may be held by the same Officer. Any Officer to whom a delegation is made pursuant to the foregoing shall serve in the capacity delegated unless and until such delegation is revoked by the Manager for any reason or no reason whatsoever, with or without cause, or such Officer resigns.

**7.4** ~~7.3~~ **Member Approval Rights.** In addition to those other matters that this Agreement makes expressly subject to the approval of all or certain of the Members, and

notwithstanding anything in this Agreement to the contrary, the following matters shall require the approval of the Manager and the Members then holding a Supermajority of the Voting Units:

(a) Any amendment or amendment and restatement of the Articles or this Agreement, ~~*provided however*, that any amendment or amendment and restatement of the Articles or this Agreement that would (i) increase the maximum number of Common Units authorized for issuance to greater than 200, (ii) create one or more new classes or series of Units having a maximum number of Units authorized for issuance that, when combined with the maximum number of Common Units authorized for issuance, equals a number greater than 200, or (iii) permits the Manager to cause the Company to issue Profits Interest Units that are dilutive of the Units held by any Member other than Poppe, shall require the approval of the Manager and the Members then holding more than 95 percent (95%) of the Voting Units; or~~

(b) Cause the Company to borrow money or to issue Common Units in exchange for capital contributions or to issue Profits Interest Units;

(c) In connection with any borrowing by or other transaction involving the Company, to hypothecate, encumber, pledge, mortgage and grant security interests in the assets of the Company to secure repayment of the borrowed sums;

(d) Redeem, or the taking of any action that will result in the redemption of, any Units;

(e) Cause the Company to enter into non-ordinary course transactions during any calendar year that results in the Company incurring indebtedness in excess of $100,000;

(f) Admittance of a new Member in the Company;

(g) ~~(b)~~ The voluntary liquidation or dissolution of the Company~~, so long as approval thereof has the approval of the Manager acting in her or his capacity as Manager, and the Members then holding more than 95 percent (95%) of the Voting Units.~~; or

(h) A merger, consolidation, acquisition of another company's assets, conversion or reorganization of the Company.

**7.5    Consent Required for Disproportionate Dilution.** For so long as Bullard, Erica Bullard and Gary "Chip" Rothenberger, Jr. ("**Rothenberger**"), or their Affiliates, collectively own at least 5% of the outstanding Common Units of the Company, the Company may not issue additional Units to either of House or W.P. Price Tax and Accounting LLC, or their respective Affiliates, including Units issued in a recapitalization, merger or similar transaction that results in a change in the number or type of Units outstanding or their exchange for interests in another entity, unless (a) the Units are issued for value and not in a compensatory transaction, and identical Units are offered or issued to then-existing Members who are "accredited investors," as defined in Regulation D promulgated under the Securities Act of 1933, on the same terms, (b) the issuance dilutes each of Bullard, Erica Bullard, Rothenberger, and Sortis (including its Affiliates) proportionally (based on their then-owned Units), or (c) each of Bullard, Erica Bullard and Rothenberger consent (provided that when any of them cease to own at least 1% of the

then-outstanding Common Units of the Company, that individual's approval will no longer be required).

**7.6** ~~7.4~~ **Exculpation and Indemnification; Fiduciary Duties.**

(a)     **Covered Persons.**  As used herein, the term "**Covered Person**" shall mean (i) each Member, (ii) each officer, director, shareholder, partner, member, manager, trustee, controlling Affiliate, employee, agent or other representative of each Member, and each of their controlling Affiliates, and (iii) each Director, Manager, employee, agent or representative of the Company.

(b)     **Standard of Care.**  To the fullest extent permitted by law, no Covered Person shall be personally liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in good faith reliance on the provisions of this Agreement, so long as such action or omission does not constitute fraud, gross negligence or willful misconduct or a knowing violation of law by such Covered Person.

(c)     **Indemnification.**   The Company will indemnify to the fullest extent permitted by law any Covered Person who is made or threatened to be made a party to, witness in, or otherwise involved in, any action, suit or proceeding, by reason of (i) any act or omission performed or omitted to be performed on behalf of the Company; or (ii) the fact that such Covered Person is or was acting in connection with the business of the Company as a partner, member, stockholder, controlling Affiliate, manager, director, officer, employee or agent of the Company, any Member, or any of their respective controlling Affiliates.  The obligation of the Company to indemnify each such Covered Person shall survive any termination of such Covered Person's service to, or relationship with, the Company.  The right to indemnification conferred in this Section ~~7.4~~7.6 shall include the right to be paid by the Company the expenses incurred in defending any proceeding in advance of its final disposition.  An advancement of expenses shall be made upon delivery to the Company of an undertaking, by or on behalf of such Covered Person, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal that such Covered Person is not entitled to be indemnified for such expenses under this Section ~~7.4~~7.6.

(d)     **Limitation of Liability.**  This Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person.  Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by the laws of the state of Oregon and any other applicable law, and in doing so, acknowledges and agrees that the duties and obligation of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement.  The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.  In furtherance and not in limitation of the foregoing, the Members and the Company acknowledge that certain of the Members are separately engaged in the restaurant and/or food service business, and expect to continue to be separately engaged, other than with respect to the Company's business, following the date of this Agreement.  Accordingly, nothing contained in this Agreement shall impose any duty with respect to, nor shall preclude any

Covered Person, directly or indirectly, from (i) competing with the Company in the conduct of the business of the Company in a manner that is not Directly Competitive (an "**Indirect Competing Business**") before the dissolution of the Company, or (ii) entering into or engaging in, for such Covered Person's own account, an investment, business, transaction or activity that is similar to the investments, businesses, transactions or activities of the Company (a ""**Corporate Opportunity**") without first offering the Company or the Members an opportunity to participate in the Corporate Opportunity, and no Covered Person shall have any obligation to account to the Company or the Members for any Corporate Opportunity or the profits therefrom. The foregoing paragraph notwithstanding, no Member shall, during the time when such Member holds any limited liability company membership interest in the Company and for two (2) years thereafter, engage in or acquire any ownership interest in any retail donut business (such retail donut business activities being defined herein as "**Directly Competitive**"). The Members and the Company acknowledge and agree in light of the separate business activities of each Member that each Covered Person's right to engage in any Indirect Competing Business and any Corporate Opportunity, and the prohibition on engaging in business that is Directly Competitive, is not unconscionable.

(e) **Not Exclusive**. The provisions of this Section ~~7.4~~7.6 shall not be deemed exclusive of any other rights or limitations of liability or indemnity to which a Covered Person may be entitled under any other contract or agreement or otherwise. Any repeal or amendment of this Section ~~7.4~~7.6 shall be prospective only and shall not adversely affect rights under this Section ~~7.4~~7.6 existing at the time of such repeal or amendment.

## 8. BOOKS AND RECORDS

**8.1 Books and Records.** The Company will maintain at its principal place of business separate books of accounts for the Company, which will reflect all records required by the Act.

**8.2 Reports.** The Manager will be responsible for the preparation of financial reports of the Company and the coordination of financial matters of the Company with the Company's accountants.

**8.3 Tax Information.** ~~The initial tax matters partner will be Poppe. At any time, the Manager may remove a tax matters partner and appoint a new tax matters partner in accordance with Regulations Section 301.6231(a)(7)2.~~

(a) **Tax Matters Member**. House is authorized to act as the "Tax Matters Member" under the Code, as in effect prior to 2018, and in any similar capacity under state or local law. The Tax Matters Members may (i) make the election provide for in Code Section 6231(a)(1)(B)(ii) (as in effect for tax years prior to 2018), and (ii) take such other actions provided in Code Section 6221 through 6231, as in effect for tax years prior to 2018.

(b) **Partnership Representative**. The Manager may from time to time designate a person to act as "Partnership Representative" within the meaning of Section 6223 of the Code for any taxable year or other period and in any similar capacity under state or local law. If the Partnership Representative is an entity, the Partnership Representative shall appoint a

"designated individual" as provided in Treas. Reg. Section 301.6223-1(b)(3). The initial Partnership Representative will be the Manager and its designated individual will be House. The Partnership Representative may exercise all of the rights and powers now or hereafter granted to the Partnership Representative under the Code. The Members and the Company intend to have the Members or their indirect owners, as applicable, pay their respective shares of all taxes, penalties and interest in connection with any tax audit of the Company, including by means of an election under Section 6226 of the Code or by means of the Members filing amended returns under Section 6225(c) of the Code. Each Member shall provide information to the Company, make elections, file amended tax returns, and pay any applicable taxes, interest and penalties, in each case to give effect to the preceding sentence, all as reasonably requested by the Partnership Representative. Such obligations will continue after the Member ceases to be a Member hereunder. Notwithstanding the foregoing, to the extent any payments of taxes, penalties or interest are made by the Company on behalf of or with respect to a current or former Member, such payment amounts shall, as determined by the Partnership Representative, (i) be applied to and reduce subsequent distributions otherwise payable to that Member or former Member under this Agreement or (ii) be payable to the Company by such Member or former Member within 30 days of written demand from the Company. Any amount so applied or paid shall not be treated as a Capital Contribution and instead shall be treated as a reimbursement to the Company of the Member's or former Member's own individual tax expense.

(c)     **Other Elections and Actions**. The Manager may, without any further consent of the Members (except as specifically required in this Agreement), (i) make any and all elections for federal, state, local, and foreign tax purposes including, without limitation, any election to adjust the basis of property pursuant to Code Sections 754, or comparable provisions of state, local, or foreign law, in connection with Transfers of Units and Company distributions, and (ii) file any tax returns and execute any agreements or other documents relating to or affecting such tax matters, including agreements or other documents that bind the Members with respect to such tax matters or otherwise affect the rights of the Company and the Members.

(d)     **Tax Information**. Necessary tax information shall be delivered to each Member as soon as practicable after the end of each calendar year but not later than four months after the end of each calendar year.

## 9.    AMENDMENTS

Except as expressly provided in Section 1.1, this Agreement and the Articles may be amended only in accordance with Section ~~7.3~~7.4(a); *provided, however*, that any change to Exhibit D pursuant to Section 6.1 shall not be an amendment that requires approval of the Members.

## 10.    TRANSFERS OF UNITS; RESTRICTIONS

10.1    **Restriction on Transfers.**    Except as otherwise expressly permitted by this Agreement, no Member shall be permitted to Transfer any Units.  Any purported Transfer not permitted under, or completed in compliance with, this Section 10 shall be null and void, and shall be disregarded by the Company.

**10.2    Permitted Transfers.**  Subject to the other provisions of this <u>Section 10</u>, a Member may at any time Transfer Common Units to:

(a)    the Company, or any other Member ~~(including to Poppe in connection with the exercise of the Purchase Option)~~;

(b)    any trust the sole beneficiary of which is a Member; or

(c)    any Person, pursuant to <u>Section 10.5(g)</u>.

Any Transfer permitted pursuant to subsections (a) through (c) above is referred to in this Agreement as a "**Permitted Transfer**."  Notwithstanding anything in this <u>Section 10.2</u> to the contrary, a Transfer to a spouse in connection with a legal separation or divorce does not constitute a Permitted Transfer.

**10.3    Additional Transfer Restrictions.**  Before any Member may Transfer Units, the transferring Member will (a) upon the Manager's request, furnish an opinion of counsel, which counsel and opinion will be reasonably satisfactory to the Manager, that either such Units will be registered under the Securities Act and any applicable state securities laws, or such Transfer is exempt from all applicable registration requirements and that such Transfer will not violate any applicable laws regulating the Transfer of securities, and (b) reimburse the Company for all costs and expenses that the Company reasonably incurs in connection with the Transfer.

**10.4    Admission as a Substitute Member.**  Any transferee in a Transfer recognized by the Company (including any transferee in a Permitted Transfer) shall be an Assignee only, and not a Member, unless and until admitted to the Company as a substitute Member in accordance with this <u>Section 10.4</u>.  A transferee in a Permitted Transfer must do the following to be admitted as a substitute Member: (a) execute an instrument satisfactory to the Manager agreeing to be bound by all the terms of this Agreement (including without limitation this <u>Section 10</u>); *provided, however*, that neither the Company nor any Person that is already a Member need execute any such instrument; (b) provide to the Company the Person's taxpayer identification number, sufficient information to determine the transferee's initial tax basis in the Units and any other information reasonably necessary to permit the Company to file all required federal and state tax returns and other legally required information statements or returns; (c) if a Person to whom Units are transferred resides in a community property state, cause such Person's spouse or domestic partner, if any, to execute a Consent of Spouse substantially in the form attached as <u>Exhibit B</u>, agreeing to be bound by the provisions of this Agreement; and (d) execute and deliver to the Company such other documentation as is determined by the Manager to be necessary or appropriate to ensure compliance with applicable law (including but not limited to federal and state securities laws) and evidence the admission of the Person as a Member.  In addition to, and not in limitation of, the foregoing, any transferee in a Transfer other than a Permitted Transfer that is nonetheless recognized by the Company shall not be admitted as a substitute Member, and shall remain an Assignee, unless and until (y) the Manager consents to the admission of the Assignee as a substitute Member (with such consent to be given or withheld in the sole and arbitrary discretion of the Manager); and (z) the transferee complies with the requirements set forth in clauses (a)–(d) of the preceding sentence.

19

80580165.9 0056979-00001
108165715.11 0056668-00010
**Exhibit F - Page 20 of 39**
Case 20-32485-pcm11    Doc 149    Filed 11/19/20

**10.5** **Right of First and Second Refusal.** In addition to the other restrictions in this Section 10, and except for any Permitted Transfer described in Sections 10.2(a) and (b), no Member may Transfer any Common Units (the "**Offered Units**") unless such Member (the "**Selling Member**") first offers to sell the Offered Units pursuant to the terms of this Section 10.5.

(a) **Limitation on Transfers.** No Transfer may be made pursuant to this Section 10.5 unless the Selling Member has received a bona fide written offer (the "**Purchase Offer**") from a Person (the "**Purchaser**") to purchase the Offered Units for a purchase price denominated and payable in United States dollars (the "**Offer Price**") at closing or according to specified terms, with or without interest, which offer will be in writing signed by the Purchaser and will be irrevocable for a period ending no sooner than the 90th day following the date on which the Company and the Members receive notice of the offer (the "**Offer Period**").

(b) **Offer Notice.** If the Selling Member desires to accept the Purchase Offer, the Selling Member will give written notice to the Company and to the Members (the "**Offer Notice**"), which will include a copy of the Purchase Offer and an offer (the "**Firm Offer**") to sell the Offered Units first, to the Company, and second, to the Members, for the price equal to the Offer Price (the "**Purchase Price**"). The Purchase Price will be payable either (i) according to the terms contained in the Purchase Offer or (ii) at the option of the Company or the Purchasing Members (as the case may be), if the Offer Price exceeds $100,000, as provided in subsection (f) below.

(c) **Acceptance of Firm Offer.** The Firm Offer will be irrevocable for the Offer Period. At any time during the first 60 days of the Offer Period, the Company may accept the Firm Offer as to all, but not less than all, of the Offered Units. The Firm Offer will be deemed to be accepted by the Company if (i) the Company accepts the Firm Offer with respect to all of the Offered Units and (ii) such notice of acceptance is given to the Selling Member on or before the 60th day of the Offer Period. Otherwise, the Firm Offer will be deemed to be rejected by the Company in its entirety.

(d) **Closing of Purchase Pursuant to Firm Offer.** If the Firm Offer is accepted, the closing of the sale of the Offered Units will take place within 60 days after the date on which the Company accepted the Firm Offer or, if later, the closing date specified in the original Purchase Offer. The Selling Member will execute any documents and instruments that may be necessary or appropriate to ~~effect~~effectuate the sale of the Offered Units to the Company pursuant to the terms of the Firm Offer and this Section 10.5.

(e) **Right of Second Refusal.** If the Firm Offer is not accepted by the Company in the manner described above, the Common Members other than the Selling Member who so elect (the "**Purchasing Members**") may at any time during the remainder of the Offer Period accept the Firm Offer and purchase all, but not less than all, of the Offered Units for the Purchase Price, payable either (i) according to the terms contained in the Purchase Offer or (ii) at the option of the Purchasing Members, if the Offer Price exceeds $100,000, as provided in subsection (f) below. The Firm Offer will be deemed to be accepted by the Purchasing Members if (i) the Purchasing Members accept the Firm Offer with respect to all of the Offered Units and

(ii) such notice of acceptance is given to the Selling Member on or before the last day of the Offer Period. Otherwise, the Firm Offer will be deemed to be rejected in its entirety. Upon any such election by the Purchasing Members to purchase the Offered Units, each Purchasing Member may purchase such Purchasing Member's proportionate share (meaning the fraction equal to the number of Units held by such Purchasing Member divided by the number of Units held by all Purchasing Members) of the Offered Units, or in such other proportion as the Purchasing Members all may agree. The closing of the sale pursuant to this Section 10.5(e) will take place within 60 days after the date on which the Purchasing Members accepted the Firm Offer or, if later, the closing date specified in the original Purchase Offer. The Selling Member will execute any documents and instruments that may be necessary or appropriate to ~~effect~~effectuate the sale of the Offered Units to the Purchasing Members pursuant to the terms of the Firm Offer and this Section 10.5.

(f) **Alternative Payment Terms.** If the Purchase Price is more than $100,000, payment may be made at the option of the Company or the Purchasing Members (as the case may be) as follows: (i) a down payment at closing of ten percent of the Purchase Price; (ii) the unpaid balance of the Purchase Price paid in 12 equal monthly installments, including principal and interest; and (iii) the deferred balance of the purchase price will bear interest at the lowest rate at which interest will not be imputed under Section 483 of the Code and be evidenced by a promissory note in a form reasonably acceptable to the Company or the Purchasing Members.

(g) **Sale Pursuant to Purchase Offer if Firm Offer Rejected.** If the Firm Offer is not accepted in the manner described above, the Selling Member may sell the Offered Units to the Purchaser at any time within 90 days after the last day of the Offer Period, provided that such sale will be made on terms no more favorable to the Purchaser than the terms contained in the Purchase Offer and provided further that such sale complies with the terms, conditions and restrictions of this Agreement that are applicable to sales of Units (and that are not expressly made inapplicable to sales occurring under this Section 10.5). If the Offered Units are not sold in accordance with the terms of the preceding sentence, the Selling Member must again give notice of any new Purchase Offer and comply with the conditions of this Section 10.5 before selling any Units.

**10.6 Option to Purchase Upon Death, Incompetency, Bankruptcy or Divorce.** Upon the death or incompetency of any Member who is a natural person, the transfer of any Units or any interest therein in any bankruptcy, foreclosure or other similar proceeding, or the dissolution of marriage or domestic relation accorded community property rights by applicable law of a Member who will be unable to retain the community property interest in such Member's Units as such Member's separate property following dissolution (each, a "**Triggering Event**", and the Units held by Successors, the "**Triggered Units**"), first, the Company, and second, the Common Members not subject to the Triggering Event, or any of them, shall have the right but not the obligation to cause a determination of Fair Market Value of the Triggered Units to be made pursuant to Section 10.7. In addition, following any such determination of Fair Market Value, first, the Company, and second, the Common Members not subject to the Triggering Event, or any of them, shall have the right but not the obligation to purchase the Triggered Units provided for in this Section 10.6. The Company may initiate any such determination of Fair Market Value within six months after the date the Company first becomes aware of the

Triggering Event, which six month period shall commence on the earlier of the date when any notice of the Triggering Event is given by any Person to the Company or the date the Manager first becomes aware of the Triggering Event. In the event the Company elects not to initiate a determination of the Fair Market Value, it shall give notice of the Triggering Event to the Common Members promptly and in any case no later than the end of the six month period. The Common Members not subject to the Triggering Event, or any of them, may initiate a determination of Fair Market Value within six months after the date such Members first receive such notice. Triggered Units may be purchased first, by the Company, and second, by such Common Members not subject to the Triggering Event electing to purchase (in each case, the "**Triggered Unit Purchaser**"), in accordance with the following procedure:

(a)     To initiate a determination of Fair Market Value after a Triggering Event, the Triggered Unit Purchaser shall give a notice to any and all known successors in interest to the Member affected by the Triggering Event ("**Successors**"). Such notice shall inform the Successors of the Triggered Unit Purchaser's intent to determine Fair Market Value pursuant to Section 10.7.

(b)     Upon a determination of Fair Market Value in accordance with this Section 10.6 and Section 10.7, the Triggered Unit Purchaser shall have 60 days to elect by notice to the Successors to purchase the Triggered Units for a purchase price equal to the Fair Market Value.

(c)     Upon any election to purchase made in accordance with Section 10.6(b), the Triggered Unit Purchaser may purchase the Triggered Units at a purchase price equal to the Fair Market Value from the Successors. In the event that one or more Members (and not the Company) constitute the Triggered Unit Purchaser, each purchasing Member may purchase such electing Member's proportionate share (meaning the fraction equal to the number of Units held by such each Purchasing Member divided by the number of Units held by all Purchasing Members) of the Triggered Units, or in such other proportion as the purchasing Members all may agree.

(d)     The closing of the purchase shall occur not more than 30 days after the expiration of the 60-day period for the election to purchase. Up until the date of the purchase, the Successors shall participate in all economic events relating to the interest in the Company, including allocations and distributions with respect thereto. At the closing of the purchase, each seller shall deliver an assignment in form and content reasonably satisfactory to the Triggered Unit Purchaser warranting to good and unencumbered title to the seller's interest in the Triggered Units, subject only to the restrictions and provisions of this Agreement.

(e)     The purchase price shall be paid in cash, or, in the event that the Triggered Units have a Fair Market Value in excess of $100,000, payment may be made by the Triggered Unit Purchaser at the Triggered Unit Purchaser's option as follows: (i) a down payment at closing of ten percent of the purchase price; (ii) the unpaid balance of the purchase price paid in 12 equal monthly installments, including principal and interest; and (iii) the deferred balance of the purchase price will bear interest at the lowest rate at which interest will not be imputed under

80580165.9 0056979-00001
108165715.11 0056668-00010
**Exhibit F - Page 23 of 39**
Case 20-32485-pcm11    Doc 149    Filed 11/19/20

Section 483 of the Code and be evidenced by a promissory note in a form acceptable to the Triggered Unit Purchaser in its sole discretion.

**10.7    Fair Market Value.**  The "**Fair Market Value**" of the Triggered Units will be the fair market value of such Units, as determined by the Triggered Unit Purchaser and the Successors, as of the last day of the month preceding the event that gives rise to the valuation, *provided, however*, that if the Triggered Unit Purchaser and the Successors are unable to reach agreement on Fair Market Value within 45 days after the date of the notice initiating the determination of Fair Market Value, Fair Market Value shall be determined at the expense of the Company by an appraiser experienced in appraising the value of businesses similar to the Company's business.  Any such appraiser shall be appointed by the Successors from a list of three proposed appraisers provided by the Triggered Unit Purchaser or be appointed as the Triggered Unit Purchaser and the Successors may otherwise agree; provided that if either the Triggered Unit Purchaser or the Successors fail to comply with the procedures for appointment of the appraiser, the appraiser shall be appointed by the presiding judge for Multnomah County, Oregon upon a petition by either the Triggered Unit Purchaser or the Successors requesting such appointment.  Any determination of the Fair Market Value of Profits Interest Units pursuant to this Section 10.7 shall be made in accordance with the intent for Profits Interest Units to represent "profits interests" for federal income tax purposes consistent with Rev Proc 93-27, 1993-2 CB 343 and Rev Proc 2001-43, 2001-2 CB 191.

**10.8    Transfer of Units by Last Remaining Member.**  Notwithstanding any other provision of this Agreement to the contrary, if at any time there is only one Member and all Units of the Member are Transferred, the transferee will automatically become a substitute Member and the Company will be continued, as provided in the Act.

**10.9    Outstanding Member Indebtedness.**  Any debt due to the Company by a Member who sells the Member's Units to the Company will be payable according to its terms, provided that any payment due under this Agreement by the Company to purchase the Member's Units may, at the Company's option, be applied to discharge the Member's indebtedness to the Company until the indebtedness is fully discharged.  Any amount applied to discharge a Member's indebtedness to the Company will be deemed payment to the Member in satisfaction of all or a portion of the repurchase price.

## 11.    DISSOLUTION AND WINDING UP

**11.1    Liquidating Events.**  The Company will dissolve and commence winding up and liquidating upon the first to occur of the following ("**Liquidating Events**"): (a) the vote by Members pursuant to Section ~~7.3~~7.4(b) to dissolve, ~~wind up and~~ liquidate the Company's assets and wind up the Company's affairs; or (b) the entry of a judicial decree of dissolution of the Company pursuant to the Act.  To the maximum extent permitted by law, the Liquidating Events are the sole events that shall cause a dissolution of the Company.

**11.2    Winding Up.**  Upon the occurrence of a Liquidating Event, (i) the Company will continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors (including Members that are creditors), and (ii) no Member or Manager will take any action that is inconsistent with winding up the Company's

business and affairs. To the extent not inconsistent with the foregoing, all covenants and obligations in this Agreement will continue in full force and effect until such time as the Company property has been distributed pursuant to this Section 11.2. The Manager will (w) be responsible for overseeing the winding up and dissolution of the Company, (x) take full account of the Company's liabilities and property, (y) cause Company property to be liquidated as promptly as is consistent with obtaining fair value therefore, and (z) cause any proceeds to be distributed in accordance with this Section 11.2. Such amount shall be paid and distributed in the following order:

(a)     First, to the payment and discharge of all of the Company's debts and liabilities to creditors, including Members to the extent permitted by law;

(b)     Second, in accordance with the priority set forth in Section 5.2.

**11.3     Distribution in Accordance with Capital Accounts.** Allocations of Profits, Losses, and items of income, gain, deduction and loss under Section 4.1 are intended to result in liquidating distributions under Section 11.2 to each of the Members based on their respective positive Capital Account balances in accordance with Regulations section 1.704-1(b)(2)(ii)(b)(2). Nevertheless, if the amount distributable under Section 11.2 to any Member does not equal the positive Capital Account of such Member, the amount distributable will be determined under Section 11.2 without regard to such Capital Account.

**11.4     Deficit Capital Accounts.** If any Member has a deficit balance in his or her Capital Account (after giving effect to all contributions, distributions and allocations for all Fiscal Years), such Member will have no obligation to make any contribution to the capital of the Company with respect to such deficit, and such deficit will not be considered a debt owed to the Company or to any other Person for any purpose whatsoever.

**11.5     Articles of Dissolution.** The Company shall terminate upon the completion of the distribution of the Company's assets as provided in Section 11.2. The Manager shall cause Articles of Dissolution to be filed with the Secretary of State of Oregon and take such other actions as are necessary to evidence the termination of the Company.

**12.     MISCELLANEOUS**

**12.1     Role of Legal Counsel.** Each of the undersigned acknowledges and agrees that this Agreement ~~and other documentation relating to the Company~~ has been prepared by Stoel Rives LLP as counsel to ~~Poppe, and not to~~ the Company ~~or any other Member, and the Company~~, and each ~~other~~ Member has been advised to obtain and has either obtained, or decided to forego obtaining, the advice of separate, independent legal counsel with respect to this Agreement, the other documentation referred to in this Agreement and the transactions contemplated by this Agreement.

**12.2     Notices.** All notices and communications required or permitted under this Agreement or the Act will be in writing and delivered by certified mail (postage prepaid), delivered personally, sent by nationally recognized overnight courier service (costs prepaid), by email (including with attached PDF document(s)) or by facsimile and, in each case, addressed to

Case 20-32485-pcm11     Doc 149     Filed 11/19/20

the address specified on such Person's signature page to this Agreement or such other address as such Person may from time to time specify by notice to the Manager in accordance with this Section 12.2.  Notice will be deemed to be delivered and received for all purposes (a) on the date of delivery if personally delivered, sent by email or sent by facsimile with confirmation of successful transmission, (b) three days after deposit in the mail if sent by certified mail, or (c) one day after deposit with a nationally recognized overnight courier service.

**12.3    Binding Effect.**  Except as otherwise provided in this Agreement, every provision of this Agreement will be binding upon and inure to the benefit of the parties hereto and their respective permitted successors, transferees and assigns.

**12.4    No Third-Party Beneficiaries.**  This Agreement is solely for the benefit of the parties to this Agreement and shall not confer upon third parties (other than the Manager and any indemnitee under Section 7.47.6) any remedy, claim, liability, reimbursement, claim of action or other right under this Agreement.

**12.5    Interpretation.**  Unless otherwise indicated, section references are to the relevant sections in this Agreement.  For purposes of the provisions of the Agreement relating to economic interests (including the provisions relating to Capital Accounts and allocations and distributions) or acknowledgments by the Members, but not for purposes of the provisions of the Agreement relating to voting rights, inspection rights and other rights that are exclusively those of a member under the Act or this Agreement, the term "Member" shall be deemed to include any Assignee or other holder of any interest in the Company.

**12.6    Severability.**  In case any one or more of the provisions in this Agreement should be invalid, illegal or unenforceable, the enforceability of the remaining provisions will in no way be affected or impaired.  If any such term, provision, covenant or restriction is held to be invalid, void, or unenforceable, the parties will use their best efforts to find and employ another means to achieve the same or substantially the same result as that contemplated by such term, provision, covenant or restriction.

**12.7    Incorporation by Reference.**  Every exhibit and other appendix that is attached to this Agreement and that this Agreement refers to is incorporated in this Agreement by reference.

**12.8    Further Action.**  Each Member, upon the request of the Manager, agrees to perform all further acts and execute, acknowledge and deliver any documents that may be reasonably necessary, appropriate or desirable to carry out the provisions of this Agreement.

**12.9    Governing Law; Priority.**  This Agreement will be governed by, construed and enforced in accordance with the laws of the state of Oregon (regardless of the laws that might otherwise govern under applicable principles of conflict of laws).  In the event of any inconsistency or conflict between any terms of this Agreement and the Act, the terms of this Agreement shall govern to the maximum extent permitted by law.

**12.10   Jurisdiction and Venue.**  Each Member consents to the personal jurisdiction of the state and federal courts located in the state of Oregon, and waives any argument that venue in any such forum is not convenient or proper.

**12.11   No Waiver.**  Neither the failure nor any delay on the part of any party to exercise any right under this Agreement will operate as a waiver, nor will any single or partial exercise of any right preclude any other or further exercise of the same or any other right, nor will any waiver of any right with respect to any occurrence be construed as a waiver of such right with respect to any other occurrence.

**12.12   Counterparts; Facsimiles.**  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which will be considered one and the same agreement. Facsimile signatures or signatures transmitted via PDF file of the parties on this Agreement or any amendment of this Agreement shall be deemed original signatures for all purposes.

**12.13   Entire Agreement.**  This Agreement (together with all exhibits and schedules hereto) constitutes the entire agreement among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements and understandings, written and oral, relating to the subject matter hereof, including without limitation the OriginalPrior Operating Agreement and the Buy Sell Agreement.

*[Signature Page Follows]*

80580165.9 0056979-00001
108165715.11 0056668-00010
**Exhibit F - Page 27 of 39**
Case 20-32485-pcm11    Doc 149    Filed 11/19/20

The undersigned have executed this Second Amended and Restated Operating Agreement of Blue Star Doughnuts LLC as of the Effective Date.

**THE COMPANY:**   **BLUE STAR DOUGHNUTS LLC, an Oregon limited liability company**

By:_____
   Katherine ~~M~~J. Poppe, ~~Member~~Manager

~~By:_____~~
~~_____~~
~~Micah L. Camden, Member~~

~~By:_____~~
~~_____~~
~~Basil Bullard, Member~~

~~By:_____~~
~~_____~~
~~Gary "Chip" Rothenberger, Jr., Member~~

*[continued on next page]*

**MEMBERS:**

_____ Katherine M. Poppe

_____ Address:

_____

_____ Micah L. Camden

_____ Address:

_____

_____ Basil Bullard

_____ Address:

_____

_____ Gary "Chip" Rothenberger, Jr.

_____ Address:

_____

_____
Katherine J. House

Address:


_____
Basil Bullard

Address:

_____
Micah L. Camden

Address:


_____
Gary "Chip" Rothenberger, Jr.

Address:


[Signature Page to
Second Amended and Restated Operating Agreement of Blue Star Doughnuts LLC]

108165715.11 0056668-00010

**Exhibit F - Page 29 of 39**

W.P. Price Tax and Accounting, LLC

Sortis Holdings, Inc.

_____
By: Will Price, its sole member and manager

_____
By:

Address:

Address:

## Exhibit A

## DEFINITIONS

Capitalized words and phrases used in this Agreement have the meanings set forth below:

"**Act**" means the Oregon Limited Liability Company Act, as amended from time to time.

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the negative balance, if any, in the Capital Account of such Member as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

        (a)      add to such Capital Account the following items:

                (i) the amount, if any, that such Member is obligated to contribute upon liquidation of such Member's interest in the Company; and

                (ii)      the amount that such Member is obligated to restore or is deemed to be obligated to restore pursuant to Regulations Section 1.704-1(b)(2)(ii)(c) or the penultimate sentence of each of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

        (b)      subtract from such Capital Account the items described in Regulations Sections 1.704 1(b)(2)(ii)(d)(4), (5) and (6).

This definition of "Adjusted Capital Account Deficit" is intended to comply with the provisions of Regulations Section 1.704 1(b)(2)(ii)(d) and will be interpreted consistently therewith.

"**Adjusted Capital Contributions**" means, as of any day, the Capital Contributions with respect to a Unit reduced by the aggregate amount of cash and the fair market value of any Company property (net of liabilities) previously distributed with respect to such Unit under Sections 5.2 and 11.2, *provided, however* that in no event shall Adjusted Capital Contributions be less than $0. In the event any Member Transfers all or any portion of its Units in accordance with the terms of this Agreement, his transferee shall succeed to the Adjusted Capital Contribution of the transferor to the extent it relates to the transferred Units.

"**Affiliate**" means, with respect to any Person: (i) any Person directly or indirectly controlling, controlled by or under common control with such Person; (ii) any Person owning or controlling 10 percent or more of the outstanding voting interests of such Person; (iii) any officer, director, or general partner of such Person; or (iv) any Person who is an officer, director, general partner, trustee, or holder of 10 percent or more of the voting interests of any Person described in clauses (i) through (iii) of this sentence. For purposes of this definition, the term "controls," "is controlled by," or "is under common control with" will mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

80580165.9 0056979 00001             A A-1
108165715.11 0056668-00010
**Exhibit F - Page 31 of 39**
Case 20-32485-pcm11    Doc 149    Filed 11/19/20

"**Agreement**" has the meaning set forth in the preamble.

"**Articles**" means the Articles of Organization of the Company filed with the Oregon Secretary of State on July 5, 2012, as may be amended, restated or superseded from time to time.

"**Assignee**" means the holder of an interest in the Company that (i) has not been admitted as a Member in accordance with Section 2.3(b) or Section 10.4 or (ii) has ceased to be a Member, whether due to expulsion, permitted withdrawal, transfer of its interest or otherwise. An Assignee has the right to receive (a) distributions, as and when made, and (b) allocations of Profits and Losses, in each case on account of the interest held, but shall not exercise or possess any rights of a Member under the Act or this Agreement, including without limitation access to Company records or the right to vote or otherwise participate in the management of the business and affairs of the Company.

"**Business Day**" shall mean any day other than Saturday, Sunday or any legal holiday on which banks in Wilmington, Delaware are closed.

"**Capital Account**" means the account maintained with respect to a Member pursuant to Section 3.1.

"**Capital Contribution**" means, with respect to any Member, the amount of money and the fair market value (net of liabilities) of any property (other than money) or services contributed or to be contributed to the Company with respect to the Units held or purchased by such Member, including additional Capital Contributions, if any.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

"**Common Member**" means a Member who holds Common Units.

"**Common Units**" has the meaning set forth in Section 2.1(a).

"**Company**" has the meaning set forth in the preamble.

"**Company Minimum Gain**" means "partnership minimum gain" as defined in Sections 1.704-2(b)(2) and 1.704-2(d) of the Regulations.

"**Depreciation**" means, for each Fiscal Year, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such Fiscal Year, except that, if the value of an asset for Capital Account purposes differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation will be an amount which bears the same ratio to such beginning value as the federal income tax depreciation, amortization or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; *provided, however*, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero,

Depreciation will be determined with reference to such beginning value using any reasonable method selected by the Manager.

"**Effective Date**" has the meaning set forth in the preamble.

"**Entity**" means any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or other association or any foreign trust or foreign business organization.

"**Fair Market Value**" has the meaning set forth in Section 10.7.

"**Firm Offer**" has the meaning set forth in Section 10.5(b).

"**Fiscal Year**" means any (a) 12-month period commencing on January 1 and ending on December 31 or (b) any portion of the period described in clause (a) for which the Company is required to allocate Profits, Losses and other items of Company income, gain, loss or deduction pursuant to Section 4.

"**Liquidating Event**" has the meaning set forth in Section 11.1.

"**Manager**" means the manager described in Section 7.1 that acts as the "manager" of the Company within the meaning of the Act and that has been granted authority to manage the business and affairs of the Company pursuant to the terms of this Agreement.

"**Member**" means any Person who owns Units and (a) is a party to this Agreement as of the Effective Date (other than the Company) or (b) has been admitted as an additional Member or substitute Member pursuant to Section 2.3(b) or Section 10.4, respectively, but only so long as such Person is a Member under this Agreement.

"**Member Nonrecourse Debt**" means "partner nonrecourse debt" as defined in Section 1.704-2(b)(4) of the Regulations.

"**Member Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Regulations.

"**Member Nonrecourse Deductions**" means "partner nonrecourse deductions" as defined in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Regulations.

"**Net Cash**" means the gross cash proceeds from Company operations (including sales and dispositions of property in the ordinary course of business) and from all sales and other dispositions (other than in the ordinary course of business) and all refinancings of property, less the portion used to pay or establish reserves for all Company expenses, debt payments, capital improvements, acquisitions of assets of or interests in another Person, research and development, replacements and contingencies, all as determined by the Manager in its sole discretion. "Net

80580165.9 0056979-00001     A- A-3
108165715.11 0056668-00010
**Exhibit F - Page 33 of 39**
Case 20-32485-pcm11    Doc 149    Filed 11/19/20

Cash" will not be reduced by depreciation, amortization, cost recovery deductions or similar allowances, but will be increased by any reductions of reserves previously established pursuant to the first sentence of this definition of "Net Cash." "Net Cash" will include all principal and interest payments with respect to any note or other obligation received by the Company in connection with sales and other dispositions (other than in the ordinary course of business) of property.

"**Nonrecourse Deductions**" has the meaning set forth in Section 1.704-2(b)(1) of the Regulations.

"**Nonrecourse Liability**" has the meaning set forth in Section 1.704-2(b)(3) of the Regulations.

"**Offer Period**" has the meaning set forth in <u>Section 10.5(a)</u>.

"**Offered Units**" has the meaning set forth in <u>Section 10.5</u>.

"**Offer Notice**" has the meaning set forth in <u>Section 10.5(b)</u>.

"**Offer Price**" has the meaning set forth in <u>Section 10.5(a)</u>.

"**Permitted Transfer**" has the meaning set forth in <u>Section 10.2</u>.

"**Person**" means any individual or Entity.

"**Profits**" and "**Losses**" means, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) will be included in taxable income or loss), with the following adjustments:

(a)     Add Company income that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses;

(b)     Subtract any Company expenditures described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses;

(c)     If any Company asset is revalued pursuant to <u>Section 3.1</u>, the amount of such adjustment will be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(d)     Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes will be computed by reference to the value of such property for Capital Account purposes, notwithstanding that the adjusted tax basis of such property differs from such value;

(e)     In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there will be taken into account Depreciation for such Fiscal Year;

(f)     To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in complete liquidation of a Member's economic rights, the amount of such adjustment will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and will be taken into account for purposes of computing Profits or Losses; and

(g)     Notwithstanding any other provision of this definition of "Profits" and "Losses," any items which are specially allocated pursuant to Sections 1 or 2 of Exhibit C will not be taken into account in computing Profits or Losses.

The amounts of the items of Company income, gain, loss or deduction available to be specially allocated pursuant to Sections 1 and 2 of Exhibit C will be determined by applying rules analogous to those set forth in subsections (a) through (f) of this definition of "Profits" and "Losses."

"**Profits Interest Agreement**" means an agreement in form and substance approved by the Manager and a Supermajority of the Members from time to time and executed by the companyCompany and a Profits Interest Member in connection with the grant of Profits Interest Units.

"**Profits Interest Member**" means a Member who holds Profits Interest Units.

"**Profits Interest Units**" has the meaning set forth in Section 2.1(a).

"**Purchase Offer**" has the meaning set forth in Section 10.5(a).

"**Purchase**"**Purchase Option" has the meaning set forth in the recitals. Price**" has the meaning set forth in Section 10.5(b).

"**Purchaser**" has the meaning set forth in Section 10.5(a).

"**Purchasing Members**" has the meaning set forth in Section 10.5(e).

"**Regulations**" means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"**Regulatory Allocations**" has the meaning set forth in <u>Section 2</u> of <u>Exhibit C</u>.

"**Securities Act**" means the Securities Act of 1933.

"**Selling Member**" has the meaning set forth in <u>Section 10.5</u>.

"**Successors**" has the meaning set forth in <u>Section 10.6(a)</u>.

"**Supermajority**" means more than ~~66 2/3 percent~~<u>50% of the voting units, provided that such percentage includes all of the voting units of House and Sortis (in each case, if they then-hold voting units)</u>.

"**Transfer**" means any sale, assignment, exchange, gift, devise, distribution, hypothecation, pledge, encumbrance, attachment, levy, foreclosure, sale by legal process under execution, attachment or receivership, or other transfer, whether voluntary or involuntary (including by operation of law).

"**Triggered Unit Purchaser**" has the meaning set forth in <u>Section 10.6</u>.

"**Triggered Units**" has the meaning set forth in <u>Section 10.6</u>.

"**Triggering Event**" has the meaning set forth in <u>Section 10.6</u>.

"**Unit**" means the units of interest among which the Company's equity, Profits and Losses, and rights afforded to Members, including, to the extent set forth in this Agreement, the right to participate in the management of the Company, are divided.  As of the Effective Date, Units include Common Units and Profits Interest Units, all of which are described in <u>Section 2.1</u>.

"**Voting Units**" means the Common <u>Units and the Series A Profits Interest</u> Units.

## Exhibit B

## FORM OF
## CONSENT OF SPOUSE OR DOMESTIC PARTNER

I, _____, spouse or domestic partner of _____, hereby acknowledge and agree as follows with respect to the Amended and Restated Operating Agreement of Blue Star Doughnuts LLC (the "**Company**"), dated ~~August 22~~October___, ~~2016~~2020, as may be amended from time to time (the "**Agreement**"):

1.  I have read and approve the provisions of the Agreement, including without limitation as they relate to any Common Units and Profits Interest Units and/or any other class or series of Unit (as defined in the Agreement) held of record (whether on the date hereof or later acquired) by my spouse or domestic partner, as applicable (the "**Spousal Units**").

2.  I have read and approve the provisions of the Agreement (and, in the case of Profits Interest Units, the provisions of the Profits Interest Agreement) that govern and restrict any Transfer (as defined in the Agreement) of the Spousal Units, and that in the case of certain proposed Transfers, the Agreement grants the Company and certain of its Members an option to purchase any or all the Spousal Units, and that in the case of a Triggering Event, the Agreement grants the Company and certain of its Members an option to purchase certain of the Spousal Units, including in each case any interest I might have in the Spousal Units.

3.  Any interest I may have in the Spousal Units, including any community property interest in the Spousal Units, will be irrevocably subject to the terms of the Agreement.

I hereby (a) appoint my spouse or domestic partner, as applicable, as my attorney-in-fact with respect to the exercise of any rights under the Agreement, and (b) consent to any amendments or modifications to the Agreement that are consented to, executed by or otherwise binding upon my spouse or domestic partner, as applicable.

DATED: _____, 20__.


_____
(signature)


_____
(printed name)


Exhibit B

80580165.9 0056979-00001
108165715.11 0056668-00010

## Exhibit C

## SPECIAL ALLOCATIONS

1.      **Special Allocations.**  The following special allocations will be made in the following order:

1.1.      **Minimum Gain Chargeback.**  Notwithstanding any other provision of Section 4 of the Agreement, items of Company income and gain will be specially allocated to one or more Members in the amount and manner required to satisfy the Company Minimum Gain Chargeback rules of Regulations Section 1.704-2(f) and the Member Minimum Gain Chargeback rules of Regulations Section 1.704-2(i)(4).

1.2.      **Qualified Income Offset**.  If any Member unexpectedly receives any adjustments, allocations or distributions described in Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6) and such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in the Agreement were made without regard to this Section 1.2 of Exhibit C, items of Company income and gain will be specially allocated to each such Member in the manner and minimum amount necessary to eliminate the Adjusted Capital Account Deficit of such Member as quickly as possible.

1.3.      **Nonrecourse Deductions**.  Nonrecourse Deductions for any Fiscal Year will be specially allocated to the Member and the Members in proportion to the number of Units held by each.

1.4.      **Member Nonrecourse Deductions.**  Any Member Nonrecourse Deductions for any Fiscal Year will be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i)(1).

1.5.      **Section 754 Adjustments.**  To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Sections 734(b) or 743(b) is required, pursuant to Regulations Sections 1.704-1(b)(2)(iv)(m)(2) or (4), to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of his or her interest in the Company, the amount of such adjustment to Capital Accounts will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss will be specially allocated to the Members and the Members in accordance with their interests in the Company if Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member to whom such distribution was made if Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

1.6.      **Loss Limitation.**  Losses allocated under Section 4.1 of the Agreement will not exceed the maximum amount of Losses that may be allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year.  If some, but not all, of the Members would have Adjusted Capital Account Deficits, as a consequence of an allocation of Losses under Section 4.1 of the Agreement, the limitation set forth in this Section

1.6 of <u>Exhibit C</u> will be applied on a Member-by-Member basis and Losses not allocable to any Member as a result of such limitation will be allocated to the other Members in accordance with the positive balances in such Members' Capital Accounts so as to allocate the maximum permissible Losses to each Member under Section 1.704-1(b)(2)(ii)(d) of the Regulations.

      2.    **Curative Allocations.** The allocations set forth in <u>Sections 1.1</u> through <u>1.6</u> of this <u>Exhibit C</u> (the "**Regulatory Allocations**") are intended to comply with certain requirements of the Regulations. To the extent possible, all Regulatory Allocations will be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss or deduction pursuant to this <u>Section 2</u> of <u>Exhibit C</u>. Therefore, notwithstanding any allocation provision other than the Regulatory Allocations, the Manager will make such offsetting special allocations of Company income, gain, loss or deduction in whatever manner they determine appropriate so that each Member's and Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance that such party would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to <u>Section 4.1</u> of the Agreement.

80580165.9 0056979.-00001            C-  C-2
108165715.11 0056668-00010
**Exhibit F - Page 39 of 39**
Case 20-32485-pcm11   Doc 149   Filed 11/19/20

# EXHIBIT G

## Subscribers and Executed Subscription Agreements

## New Unit Offering Participants

| Participant | Purchase Price |
|---|---|
| Sortis Holdings, Inc. | $1,000,000.00 |
| Equity Interest Holders | $550,000.00 |

# BLUE STAR DOUGHNUTS LLC

## SUBSCRIPTION AGREEMENT AND ACCREDITED INVESTOR QUESTIONNAIRE

This Subscription Agreement and Accredited Investor Questionnaire ("**Agreement**"), by and between Blue Star Doughnuts LLC, an Oregon limited liability company ("**Company**"), as contemplated by, and incorporated in, the Chapter 11 Plan of Reorganization of the Company that will be filed with the Bankruptcy Court on or before October 15, 2020 (as may be amended, modified or supplemented from time to time in accordance with its terms, the "**Plan**"), and the undersigned ("**Subscriber**"), shall be deemed executed as of the date the Company executes a counterpart to this Agreement previously executed by the Subscriber.

Whereas, on August 26, 2020, the Company filed a petition commencing a voluntary case under chapter 11 of title 11 of the United States Code ("**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Oregon ("**Bankruptcy Court**"), and, as a small business debtor pursuant to section 101(51D), elected to be administered under sections 1181-1195 ("**Subchapter V**") of the Bankruptcy Code.

Whereas, the Company, as a debtor and debtor-in-possession, has submitted a draft of its Plan to certain Subscribers, including the undersigned;

Whereas, the Plan provides that the Company's assets will revest in the Company, as reorganized, on the Effective Date[1] of the Plan, upon confirmation of the Plan by the Bankruptcy Court;

Whereas, on the Effective Date, the Company, as reorganized, will offer for purchase up to 2,000 Common Units ("**Units**"); and

Whereas, the Subscriber wishes to subscribe to purchase Units as set forth herein on the terms and subject to the conditions of, and in accordance with, the Plan, the Confirmation Order, and this Agreement.

NOW, THEREFORE, in consideration of the promises and the mutual agreements and covenants herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Subscriber and the Company hereby represent and agree as follows:

1.     <u>Subscription</u>.

The Subscriber subscribes for and agrees to purchase 655.2006552 Units of the Company, as reorganized in accordance with and pursuant to the Plan and Confirmation Order. In consideration for the Units, the undersigned agrees to pay to the Company $1,000,000 in cash ($1,526.25 per Unit), subject to the conditions herein. The closing of the issuance of Units

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

contemplated by this Agreement will take place on or shortly following the Effective Date of the Plan ("**Closing**").

Notwithstanding the foregoing, either the Subscriber or the Company, by notice to the other party, may reduce the number of units purchased pursuant to the Agreement by the number of Units purchased by any Equity Interest Holder other than Katherine J. House or William Price (or their affiliates), provided that the Subscriber shall pay $1,000,000 for such reduced number of Units.

2.      Representations and Warranties of the Company.

(a)      The Company is, as of the date hereof, and will be as of the Effective Date, duly organized and validly existing under the laws of the state of Oregon.

(b)      Subject to the entry of the Confirmation Order and the occurrence of the Effective Date, (i) the Company will have the requisite corporate power and authority to execute and deliver this Agreement, and (ii) this Agreement will have been duly and validity executed and delivered by the Company and will constitute the valid and binding obligations of the Company upon entry of the Confirmation Order.

(c)      The Units, when issued in accordance with the provisions hereof and the Confirmation Order, will be validly issued by the Company.

(d)      The Plan amends and restates the Company's Amended and Restated Operating Agreement, dated August 22, 2016, to, among other things, (i) increase the Units and Profits Interest Units authorized to be issued, (ii) designate that the Manager of the Company shall be comprised of three directors, a majority of which may take action on behalf of the Manager, and that Katherine J. House is entitled to elect two directors and Sortis Holdings, Inc. is entitled to elect one director, (iii) allow the Manager to designate officers of the Company and to delegate authority to them, (iv) provide that the issuance of Profits Interest Units will dilute Members equally, (v) modify the vote of Members on specified items to a super majority (2/3) standard, and (vi) make certain clean up and updating changes.

(e)      Under the Plan (i) Equity Interest Holders will retain their Equity Interests, (ii) on the Effective Date, the Company, as reorganized, will sell up to 2,000 Units to accredited investors, including the undersigned Subscriber, and (iii) the Company, as reorganized, will issue an aggregate of 993.6 Profits Interest Units to the chief executive officer, the chief financial officer of the Company, to senior management identified by Katherine J. House, and to the Plan Sponsor. The Profits Interest Units will be subject to time-vesting over a three-year period from the date of grant.

(f)      Except for the representations and warranties contained in this Section 2, none of the Company nor any other person makes any express or implied representation or warranty with respect to the Company or any other information provided to the Subscriber. None of the Company nor any other person will have or be subject to any liability or indemnification obligation to the Subscriber or any other person resulting from the distribution to the Subscriber, or use by the

2

Subscriber of, any such information, documents, projections, forecasts or other material made available to the Subscriber.

3.     Representations and Warranties of the Subscriber.

You must be an "accredited investor" as defined in Section 501 of Regulation D promulgated under the federal Securities Act of 1933.  Please indicate below the boxes that apply to you.

☐ The undersigned has an individual net worth, or joint net worth with his or her spouse, in excess of $1,000,000.  For this purpose, "net worth" means the excess of total assets at fair market value (including personal and real property but excluding the estimated fair market value of a person's primary home) over total liabilities. Total liabilities excludes any mortgage on the primary home in an amount of up to the home's estimated fair market value as long as the mortgage was incurred more than 60 days before the Units are purchased, but includes (i) any mortgage amount in excess of the home's fair market value and (ii) any mortgage amount that was borrowed during the 60-day period before the closing date for the sale of Units for the purpose of investing in the Units;

☐ The undersigned had an individual income in excess of $200,000, or joint income with spouse in excess of $300,000, in each of the two preceding years and reasonably expects to reach the same income level in the current year.  For this purpose, a person's income is the amount of that person's individual adjusted gross income (as reported on a federal income tax return);

☐ The undersigned is a private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940;

☐ The undersigned is an organization described in section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, partnership, or limited liability company, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

☐ The undersigned is a director, executive officer, or general partner of the Company;

☐ The undersigned is a trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in § 230.506(b)(2)(ii); or

☒ The undersigned is an entity in which all the equity owners are accredited investors.

4.     Conditions to Closing.

The obligations of the undersigned Subscriber to purchase and pay for the Units are irrevocable, subject to the following conditions:

3

(a)     the Company's Plan, as amended from time to time prior to the Confirmation Hearing, is confirmed by the Bankruptcy Court in a form that is reasonably acceptable to the Subscriber; and

(b)     the Effective Date occurs no later than December 15, 2020 and the Closing promptly thereafter.

5.     <u>Termination</u>.

Unless the Closing has occurred by December 31, 2020, this Agreement will terminate automatically and without any further action by any party.

6.     <u>Miscellaneous</u>.

(a)     This Agreement is not assignable by the Subscriber without the prior written consent of the Company.

(b)     The provisions of this Agreement shall be binding upon and accrue to the benefit of the parties and their respective heirs, legal representatives, successors and assigns.

(c)     This Agreement shall be governed by and construed in accordance with the laws of the state of Oregon.

**The Units are being purchased for investment and not with a view to distribution in violation of any state or federal securities laws. The Units have not been registered under any state or federal securities laws. You may not sell or distribute the Units without an effective registration statement or an opinion of counsel in a form satisfactory to the Company that such registration is not required under state or federal securities laws.**

Subscriber:   **Sortis Holdings, Inc., or assigns** _____

Signature:   By: /s/ Paul Brenneke

Name:          Paul Brenneke

Address:        co/Joe Field at Field Jerger , LLP
                ~~621, SW Morrison St~~., Ste. 510
                ~~Portland, OR 97205~~

Date:          October 12, 2020

4

**ACCEPTED**

**Blue Star Doughnuts LLC**

By: _____          By: _____
　　Katherine J. House, Manager & CEO          William Price, CFO

Date: _____, 2020          Date: _____, 2020

5

# BLUE STAR DOUGHNUTS LLC

## SUBSCRIPTION AGREEMENT AND ACCREDITED INVESTOR QUESTIONNAIRE

This Subscription Agreement and Accredited Investor Questionnaire ("**Agreement**"), by and between Blue Star Doughnuts LLC, an Oregon limited liability company ("**Company**"), as contemplated by, and incorporated in, the Chapter 11 Plan of Reorganization of the Company that will be filed with the Bankruptcy Court on or before October 15, 2020 (as may be amended, modified or supplemented from time to time in accordance with its terms, the "**Plan**"), and the undersigned ("**Subscriber**"), shall be deemed executed as of the date the Company executes a counterpart to this Agreement previously executed by the Subscriber.

Whereas, on August 26, 2020, the Company filed a petition commencing a voluntary case under chapter 11 of title 11 of the United States Code ("**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Oregon ("**Bankruptcy Court**"), and, as a small business debtor pursuant to section 101(51D), elected to be administered under sections 1181-1195 ("**Subchapter V**") of the Bankruptcy Code.

Whereas, the Company, as a debtor and debtor-in-possession, has submitted a draft of its Plan to certain Subscribers, including the undersigned;

Whereas, the Plan provides that the Company's assets will revest in the Company, as reorganized, on the Effective Date[1] of the Plan, upon confirmation of the Plan by the Bankruptcy Court;

Whereas, on the Effective Date, the Company, as reorganized, will offer for purchase up to 2,000 Common Units ("**Units**"); and

Whereas, the Subscriber wishes to subscribe to purchase Units as set forth herein on the terms and subject to the conditions of, and in accordance with, the Plan, the Confirmation Order, and this Agreement.

NOW, THEREFORE, in consideration of the promises and the mutual agreements and covenants herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Subscriber and the Company hereby represent and agree as follows:

1.   Subscription.

The Subscriber subscribes for and agrees to purchase 65.52006552 Units of the Company, as reorganized in accordance with and pursuant to the Plan and Confirmation Order.   In consideration for the Units, the undersigned agrees to pay to the Company $100,000 in cash ($1,526.25 per Unit), subject to the conditions herein.   The closing of the issuance of Units

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

contemplated by this Agreement will take place on or shortly following the Effective Date of the Plan ("**Closing**").

2.    <u>Representations and Warranties of the Company</u>.

(a)    The Company is, as of the date hereof, and will be as of the Effective Date, duly organized and validly existing under the laws of the state of Oregon.

(b)    Subject to the entry of the Confirmation Order, (i) the Company will have the requisite corporate power and authority to execute and deliver this Agreement, and (ii) this Agreement will have been duly and validity executed and delivered by the Company and will constitute the valid and binding obligations of the Company upon entry of the Confirmation Order.

(c)    The Units, when issued in accordance with the provisions hereof and the Confirmation Order, will be validly issued by the Company.

(d)    The Plan amends and restates the Company's Amended and Restated Operating Agreement, dated August 22, 2016, to, among other things, (i) increase the Units and Profits Interest Units authorized to be issued, (ii) designate that the Manager of the Company shall be comprised of three directors, a majority of which may take action behalf of the Manager, and that Katherine J. House is entitled to elect two directors and Sortis Holdings, Inc. is entitled to elect one director, (iii) allow the Manager to designate officers of the Company and to delegate authority to them, (iv) provide that the issuance of Profits Interest Units will dilute Members equally, (v) modify the vote of Members on specified items to a super majority (2/3) standard, and (vi) make certain clean up and updating changes.

(e)    Under the Plan (i) Equity Interest Holders will retain their Equity Interests, (ii) on the Effective Date, the Company, as reorganized, will sell up to 2,000 Units to accredited investors, including the undersigned Subscriber, and (iii) the Company, as reorganized, will issue an aggregate of 993.6 Profits Interest Units to the chief executive officer, the chief financial officer of the Company, to senior management identified by Katherine J. House, and to the Plan Sponsor. The Profits Interest Units will be subject to time-vesting over a three-year period from the date of grant.

(f)    Except for the representations and warranties contained in this Section 2, none of the Company nor any other person makes any express or implied representation or warranty with respect to the Company or any other information provided to the Subscriber. None of the Company nor any other person will have or be subject to any liability or indemnification obligation to the Subscriber or any other person resulting from the distribution to the Subscriber, or use by the Subscriber of, any such information, documents, projections, forecasts or other material made available to the Subscriber.

108286208.3 0056668-00010

DocuSign Envelope ID: 76599134-495C-478A-B865-F66C25023541

3.     <u>Representations and Warranties of the Subscriber</u>.

You must be an "accredited investor" as defined in Section 501 of Regulation D promulgated under the federal Securities Act of 1933.  Please indicate below the boxes that apply to you.

☐  The undersigned has an individual net worth, or joint net worth with his or her spouse, in excess of $1,000,000.  For this purpose, "net worth" means the excess of total assets at fair market value (including personal and real property but excluding the estimated fair market value of a person's primary home) over total liabilities. Total liabilities excludes any mortgage on the primary home in an amount of up to the home's estimated fair market value as long as the mortgage was incurred more than 60 days before the Units are purchased, but includes (i) any mortgage amount in excess of the home's fair market value and (ii) any mortgage amount that was borrowed during the 60-day period before the closing date for the sale of Units for the purpose of investing in the Units;

☐  The undersigned had an individual income in excess of $200,000, or joint income with spouse in excess of $300,000, in each of the two preceding years and reasonably expects to reach the same income level in the current year.  For this purpose, a person's income is the amount of that person's individual adjusted gross income (as reported on a federal income tax return);

☐  The undersigned is a private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940;

☐  The undersigned is an organization described in section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, partnership, or limited liability company, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

☒  The undersigned is a director, executive officer, or general partner of the Company;

☐  The undersigned is a trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in § 230.506(b)(2)(ii); or

☐  The undersigned is an entity in which all the equity owners are accredited investors.

4.     <u>Conditions to Closing</u>.

The obligations of the undersigned Subscriber to purchase and pay for the Units are irrevocable, subject to the following conditions:

(a)     the Company's Plan, as amended from time to time prior to the Confirmation Hearing, is confirmed by the Bankruptcy Court in a form that is reasonably acceptable to the Subscriber; and

108286208.3 0056668-00010

**Exhibit G - Page 10 of 23**

Case 20-32485-pcm11     Doc 149     Filed 11/19/20

(b)     the Effective Date occurs no later than December 15, 2020 and the Closing promptly thereafter.

5.     <u>Termination</u>.

Unless the Closing has occurred by December 31, 2020, this Agreement will terminate automatically and without any further action by any party.

6.     <u>Miscellaneous</u>.

(a)     This Agreement is not assignable by the Subscriber without the prior written consent of the Company.

(b)     The provisions of this Agreement shall be binding upon and accrue to the benefit of the parties and their respective heirs, legal representatives, successors and assigns.

(c)     This Agreement shall be governed by and construed in accordance with the laws of the state of Oregon.

**The Units are being purchased for investment and not with a view to distribution in violation of any state or federal securities laws.  The Units have not been registered under any state or federal securities laws. You may not sell or distribute the Units without an effective registration statement or an opinion of counsel in a form satisfactory to the Company that such registration is not required under state or federal securities laws.**

Subscriber:   **KATHERINE J. HOUSE**

Signature:     *Katherine House* _

Name:          Katherine J. House

Address:       3753 N. Mississippi Ave.
               Portland, OR 97227

Date:          October 12, 2020

**ACCEPTED**

**Blue Star Doughnuts LLC**

By:  _____          By:  _____
     Katherine J. House, Manager & CEO        William Price, CFO

Date:  October 12, 2020             Date:  October 12, 2020

4

DocuSign Envelope ID: 4BDDE5F9-4667-45F8-A554-9C625B195D1E

**BLUE STAR DOUGHNUTS LLC**

**SUBSCRIPTION AGREEMENT AND ACCREDITED INVESTOR QUESTIONNAIRE**

This Subscription Agreement and Accredited Investor Questionnaire ("**Agreement**"), by and between Blue Star Doughnuts LLC, an Oregon limited liability company ("**Company**"), as contemplated by, and incorporated in, the Chapter 11 Plan of Reorganization of the Company that will be filed with the Bankruptcy Court on or before October 15, 2020 (as may be amended, modified or supplemented from time to time in accordance with its terms, the "**Plan**"), and the undersigned ("**Subscriber**"), shall be deemed executed as of the date the Company executes a counterpart to this Agreement previously executed by the Subscriber.

Whereas, on August 26, 2020, the Company filed a petition commencing a voluntary case under chapter 11 of title 11 of the United States Code ("**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Oregon ("**Bankruptcy Court**"), and, as a small business debtor pursuant to section 101(51D), elected to be administered under sections 1181-1195 ("**Subchapter V**") of the Bankruptcy Code.

Whereas, the Company, as a debtor and debtor-in-possession, has submitted a draft of its Plan to certain Subscribers, including the undersigned;

Whereas, the Plan provides that the Company's assets will revest in the Company, as reorganized, on the Effective Date[1] of the Plan, upon confirmation of the Plan by the Bankruptcy Court;

Whereas, on the Effective Date, the Company, as reorganized, will offer for purchase up to 2,000 Common Units ("**Units**"); and

Whereas, the Subscriber wishes to subscribe to purchase Units as set forth herein on the terms and subject to the conditions of, and in accordance with, the Plan, the Confirmation Order, and this Agreement.

NOW, THEREFORE, in consideration of the promises and the mutual agreements and covenants herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Subscriber and the Company hereby represent and agree as follows:

1.    <u>Subscription</u>.

The Subscriber subscribes for and agrees to purchase 32.76003276 Units of the Company, as reorganized in accordance with and pursuant to the Plan and Confirmation Order. In consideration for the Units, the undersigned agrees to pay to the Company $50,000 in cash ($1,526.25 per Unit), subject to the conditions herein. The closing of the issuance of Units

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

DocuSign Envelope ID: 4BDDE5F9-4667-45F8-A554-9C625B195D1E

contemplated by this Agreement will take place on or shortly following the Effective Date of the Plan ("**Closing**").

2. <u>Representations and Warranties of the Company</u>.

(a)     The Company is, as of the date hereof, and will be as of the Effective Date, duly organized and validly existing under the laws of the state of Oregon.

(b)     Subject to the entry of the Confirmation Order, (i) the Company will have the requisite corporate power and authority to execute and deliver this Agreement, and (ii) this Agreement will have been duly and validity executed and delivered by the Company and will constitute the valid and binding obligations of the Company upon entry of the Confirmation Order.

(c)     The Units, when issued in accordance with the provisions hereof and the Confirmation Order, will be validly issued by the Company.

(d)     The Plan amends and restates the Company's Amended and Restated Operating Agreement, dated August 22, 2016, to, among other things, (i) increase the Units and Profits Interest Units authorized to be issued, (ii) designate that the Manager of the Company shall be comprised of three directors, a majority of which may take action behalf of the Manager, and that Katherine J. House is entitled to elect two directors and Sortis Holdings, Inc. is entitled to elect one director, (iii) allow the Manager to designate officers of the Company and to delegate authority to them, (iv) provide that the issuance of Profits Interest Units will dilute Members equally, (v) modify the vote of Members on specified items to a super majority (2/3) standard, and (vi) make certain clean up and updating changes.

(e)     Under the Plan (i) Equity Interest Holders will retain their Equity Interests, (ii) on the Effective Date, the Company, as reorganized, will sell up to 2,000 Units to accredited investors, including the undersigned Subscriber, and (iii) the Company, as reorganized, will issue an aggregate of 993.6 Profits Interest Units to the chief executive officer, the chief financial officer of the Company, to senior management identified by Katherine J. House, and to the Plan Sponsor. The Profits Interest Units will be subject to time-vesting over a three-year period from the date of grant.

(f)     Except for the representations and warranties contained in this Section 2, none of the Company nor any other person makes any express or implied representation or warranty with respect to the Company or any other information provided to the Subscriber.  None of the Company nor any other person will have or be subject to any liability or indemnification obligation to the Subscriber or any other person resulting from the distribution to the Subscriber, or use by the Subscriber of, any such information, documents, projections, forecasts or other material made available to the Subscriber.

108286304.4 0056668-00010

DocuSign Envelope ID: 4BDDE5F9-4667-45F8-A554-9C625B195D1E

3. <u>Representations and Warranties of the Subscriber</u>.

You must be an "accredited investor" as defined in Section 501 of Regulation D promulgated under the federal Securities Act of 1933. Please indicate below the boxes that apply to you.

☐ The undersigned has an individual net worth, or joint net worth with his or her spouse, in excess of $1,000,000. For this purpose, "net worth" means the excess of total assets at fair market value (including personal and real property but excluding the estimated fair market value of a person's primary home) over total liabilities. Total liabilities excludes any mortgage on the primary home in an amount of up to the home's estimated fair market value as long as the mortgage was incurred more than 60 days before the Units are purchased, but includes (i) any mortgage amount in excess of the home's fair market value and (ii) any mortgage amount that was borrowed during the 60-day period before the closing date for the sale of Units for the purpose of investing in the Units;

☐ The undersigned had an individual income in excess of $200,000, or joint income with spouse in excess of $300,000, in each of the two preceding years and reasonably expects to reach the same income level in the current year. For this purpose, a person's income is the amount of that person's individual adjusted gross income (as reported on a federal income tax return);

☐ The undersigned is a private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940;

☐ The undersigned is an organization described in section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, partnership, or limited liability company, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

☐ The undersigned is a director, executive officer, or general partner of the Company;

☐ The undersigned is a trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in § 230.506(b)(2)(ii); or

☒ The undersigned is an entity in which all the equity owners are accredited investors.

4. <u>Conditions to Closing</u>.

The obligations of the undersigned Subscriber to purchase and pay for the Units are irrevocable, subject to the following conditions:

(a) the Company's Plan, as amended from time to time prior to the Confirmation Hearing, is confirmed by the Bankruptcy Court in a form that is reasonably acceptable to the Subscriber; and

3

(b)     the Effective Date occurs no later than December 15, 2020 and the Closing promptly thereafter.

5.     <u>Termination</u>.

Unless the Closing has occurred by December 31, 2020, this Agreement will terminate automatically and without any further action by any party.

6.     <u>Miscellaneous</u>.

(a)     This Agreement is not assignable by the Subscriber without the prior written consent of the Company.

(b)     The provisions of this Agreement shall be binding upon and accrue to the benefit of the parties and their respective heirs, legal representatives, successors and assigns.

(c)     This Agreement shall be governed by and construed in accordance with the laws of the state of Oregon.

**The Units are being purchased for investment and not with a view to distribution in violation of any state or federal securities laws.  The Units have not been registered under any state or federal securities laws. You may not sell or distribute the Units without an effective registration statement or an opinion of counsel in a form satisfactory to the Company that such registration is not required under state or federal securities laws.**

**Subscriber:   W.P. PRICE TAX AND ACCOUNTING, LLC**

Signature:     ____ *William Price* _

Name:          William Price

Address:       c/o William Price
                70 SW Century Dr 100-328
                Bend, Or 9703

Date:          October 14, 2020

**ACCEPTED**

**Blue Star Doughnuts LLC**

| By: _____ | By: _____ |
|---|---|
| Katherine J. House, Manager & CEO | William Price, CFO |
| Date: _____, 2020 | Date: _____, 2020 |

4

## BLUE STAR DOUGHNUTS LLC

## SUBSCRIPTION AGREEMENT AND ACCREDITED INVESTOR QUESTIONNAIRE

This Subscription Agreement and Accredited Investor Questionnaire ("**Agreement**"), by and between Blue Star Doughnuts LLC, an Oregon limited liability company ("**Company**"), as contemplated by, and incorporated in, the Chapter 11 Plan of Reorganization of the Company filed with the Bankruptcy Court on October 16, 2020 (as may be amended, modified or supplemented from time to time in accordance with its terms, the "**Plan**"), and the undersigned ("**Subscriber**"), shall be deemed executed as of the date the Company executes a counterpart to this Agreement previously executed by the Subscriber.

Whereas, on August 26, 2020, the Company filed a petition commencing a voluntary case under chapter 11 of title 11 of the United States Code ("**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Oregon ("**Bankruptcy Court**"), and, as a small business debtor pursuant to section 101(51D), elected to be administered under sections 1181-1195 ("**Subchapter V**") of the Bankruptcy Code;

Whereas, on October 16, 2020, the Company, as debtor and debtor-in-possession, filed the Plan with the Bankruptcy Court;

Whereas, the Plan provides that the Company's assets will revest in the Company, as reorganized, on the Effective Date[1] of the Plan, upon confirmation of the Plan by the Bankruptcy Court;

Whereas, on the Effective Date, the Company, as reorganized, will offer for purchase up to 2,000 Common Units ("**Units**"); and

Whereas, the Subscriber wishes to subscribe to purchase Units as set forth herein on the terms and subject to the conditions of, and in accordance with, the Plan, the Confirmation Order, and this Agreement.

NOW, THEREFORE, in consideration of the promises and the mutual agreements and covenants herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Subscriber and the Company hereby represent and agree as follows:

1.      Subscription.

The Subscriber subscribes for and agrees to purchase 70 Units of the Company, as reorganized in accordance with and pursuant to the Plan and Confirmation Order.  In consideration for the Units, the undersigned agrees to pay to the Company $350,000 in cash ($5,000 per Unit), subject to the conditions herein.  The closing of the issuance of Units

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

108356437.2 0056668-00010

contemplated by this Agreement will take place on or shortly following the Effective Date of the Plan ("**Closing**").

2. Representations and Warranties of the Company.

(a) The Company is, as of the date hereof, and will be as of the Effective Date, duly organized and validly existing under the laws of the state of Oregon.

(b) Subject to the entry of the Confirmation Order, (i) the Company will have the requisite corporate power and authority to execute and deliver this Agreement, and (ii) this Agreement will have been duly and validity executed and delivered by the Company and will constitute the valid and binding obligations of the Company upon entry of the Confirmation Order.

(c) The Units, when issued in accordance with the provisions hereof and the Confirmation Order, will be validly issued by the Company.

(d) The Plan amends and restates the Company's Amended and Restated Operating Agreement, dated August 22, 2016, to, among other things, (i) increase the Units and Profits Interest Units authorized to be issued, (ii) designate that the Manager of the Company shall be comprised of three directors, a majority of whom may take action behalf of the Manager, and that Katherine J. House is entitled to elect two directors and Sortis Holdings, Inc. is entitled to elect one director, (iii) designate that Basil Bullard ("**Bullard**") is entitled to select one board observer, (iv) allow the Manager to designate officers of the Company and to delegate authority to them, (v) provide that the issuance of Profits Interest Units will dilute Members equally, (vi) modify the vote of Members on specified items to a super majority standard, and (vii) make certain clean up and updating changes.

(e) Under the Plan (i) Equity Interest Holders will retain their Equity Interests, (ii) on the Effective Date, the Company, as reorganized, will sell up to 2,000 Units to accredited investors, including the undersigned Subscriber, and (iii) the Company, as reorganized, will issue an aggregate of 280.0 Profits Interest Units to the chief executive officer, the chief financial officer of the Company, to Bullard, to senior management identified by Katherine J. House, and to the Plan Sponsor and designees of the Plan Sponsor. The Profits Interest Units will be subject to time-vesting over a three-year period from the date of grant, excepting those issued to Bullard, the Plan Sponsor, and the designees of the Plan Sponsor, which will not be subject to time-vesting.

(f) Except for the representations and warranties contained in this Section 2, none of the Company nor any other person makes any express or implied representation or warranty with respect to the Company or any other information provided to the Subscriber. None of the Company nor any other person will have or be subject to any liability or indemnification obligation to the Subscriber or any other person resulting from the distribution to the Subscriber, or use by the Subscriber of, any such information, documents, projections, forecasts or other material made available to the Subscriber.

2

3.  Representations and Warranties of the Subscriber.

You must be an "accredited investor" as defined in Section 501 of Regulation D promulgated under the federal Securities Act of 1933. Please indicate below the boxes that apply to you.

☑ The undersigned has an individual net worth, or joint net worth with his or her spouse, in excess of $1,000,000. For this purpose, "net worth" means the excess of total assets at fair market value (including personal and real property but excluding the estimated fair market value of a person's primary home) over total liabilities. Total liabilities excludes any mortgage on the primary home in an amount of up to the home's estimated fair market value as long as the mortgage was incurred more than 60 days before the Units are purchased, but includes (i) any mortgage amount in excess of the home's fair market value and (ii) any mortgage amount that was borrowed during the 60-day period before the closing date for the sale of Units for the purpose of investing in the Units;

☑ The undersigned had an individual income in excess of $200,000, or joint income with spouse in excess of $300,000, in each of the two preceding years and reasonably expects to reach the same income level in the current year. For this purpose, a person's income is the amount of that person's individual adjusted gross income (as reported on a federal income tax return);

☐ The undersigned is a private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940;

☐ The undersigned is an organization described in section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, partnership, or limited liability company, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

☐ The undersigned is a director, executive officer, or general partner of the Company;

☐ The undersigned is a trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in § 230.506(b)(2)(ii); or

☐ The undersigned is an entity in which all the equity owners are accredited investors.

4.  Conditions to Closing.

The obligations of the undersigned Subscriber to purchase and pay for the Units are irrevocable, subject to the following conditions:

(a)  the Company's Plan, as amended from time to time prior to the Confirmation Hearing, is confirmed by the Bankruptcy Court in a form that is reasonably acceptable to the Subscriber; and

108356437.2 0056668-00010

(b)    the Effective Date occurs no later than December 15, 2020 and the Closing promptly thereafter.

5.    Termination.

Unless the Closing has occurred by December 31, 2020, this Agreement will terminate automatically and without any further action by any party.

6.    Miscellaneous.

(a)    This Agreement is not assignable by the Subscriber without the prior written consent of the Company.

(b)    The provisions of this Agreement shall be binding upon and accrue to the benefit of the parties and their respective heirs, legal representatives, successors and assigns.

(c)    This Agreement shall be governed by and construed in accordance with the laws of the state of Oregon.

**The Units are being purchased for investment and not with a view to distribution in violation of any state or federal securities laws. The Units have not been registered under any state or federal securities laws. You may not sell or distribute the Units without an effective registration statement or an opinion of counsel in a form satisfactory to the Company that such registration is not required under state or federal securities laws.**

**Subscriber:    BASIL BULLARD**

Signature:    _____

Name:    Basil Bullard

Address:    2541 NW Overton Street
Portland, OR 97210

Date:    November _18_, 2020

**ACCEPTED**

**Blue Star Doughnuts LLC**

By:    _____          By:    _____
        Katherine J. House, Manager & CEO              William Price, CFO

Date:    _____, 2020          Date:    _____, 2020

4

# BLUE STAR DOUGHNUTS LLC

## SUBSCRIPTION AGREEMENT AND ACCREDITED INVESTOR QUESTIONNAIRE

This Subscription Agreement and Accredited Investor Questionnaire ("**Agreement**"), by and between Blue Star Doughnuts LLC, an Oregon limited liability company ("**Company**"), as contemplated by, and incorporated in, the Chapter 11 Plan of Reorganization of the Company filed with the Bankruptcy Court on October 16, 2020 (as may be amended, modified or supplemented from time to time in accordance with its terms, the "**Plan**"), and the undersigned ("**Subscriber**"), shall be deemed executed as of the date the Company executes a counterpart to this Agreement previously executed by the Subscriber.

Whereas, on August 26, 2020, the Company filed a petition commencing a voluntary case under chapter 11 of title 11 of the United States Code ("**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Oregon ("**Bankruptcy Court**"), and, as a small business debtor pursuant to section 101(51D), elected to be administered under sections 1181-1195 ("**Subchapter V**") of the Bankruptcy Code;

Whereas, on October 16, 2020, the Company, as debtor and debtor-in-possession, filed the Plan with the Bankruptcy Court;

Whereas, the Plan provides that the Company's assets will revest in the Company, as reorganized, on the Effective Date[1] of the Plan, upon confirmation of the Plan by the Bankruptcy Court;

Whereas, on the Effective Date, the Company, as reorganized, will offer for purchase up to 2,000 Common Units ("**Units**"); and

Whereas, the Subscriber wishes to subscribe to purchase Units as set forth herein on the terms and subject to the conditions of, and in accordance with, the Plan, the Confirmation Order, and this Agreement.

NOW, THEREFORE, in consideration of the promises and the mutual agreements and covenants herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Subscriber and the Company hereby represent and agree as follows:

1. Subscription.

The Subscriber subscribes for and agrees to purchase 10 Units of the Company, as reorganized in accordance with and pursuant to the Plan and Confirmation Order. In consideration for the Units, the undersigned agrees to pay to the Company $50,000 in cash ($5,000 per Unit), subject to the conditions herein. The closing of the issuance of Units contemplated by this Agreement will take place on or shortly following the Effective Date of the Plan ("**Closing**").

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan

108792284.2 0056668-00010

2. <u>Representations and Warranties of the Company</u>.

(a) The Company is, as of the date hereof, and will be as of the Effective Date, duly organized and validly existing under the laws of the state of Oregon.

(b) Subject to the entry of the Confirmation Order, (i) the Company will have the requisite corporate power and authority to execute and deliver this Agreement, and (ii) this Agreement will have been duly and validity executed and delivered by the Company and will constitute the valid and binding obligations of the Company upon entry of the Confirmation Order.

(c) The Units, when issued in accordance with the provisions hereof and the Confirmation Order, will be validly issued by the Company.

(d) The Plan amends and restates the Company's Amended and Restated Operating Agreement, dated August 22, 2016, to, among other things, (i) increase the Units and Profits Interest Units authorized to be issued, (ii) designate that the Manager of the Company shall be comprised of three directors, a majority of which may take action behalf of the Manager, and that Katherine J. House is entitled to elect two directors and Sortis Holdings, Inc. is entitled to elect one director, (iii) designate that Basil Bullard ("**Bullard**") is entitled to select one board observer, (iv) allow the Manager to designate officers of the Company and to delegate authority to them, (v) provide that the issuance of Profits Interest Units will dilute Members equally, (vi) modify the vote of Members on specified items to a super majority standard, and (vii) make certain clean up and updating changes.

(e) Under the Plan (i) Equity Interest Holders will retain their Equity Interests, (ii) on the Effective Date, the Company, as reorganized, will sell up to 2,000 Units to accredited investors, including the undersigned Subscriber, and (iii) the Company, as reorganized, will issue an aggregate of 280.0 Profits Interest Units to the chief executive officer, the chief financial officer of the Company, to Bullard, to senior management identified by Katherine J. House, and to the Plan Sponsor and designees of the Plan Sponsor. The Profits Interest Units will be subject to time-vesting over a three-year period from the date of grant, excepting those issued to Bullard, the Plan Sponsor, and the designees of the Plan Sponsor, which will not be subject to time-vesting.

(f) Except for the representations and warranties contained in this Section 2, none of the Company nor any other person makes any express or implied representation or warranty with respect to the Company or any other information provided to the Subscriber. None of the Company nor any other person will have or be subject to any liability or indemnification obligation to the Subscriber or any other person resulting from the distribution to the Subscriber, or use by the Subscriber of, any such information, documents, projections, forecasts or other material made available to the Subscriber.

2

3. <u>Representations and Warranties of the Subscriber</u>.

You must be an "accredited investor" as defined in Section 501 of Regulation D promulgated under the federal Securities Act of 1933. Please indicate below the boxes that apply to you.

☑ The undersigned has an individual net worth, or joint net worth with his or her spouse, in excess of $1,000,000. For this purpose, "net worth" means the excess of total assets at fair market value (including personal and real property but excluding the estimated fair market value of a person's primary home) over total liabilities. Total liabilities excludes any mortgage on the primary home in an amount of up to the home's estimated fair market value as long as the mortgage was incurred more than 60 days before the Units are purchased, but includes (i) any mortgage amount in excess of the home's fair market value and (ii) any mortgage amount that was borrowed during the 60-day period before the closing date for the sale of Units for the purpose of investing in the Units;

☐ The undersigned had an individual income in excess of $200,000, or joint income with spouse in excess of $300,000, in each of the two preceding years and reasonably expects to reach the same income level in the current year. For this purpose, a person's income is the amount of that person's individual adjusted gross income (as reported on a federal income tax return);

☐ The undersigned is a private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940;

☐ The undersigned is an organization described in section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, partnership, or limited liability company, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

☐ The undersigned is a director, executive officer, or general partner of the Company;

☐ The undersigned is a trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in § 230.506(b)(2)(ii); or

☐ The undersigned is an entity in which all the equity owners are accredited investors.

4. <u>Conditions to Closing</u>.

The obligations of the undersigned Subscriber to purchase and pay for the Units are irrevocable, subject to the following conditions:

(a)    the Company's Plan, as amended from time to time prior to the Confirmation Hearing, is confirmed by the Bankruptcy Court in a form that is reasonably acceptable to the Subscriber; and

3

(b)     the Effective Date occurs no later than December 15, 2020 and the Closing promptly thereafter.

5.     Termination.

Unless the Closing has occurred by December 31, 2020, this Agreement will terminate automatically and without any further action by any party.

6.     Miscellaneous.

(a)     This Agreement is not assignable by the Subscriber without the prior written consent of the Company.

(b)     The provisions of this Agreement shall be binding upon and accrue to the benefit of the parties and their respective heirs, legal representatives, successors and assigns.

(c)     This Agreement shall be governed by and construed in accordance with the laws of the state of Oregon.

**The Units are being purchased for investment and not with a view to distribution in violation of any state or federal securities laws. The Units have not been registered under any state or federal securities laws. You may not sell or distribute the Units without an effective registration statement or an opinion of counsel in a form satisfactory to the Company that such registration is not required under state or federal securities laws.**

**Subscriber:     GARY "CHIP" ROTHENBERGER, JR.**

Signature:     _____

Name:          Gary "Chip" Rothenberger, Jr.

Address:       2737 NW Skyliners Rd
               Bend, OR 97703

Date:          November _18_ , 2020

**ACCEPTED**

**Blue Star Doughnuts LLC**

By: _____          By: _____
    Katherine J. House, Manager & CEO       William Price, CFO

Date: _____ , 2020              Date: _____ , 2020

4

108792284.2 0056668-00010

# EXHIBIT H

# Reorganized Debtor
Capital Structure

# Blue Star Doughnuts
## Reorganized Debtor Capital Structure

| Members | New money | (Old) Common Units | (New) Common Units | Profits Interest Units (Voting) | Profits Interest Units (Non-Voting) | Total Units | Voting Units | Total % Units | Voting % Units |
|---|---|---|---|---|---|---|---|---|---|
| Katherine J. Poppe | $100,000.00 | 46 | 20 | 152 | | 218 | 218 | 32.01% | 34.49% |
| Micah L. Camden | | 14 | 0 | | | 14 | 14 | 2.06% | 2.22% |
| Basil Bullard | $350,000.00 | 15 | 70 | 8 | | 93 | 93 | 13.66% | 14.72% |
| Gary "Chip" Rothenberger, Jr. | $50,000.00 | 15 | 10 | | | 25 | 25 | 3.67% | 3.96% |
| W.P. Price Tax and Accounting, LLC | $50,000.00 | 1 | 10 | 51 | | 62 | 62 | 9.10% | 9.81% |
| Stephanie Thornton | | 0 | 0 | | 14 | 14 | 0 | 2.06% | 0.00% |
| Jessica Kulp | | 0 | 0 | | 14 | 14 | 0 | 2.06% | 0.00% |
| Cami Justice | | 0 | 0 | | 7 | 7 | 0 | 1.03% | 0.00% |
| Yasuko Johnson | | 0 | 0 | | 7 | 7 | 0 | 1.03% | 0.00% |
| Alec Cornejo | | 0 | 0 | | 7 | 7 | 0 | 1.03% | 0.00% |
| Sortis and assigns | | 0 | 0 | 10 | | 10 | 10 | 1.47% | 1.58% |
| Flipswitch Management Group, LLC | | | | 10 | | 10 | 10 | 1.47% | 1.58% |
| Sortis | $1,000,000.00 | 0 | 200 | 152 | | 200 | 200 | 29.37% | 31.65% |
| **Total** | **$1,550,000.00** | **91** | **310** | **231** | **49** | **681** | **632** | **100.00%** | **100.00%** |

**Total Units Outstanding (post-closing):**  681

**Price per new common unit:**  $5,000.00

# EXHIBIT I

# Management and Compensation of Reorganized Debtor's Officers

**Exhibit I - Page 1 of 2**

Case 20-32485-pcm11    Doc 149    Filed 11/19/20

## Board of Directors

Katherine J. House

William Price

Butch Bannon


## Officers

Katherine J. House, CEO (yearly compensation: $150,000.00)

William Price, CFO (yearly compensation: $150,000.00)

# EXHIBIT J

# Liquidation Analysis

# Blue Star Doughnuts, LLC
## Liquidation Analysis

The Debtor provides this liquidation analysis to allow Creditors to compare their proposed treatment under the Plan to their treatment in a hypothetical liquidation. This liquidation analysis is projected as of November 23, 2020 ("**Valuation Date**"), which is the date of the hearing scheduled before the Bankruptcy Court to consider confirmation of the Plan.

## Liquidation Value of Debtor's Assets

The Debtor's principal assets consist of cash on hand, accounts receivable, inventory, machinery and equipment, and intangible assets.

Although precise values are attributed to some of the Debtor's relevant assets, the valuation of the Debtor's various assets are inherently uncertain; may have changed since the dates of any appraisals referred to below; and may be affected by circumstances not contemplated by the appraisal reports, such as the economic impact of the Covid-19 pandemic. Therefore, although the Debtor considers the following data the best available evidence of the liquidation value of its assets, the Debtor makes no warranty as to the accuracy of the valuations or whether the asset values could be achieved on the Valuation Date.

1. **Cash on Hand**: According to the Debtor's projections, the Debtor expects to have $173,716.34 in Cash available in its deposit accounts on the Valuation Date, with $20,393.23 in a deposit account with Commerce Bank and the remainder in deposit accounts with Wells Fargo. Collectively, the Debtor's Cash on hand constitutes collateral of Wells Fargo and Commerce Bank.

2. **Accounts Receivable**: According to the Debtor's projections, the Debtor expects to have approximately $42,000 in outstanding and collectible accounts receivable on the Valuation Date on account of its wholesale sales to grocery stores. These accounts receivables are subject to Commerce Bank's first-priority security interest for amounts due under the Commerce Bank Operating Line of Credit.

3. **Inventory**: According to the Debtor's projections, the Debtor expects to have inventory of *de minimis* value on the Valuation Date. This inventory is subject to Commerce Bank's first-priority security interest for amounts due under the Commerce Bank Operating Line of Credit.

4. **Ford Transit Vehicles**: The book values for the Ford Transit Vehicles are $11,190; $11,190; and $23,732, for a total of $46,112.00. The Ford Transit Vehicles are each subject to a first-priority purchase-money security interest in favor of Ford Motor Credit Company pursuant to the Ford Transit Installment Contracts, on account of which the Debtor owes, in the aggregate, $50,442.83.

5. **Machinery and Equipment**: At the request of Commerce Bank, Pahl Industrial, Inc. conducted an appraisal ("**Pahl Appraisal**") of the Debtor's machinery and equipment that included a physical examination of all accessible equipment at most of the Debtor's locations on July 1, 2020. See Declaration of Dan Pahl, Dkt. 79. The Pahl Appraisal concluded that the Debtor's machinery and equipment had a total forced liquidation

value of $150,000 and a total orderly liquidation value of $181,845 as of July 13, 2020. To the extent there are additional items of equipment in Debtor's possession that were not included in the Pahl Appraisal (*i.e.*, some office computer equipment), the liquidation value is *de minimus* and will not be considered for the purposes of this analysis.

6.      **Intangible Assets**:  The Debtor believes that the approximate fair market value of its intangible assets, including its intellectual property and goodwill, is $540,000.  See Declaration of William Price, Dkt. 71 at ¶19.  However, in either an orderly or forced liquidation scenario, the ultimate value of the Debtor's intangible assets is difficult to ascertain but likely greater than *de minimis*.

7.      **Avoidance Claims:** The Debtor believes that the approximate face value of potentially viable Avoidance Claims is $241,000, and that the estimated value of the Avoidance Claims, less litigation costs and collection risks, is $100,000.

None of the foregoing values account for the costs of sale, and certain of the valuations include only a fair market or orderly liquidation value, and not a forced sale value.  In Debtor's counsel's experience, costs of sale (including commissions, title insurance, escrow, and closing costs (where applicable), marketing expenses, and the like) typically total around 10% of the price of an asset, and forced sales typically result in significantly lower sale prices than orderly liquidations.  Accordingly, (i) certain items in the following table summarizing the Debtor's liquidation analysis (*i.e.*, inventory, Ford Transit Vehicles, machinery & equipment) are reduced by 10% for costs of sale in the "Adjusted" column, and (ii) for certain items as to which the Debtor has only fair market value estimates or book value (*i.e.*, inventory, Ford Transit Vehicles, machinery & equipment), the forced sale value is assumed to be 25% less than the estimated fair market value or book value of the asset.  No such discounts were applied to the Cash, accounts receivable, or Avoidance Claims.

Taking these factors into account, the Debtor estimates the orderly and the forced liquidation values of the property in the Bankruptcy Estate are as follows:

# Blue Star Doughnuts, LLC
## Liquidation Analysis

| Liquidation Analysis—Summary of Recovery Scenarios | | | | |
|---|---|---|---|---|
| Asset | OLV | OLV - Adjusted | Forced Sale | Forced Sale - Adjusted |
| Cash | $173,716.34 | $173,716.34 | $173,716.34 | $173,716.34 |
| Accounts Receivable | $42,000.00 | $42,000.00 | $42,000.00 | $42,000.00 |
| Inventory | *De minimis* | *De minimis* | *De minimis* | *De minimis* |
| Ford Transit Vehicles | $46,112.00 | $41,500.80 | $34,584.00 | $31,125.60 |
| Machinery & Equipment | $181,845.00 | $163,660.50 | $150,000.00 | $135,000.00 |
| Intangible Assets | *Difficult to ascertain; encumbered; subject to locating willing buyer* | *Difficult to ascertain; encumbered; subject to locating willing buyer* | *Difficult to ascertain; encumbered; subject to locating willing buyer* | *Difficult to ascertain; encumbered; subject to locating willing buyer* |
| Avoidance Claims | $100,000.00 | $100,000.00 | $100,000.00 | $100,000.00 |
| **TOTALS** | **$543,673.34** | **$520,877.64** | **$500,300.34** | **$481,841.94** |

The Debtor cannot predict where within these ranges of values (from a low of $481,841.94 to a high of $543,673.34) an actual liquidation of the Debtor would fall, particularly given the inherent uncertainty as to the value of the Debtor's intangible assets. Moreover, in light of the unprecedented economic environment, it is possible that the actual liquidation value of the Debtor's assets would be less than $481,841.94.

## Treatment of Creditors

The treatment of the Debtor's Creditors is even more difficult to predict in a hypothetical liquidation because, in addition to the uncertainty regarding the value of the Debtor's assets, in the context of a liquidation the largest unsecured Claims against the Debtor are either disputed in the case of Morrison Development, LLC's Claim or contingent in the case of Commerce Bank's PPP Claim, and the Debtor cannot predict the ultimate outcome of such disputes and contingencies. ***Solely for purposes of this analysis,*** the Debtor assumes that (i) the Commerce Bank Secured Claim will be fixed at $285,305.61; (ii) the Morrison Development Claim will be fixed at $330,000.00, and (iii) the Debtor will obtain 100% forgiveness of the PPP Loan.

# Blue Star Doughnuts, LLC
## Liquidation Analysis

For purposes of this analysis, (i) the Debtor does not account for Allowed Administrative Expense Claims, which are presently unknown but will likely increase in the event of a liquidation because legal professional fees will not be subject to Stoel Rives Post-petition Fee Cap; and (ii) the Debtor assumes that upon liquidation, the Wells Fargo Secured Claim is funded from available Cash in the Wells Fargo deposit accounts; the Commerce Bank Secured Claim is funded first from the Cash available in the Commerce Bank operating account, second from the remaining Cash in the Wells Fargo deposit accounts, and third from the liquidation of accounts receivable, inventory, machinery & equipment, and intangible assets, in that order; the Ford Motor Credit Company Secured Claim is funded from the liquidation of the Ford Transit Vehicles; and the Multnomah County Claim is funded from the liquidation of Debtor's personal property. Each of the remaining Classes of Creditors shall then be funded *pro rata* with any available liquidation proceeds remaining.

Based on these assumptions and liquidation values, the Debtor anticipates that the Allowed Claims against and Allowed Equity Interests in the Debtor would receive the distributions from liquidation proceeds as set forth below.

| Claims | Chapter 11 Plan | OLV | OLV - Adjusted | Forced Sale | Forced Sale - Adjusted |
|---|---|---|---|---|---|
| 1: Commerce Bank Secured Claim | $285,305.61**** | $285,305.61**** | $269,249.27*** | $255,588.77*** | $240,588.77*** |
| 2: Wells Fargo Secured Claim | Unimpaired | $106,582.43* | $106,582.43* | $106,582.43* | $106,582.43* |
| 3: Ford Motor Secured Claim | Unimpaired | $46,112.00*** | $41,500.80*** | $34,584.00*** | $31,125.60*** |
| Multnomah County Claim | $3,545.14* | $3,545.14* | $3,545.14* | $3,545.14* | $3,545.14* |
| Allowed Priority Tax Claims | $5,943.76* | $5,943.76* | $5,943.76* | $5,943.76* | $5,943.76* |
| 4: Priority Unsecured Claims | $369.72* | $369.72* | $369.72* | $369.72* | $369.72* |
| 6: Morrison Development Claim | $330,000.00** | $57,980.30*** | $52,345.66*** | $50,309.61*** | $48,613.44*** |
| 7: General Unsecured Claims | $157,000.00** | $28,345.48*** | $28,306.82*** | $30,342.87*** | $32,039.04*** |
| 8: Equity Interests | Retain Equity Interests | $0.00 | $0.00 | $0.00 | $0.00 |

\* Payment in full on Effective Date; unimpaired
\*\* Payment in full; impaired by terms of payment

# Blue Star Doughnuts, LLC
## Liquidation Analysis

\*\*\* Partial payment; impaired
\*\*\*\* Stipulated amount, does not include post-petition attorney fees, the reasonableness of which are disputed by the Debtor.

As indicated above, the Wells Fargo Secured Claim would most likely be Paid in Full, with or without confirmation of the Plan, but the other secured Claims—including those in Classes 1 and 3—are likely to receive a reduced payment in an orderly liquidation and a relatively small percentage payment in a forced sale scenario, while unsecured Claims, such as those in Classes 6 and 7, are likely to receive far less in an orderly liquidation or a forced sale than their proposed treatment under the Plan.

Equity Interests Holders in the Debtor would not receive any distributions on account of their Equity Interests in the Debtor under any of these scenarios, except that under the Plan they would retain their membership units, and in any liquidation or forced sale scenario their Equity Interests would be cancelled.

For these reasons, the Debtor submits that confirmation of the Plan is in the best interests of its Creditors and satisfies the "best interests test" with respect to the holders of its Equity Interests for purposes of section 1129(a)(7) of the Bankruptcy Code.